UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| NATIONAL RAILROAD PASSENGER CORP. and BNSF RAILWAY COMPANY, | ) ) ) |
| Plaintiffs, | ) ) |
| and | ) ) |
| EVERETT OWEN, et al., | ) ) ) |
| Intervenor-Plaintiffs, | ) ) |
| v. | ) ) ) Case No. 16-cv-1094-JTM-TJJ |
| CIMARRON CROSSING FEEDERS, LLC, | ) ) ) |
| Defendant, | ) ) |
| and | ) ) |
| NATIONAL RAILROAD PASSENGER CORP. d/b/a AMTRAK; and BNSF RAILWAY COMPANY, | ) ) ) ) |
| Defendants and Intervenor-Defendants. | ) ) ) |

## MEMORANDUM AND ORDER

This matter is before the Court on Intervenor-Plaintiffs' Motion to Compel Inspection of Locomotive Headlight (ECF No. 222).[1] Intervenor-Plaintiffs request an order compelling daytime and night-time inspections of the headlight of the Amtrak locomotive involved in the derailment at issue, or a "substantially similar locomotive," and permitting sight distance, conspicuity, and illumination testing of the headlight. Plaintiffs National Railroad Passenger Corp. ("Amtrak") and BNSF Railway Co. (collectively "Railroad Plaintiffs") oppose the motion

---

[1] For a more detailed discussion of the facts, see the Court's December 19, 2016 Memorandum & Order (ECF No. 82). *Nat'l R.R. Passenger Corp. v. Cimarron Crossing Feeders, LLC*, No. 16-CV-1094-JTM-TJJ, 2016 WL 7336409, at *1 (D. Kan. Dec. 19, 2016).

on several grounds. As set forth below, the Court denies the motion on relevance and proportionality grounds.

## I. DUTY TO CONFER

Fed. R. Civ. P. 37(a)(1) requires any motion to compel discovery to include a "certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." In conjunction with Fed. R. Civ. P. 37, District of Kansas Local Rule 37.2 provides:

> The court will not entertain any motion to resolve a discovery dispute pursuant to Fed. R. Civ. P. 26 through 37, . . . unless the attorney for the moving party has conferred or has made reasonable effort to confer with opposing counsel concerning the matter in dispute prior to the filing of the motion. Every certification required by Fed. R. Civ. P. 26(c) and 37 and this rule related to the efforts of the parties to resolve discovery or disclosure disputes must describe with particularity the steps taken by all attorneys to resolve the issues in dispute.
>
> A "reasonable effort to confer" means more than mailing or faxing a letter to the opposing party. It requires that the parties in good faith converse, confer, compare views, consult, and deliberate, or in good faith attempt to do so.

The purpose of the local rule is to encourage the parties to satisfactorily resolve their discovery disputes prior to resorting to judicial intervention.[2]

The Court finds Intervenor-Plaintiffs' stated efforts to confer before filing their motion appear minimal. Intervenor-Plaintiffs state in the body of their motion: "[c]ounsel certifies . . . that he conferred with [Railroad Plaintiffs'] counsel via telephone call regarding the inspection at issue . . . and that the parties were unable to resolve the dispute regarding the inspection . . . ."[3] At the end of their Motion, Intervenor-Plaintiffs add a "Meet and Confer Statement," certifying

---

[2] *Pro Fit Mgmt., Inc. v. Lady of Am. Franchise Corp.*, No. 08-CV-02662-JAR-DJW, 2011 WL 5825423, at *1 (D. Kan. Nov. 17, 2011).

[3] Mot. at 1, ECF No. 222.

that their counsel met and conferred with Railroad Plaintiffs' counsel "telephonically on August 17, 2017."[4]

Railroad Plaintiffs describe the meet and confer efforts differently. They contend their counsel had informal discussions with Intervenor-Plaintiffs' counsel regarding the request for a train headlight inspection before the request to inspect was served on August 11, 2017, but no agreement was reached. Railroad Plaintiffs contend that, while their counsel and Intervenor-Plaintiffs' counsel did have a telephone conference on August 17, 2017, they did not specifically discuss the terms of Intervenor-Plaintiffs' request to inspect the locomotive headlight.

Intervenor-Plaintiffs served their Request to Inspect Locomotive Headlight via email on August 11, 2017.[5] Under Fed. R. Civ. P. 34(b)(2)(A), Railroad Plaintiffs' response to this request to inspect the headlight was due within 30 days, on September 11, 2017. Intervenor-Plaintiffs filed the instant motion on September 6, 2017, before Railroad Plaintiffs had served their response.

The Court does not condone Intervenor-Plaintiffs filing their motion to compel before Railroad Plaintiffs served their written objections to the request to inspect the locomotive headlight. Intervenor-Plaintiffs' motion to compel was premature, filed without the knowledge of Railroad Plaintiffs' specific written objections. Nonetheless, Intervenor-Plaintiffs allege there were discussions between the parties over the last several months regarding their request for a locomotive headlight inspection, and Railroad Plaintiffs acknowledge at least one such discussion took place. The Court therefore finds Intervenor-Plaintiffs have *minimally* satisfied their D. Kan. Rule 37.2 duty to confer and will take up the motion on its merits.

---

[4] *Id.* at 2.

[5] *See* Req. to Inspect Locomotive Headlight, ECF No. 223-1.

## II.     RAILROAD PLAINTIFFS' SUBSTANTIVE OBJECTIONS TO THE REQUESTED LOCOMOTIVE HEADLIGHT INSPECTION

Railroad Plaintiffs object that Intervenor-Plaintiffs' requested locomotive headlight inspection will be conducted under conditions that did not exist at the time of the derailment and the results therefore cannot be relevant to the claims or defenses in this case. They also object that the request is burdensome, harassive, and seeks discovery that is not proportional to the needs of the case. They contend the requested inspections would subject Amtrak to the undue burden and excessive expense of removing a locomotive from service and normal business operations, and would subject non-party, fare-paying Amtrak passengers to delays and significant disruption. Finally, Railroad Plaintiffs assert Intervenor-Plaintiffs have ample evidence of the actual conditions at the time of the derailment that Intervenor-Plaintiffs' experts can utilize effectively to reach their opinions. They note this evidence includes the locomotive video depicting the subject train approaching the derailment scene, which shows the actual visibility, lighting conditions and track conditions involved in the derailment.

Intervenor-Plaintiffs argue that the conspicuity of the locomotive's headlight is one of the central questions to their claims against Amtrak. They contend an inspection and test of the headlight is important to accurately determine what the train crew saw or should have seen in front of them, at what distance the track defect was visible, and whether the train crew saw or should have seen the defect in sufficient time to apply the emergency brakes and slow or stop the locomotive to prevent the derailment.

### A.     Relevancy Objection

Intervenor-Plaintiffs argue that the requested locomotive headlight inspection would provide information relevant to the following claims against Amtrak: (1) failing to keep a proper lookout prior to the derailment; (2) failing to slow or stop the train to avoid "a specific,

individual hazard" prior to the derailment and/or failing to approach the derailment site prepared to stop due to "an essentially local safety hazard;" and (3) failing to immediately apply the emergency brakes. They argue "[t]he ability of the train crew to see the defect in enough time to stop prior to the defect or substantially reduce speed so as [not to] derail the train or substantially reduce the derailment forces is critically relevant to this case and related to [their negligence] claims."[6]

Intervenor-Plaintiffs request four hours for their headlight inspection, two hours during daylight hours and two hours during the night-time. Thus, the Court will first consider Railroad Plaintiffs' relevance objection to the proposed daytime headlight inspection of the subject locomotive's headlight. Railroad Plaintiffs challenge the relevance of a headlight inspection during daylight hours as the derailment at issue occurred shortly after midnight. Intervenor-Plaintiffs have not explained why a daytime inspection of the headlight is needed or what additional relevant information it would provide. The Court therefore sustains Railroad Plaintiffs' relevancy objection to Intervenor-Plaintiffs' request for a daylight inspection of the locomotive headlight.

Railroad Plaintiffs also dispute the relevance of a night-time inspection of the headlight from the subject locomotive or a "substantially similar locomotive." With respect to a night-time inspection, Railroad Plaintiffs argue that any information obtained from such inspection and testing would not be relevant because the track defect has been repaired and the exact conditions on the night of the derailment cannot be re-created. Railroad Plaintiffs also contend Intervenor-Plaintiffs are seeking to compel the inspection of "some random locomotive to assess the

---

[6] ECF No. 240 at 3.

5

visibility of a defect that no longer exists under conditions that did not exist on the night of the derailment."[7]

The Court finds Railroad Plaintiffs have raised valid concerns regarding the relevancy of information that potentially could be obtained from an inspection of a "substantially similar locomotive" headlight or even of the actual headlight of the subject locomotive. Intervenor-Plaintiffs never address the changed conditions of the track at issue. Railroad Plaintiffs are correct that the defect in the track has been repaired. Intervenor-Plaintiffs simply cannot recreate the condition of the defective track to inspect and test whether the defect could have been seen or reacted to, at any particular distance. The Court also questions Intervenor-Plaintiffs vague assertion that they could closely approximate the night-time visibility conditions on the night of the derailment for purposes of measuring how far the locomotive's headlight illuminates the track. The Court has additional concerns regarding the plausibility of identifying and utilizing a "substantially similar locomotive" headlight for inspection and testing purposes. Again, it may be impossible to accurately and reliably recreate the illumination of the actual locomotive headlight on the night of the derailment using a "substantially similar locomotive" headlight. For example, differences in the age, placement, and quality of individual locomotive headlights, among other differences, even if the locomotive's headlight lamps are the same wattage and voltage, call into question how relevant any data from a "substantially similar locomotive" headlight would be in this case.

The Court thus sustains Railroad Plaintiffs' relevance objection to inspection of a "substantially similar locomotive" headlight. Additionally, with regard to Intervenor-Plaintiffs' proposed night-time inspection of the actual locomotive headlight at issue, due to the repair of

---

[7] ECF No. 231 at 15.

the track defect and the inability to recreate conditions the night of the derailment, the Court finds the requested inspection will likely yield information of only potentially marginal relevance to the claims in this case. The Court turns now to the proportionality analysis of this request.

### B. Proportionality Objection

Railroad Plaintiffs also object that the disproportionate burden and prejudice upon them to coordinate a night-time headlight inspection of the Amtrak locomotive at issue outweighs any possible benefit an inspection may yield. They contend the Court should therefore deny Intervenor-Plaintiffs' request on proportionality grounds.

Federal Rule of Civil Procedure 26(b)(1) allows parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." As further provided in the Rule, proportionality is to be determined by considering, to the extent they apply, the following six factors: (1) the importance of the issues at stake in the action, (2) the amount in controversy, (3) the parties' relative access to relevant information, (4) the parties' resources, (5) the importance of the discovery in resolving the issues, and (6) whether the burden or expense of the proposed discovery outweighs its likely benefit.[8]

Rule 26(b)(1) was amended effective December 1, 2015. One of the changes restored proportionality to the definition of the scope of discovery and was intended to reinforce the parties' Rule 26(g) obligation to consider the proportionality factors in discovery.[9] The advisory committee's note to the 2015 amendments clarified that "the change does not place on the party

---

[8] Fed. R. Civ. P. 26(b)(1); *Fish v. Kobach*, No. 15-9300-JAR-JPO, 2016 WL 893787, at *1 (D. Kan. Mar. 8, 2016).

[9] Fed. R. Civ. P. 26(b) advisory committee's note to the 2015 amendment.

7

seeking discovery the burden of addressing all proportionality considerations."[10] The party resisting discovery bears the burden to support its objections based upon proportionality; it cannot refuse discovery "simply by making a boilerplate objection that [the discovery sought] is not proportional."[11]  The advisory committee's note also recognizes the parties may have "informational asymmetry," meaning that one party may have very little information on a specific factor, while the other party may have vast amounts of information.  For example, a party claiming undue burden or expenses ordinarily has far better information —perhaps the only information—with that aspect of the [proportionality] determination."[12]  On other proportionality factors, the party seeking the discovery by claiming that a request is important to resolve the issues "should be able to explain the ways in which the underlying information bears on the issues as that party understands them."[13]

Railroad Plaintiffs cite three cases from other Districts analyzing the Rule 26 proportionality requirement in an inspection context.[14] Those cases found the requested inspection, or certain steps of the inspection, would be disproportionately burdensome even

---

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *See, e.g., United States v. 400 Acres of Land,* No. 2:15-cv-01743-MMD-NJK, 2017 WL 955187, at *1–3 (D. Nev. Mar. 10, 2017) (denying motion to compel inspection of land near a classified national defense area where court determined that requested inspection was not proportional to the needs of the case); *Lopez v. United States*, No. 15-CV-180-JAH(WVG), 2017 WL 1062581, at *6 (S.D. Cal. Mar. 21, 2017) (denying attorney's request to inspect elevator platform aboard U.S. Navy warship finding requested inspection was not proportional to the needs of the case given the quality of the discovery already provided and defendant's willingness to stipulate to critical facts); *Duvall v. BOPCO, L.P.*, No. CV 15-2404, 2016 WL 1268343, at *2 (E.D. La. Apr. 1, 2016) (finding three steps of plaintiff's proposed inspection of barge equipment were unduly burdensome, hazardous, and disruptive of barge owner's operations in a manner that outweighed their likely benefit to the case).

where the inspection could potentially uncover relevant evidence. The Court has reviewed those cases and finds them helpful to its analysis. While the cases are all factually distinguishable, the Court agrees that a proportionality analysis in inspection cases such as these requires balancing "the degree to which the proposed inspection will aid in the search for truth" against the burdens and dangers created by it.[15]

Consistent with the above-cited cases, the Court will focus its Rule 26(b)(1) proportionality analysis on the fifth and sixth factors discussed above. After careful consideration of these factors, the Court concludes the heavy burden and expense that would be imposed on Railroad Plaintiffs from the proposed inspection outweighs any potential benefit of evidence that might be obtained by Intervenor-Plaintiffs. Railroad Plaintiffs have demonstrated that it would be unduly burdensome and expensive to take the subject Amtrak locomotive out of service for the length of time necessary to conduct such night-time inspection and that conducting the inspection while the train is in service would not be feasible due to the impact on Amtrak's passengers. In their reply, Intervenor-Plaintiffs state they are willing to conduct the inspection at the derailment scene or another mutually convenient location where there is tangent track for at least a mile, similar to the track at the derailment site. But this concession does not obviate the burden or expense that Railroad Plaintiffs would incur in arranging the inspection or in actually removing the subject locomotive from service for inspection. Additionally, moving the inspection to a location different from where the derailment occurred would further minimize the potential relevance and reliability of the information and data obtained.

With regard to the "importance" proportionality factors, Intervenor-Plaintiffs have not convinced the Court of the importance of the discovery to be obtained from the requested

---

[15] *400 Acres of Land*, 2017 WL 955187, at *2; *Lopez*, 2017 WL 1062581, at *3.

9

headlight inspection in resolving Intervenor-Plaintiffs' claims against Amtrak. As Railroad Plaintiffs point out, Intervenor-Plaintiffs have access to video evidence from the lead locomotive on the subject Amtrak train, which was equipped with an LDVR video that recorded the train traveling over the damaged track at the derailment site. The video of the actual derailment shows the visibility of the track conditions at the time of the derailment from the vantage point of the train crew. This video shows two seconds elapsed between when the track defect is first visible on the video and when the locomotive swayed as it passed over the misalignment of the track traveling 60 mph. The video reflects the "actual" conditions and defect on the night of the accident. On the other hand, it is simply not possible for Intervenor-Plaintiffs to recreate these conditions with their requested inspection.

There are also numerous photographs and other measurements, taken at the derailment scene on the night of the incident and the day after, which have been provided to Intervenor-Plaintiffs. The event recorder data from the subject locomotive has been provided in discovery, which documented the speed, distance traveled and operating events of the train's movement. Intervenor-Plaintiffs have inspected the rails that were damaged in the derailment and conducted a two-day inspection of the derailment area. This inspection included riding 10 miles of tracks in a hy-rail vehicle, detailed surveying of the trackage at the derailment scene, scanning the rails and taking aerial photographs.

Intervenor-Plaintiffs assert that a physical inspection and testing of the headlight is still needed because the locomotive video was recorded at a low resolution and the video would not accurately depict what can be seen by the human eye, such reflections on the rail as the normal human eye would see. They also claim the video does not show what the train crew were actually viewing as they approached the track defect due to the poor quality of the locomotive video.

10

They argue the NTSB report describes when the video first depicts the defect, not when the defect is visible to the train crew.

Irrespective of the purported poor quality, low resolution, and other limitations of the locomotive video depicting the train approaching and traveling over the track defect, there is significant information and data available to Intervenor-Plaintiffs. The Court is not persuaded that the requested inspection would yield additional relevant and reliable information. As noted in the relevance discussion above, the Court has concluded that the data and information Intervenor-Plaintiffs might obtain through the requested inspection is of only potentially marginal relevance to the issues of when the train crew saw or should have seen the track defect and whether they could have prevented the derailment. While these are important issues at stake in this case, the Court is not convinced that the proposed inspection would be probative to establish the distance at which the Amtrak train crew saw or should have seen—while traveling 60 mph on a different night—a track defect described as a "displacement of the railroad tracks of over one foot."[16]

When considering the burden of the requested inspection and the availability of other evidence, as compared with the likely benefit to be obtained, the Court concludes the requested inspection is not proportional to the needs of the case and Railroad Plaintiffs should not be compelled to permit the requested inspection of the locomotive headlight.

**IT IS THEREFORE ORDERED THAT** Intervenor-Plaintiffs' Motion to Compel Inspection of Locomotive Headlight (ECF No. 222) is DENIED.

---

[16] *See* Complaint ¶ 17 (ECF No. 1).

**IT IS FURTHER ORDERED THAT** each party shall bear its own expenses related to this motion.

**IT IS SO ORDERED.**

Dated October 19, 2017, at Kansas City, Kansas.

*Teresa J. James*
Teresa J. James
U. S. Magistrate Judge