UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| NATIONAL RAILROAD PASSENGER | ) | |
| CORP. and BNSF RAILWAY COMPANY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| and | ) | |
| | ) | |
| EVERETT OWEN, | ) | |
| et al., | ) | |
| Intervenor-Plaintiffs, | ) | |
| v. | ) | Case No. 16-cv-1094-JTM-TJJ |
| | ) | |
| CIMARRON CROSSING FEEDERS, LLC, | ) | |
| | ) | |
| Defendant, | ) | |
| and | ) | |
| | ) | |
| NATIONAL RAILROAD PASSENGER CORP. | ) | |
| d/b/a AMTRAK; and BNSF RAILWAY | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants and | ) | |
| Intervenor-Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the Motion for Protective Order Regarding Intervenor-

Plaintiffs' Third Notices of Video Deposition Duces Tecum of Corporate Designee(s) (ECF No.

237) ("Motion for Protective Order") filed by Plaintiffs National Railroad Passenger Corporation

("Amtrak") and BNSF Railway Company ("BNSF") (jointly "Railroad Plaintiffs"). As set forth

below, the motion is granted in part and denied in part.

## I. FACTS RELEVANT TO THE DEPOSITION TOPICS AND DOCUMENT REQUESTS AT ISSUE[1]

On September 19, 2017, Intervenor-Plaintiffs served their third notices of Rule 30(b)(6) video depositions on Amtrak and BNSF ("Notices").[2] The Notice served upon Amtrak set out nine areas of inquiry ("Topics") and ten requests for production of documents ("Requests") concerning issues related to train crew performance and visibility (Exhibit C), and another ten Topics and eleven Requests concerning incentive bonuses (Exhibit D).[3] The Notice served upon BNSF set out six Topics and six Requests concerning issues regarding passenger operations (Exhibit C); ten Topics and eleven Requests concerning incentive bonuses (Exhibit D); five Topics and six Requests concerning BNSF specific track repairs (Exhibit E); and twenty-three Topics and nine Requests concerning derailment analysis and education (Exhibit F).[4]  In response, on October 2, 2017, Railroad Plaintiffs timely filed their Motion for Protective Order.

## II. OBJECTIONS TO THE DEPOSITION TOPICS AND DOCUMENT REQUESTS

Railroad Plaintiffs request a protective order prohibiting discovery into, or alternatively limiting, the deposition Topics and Requests set out in Exhibits C[5] and D to the Notice served on Amtrak, and Exhibits C, D, E, and F to the Notice served upon BNSF. Railroad Plaintiffs also

---

[1] For a more detailed discussion of the facts, see the Court's December 19, 2016 Memorandum & Order (ECF No. 82). *Nat'l R.R. Passenger Corp. v. Cimarron Crossing Feeders, LLC*, No. 16-CV-1094-JTM-TJJ, 2016 WL 7336409, at *1 (D. Kan. Dec. 19, 2016).

[2] *See* Certificate of Service, ECF No. 230.

[3] *See* Third Notice of Video Dep. Duces Tecum of Corporate Designee(s) for Amtrak, ECF No. 237-1.

[4] *See* Third Notice of Video Dep. Duces Tecum of Corporate Designee(s) for BNSF, ECF No. 237-2.

[5] Intervenor-Plaintiffs have withdrawn Exhibit C Topic 2 to Amtrak. *See* ECF No. 244 at 3 n. 1.

object to the Intervenor-Plaintiffs' stated intent to live internet stream the depositions and the unilateral noticing of the depositions. The Court will address each of Railroad Plaintiffs' global and specific objections in turn below.

### A.    Relevant Rules and Law

Before addressing Railroad Plaintiffs' objections to specific Topics and Requests, the Court sets out the relevant Rules applicable to its rulings.

Federal Rule of Civil Procedure 26(b)(1) sets out the general scope of discovery:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

When a party seeks to depose an organization, Rule 30(b)(6) requires that the deposition notice "describe with reasonable particularity the matters for examination." This means the requesting party must take care to designate, with painstaking specificity, the particular subject areas that are intended to be questioned, and that are relevant to the issues in dispute.[6] If the deponent "cannot identify the outer limits of the areas of inquiry noticed, compliant designation is not feasible."[7]

Rule 34(b)(1)(A) likewise requires that a request for production "must describe with reasonable particularity each item or category of items to be inspected." Though what qualifies as "reasonabl[y] particular" depends at least in part on the circumstances of each case, a

---

[6] *Sprint Commc'ns Co., L.P. v. Theglobe.com, Inc.*, 236 F.R.D. 524, 528 (D. Kan. 2006); *E.E.O.C. v. Thorman & Wright Corp.*, 243 F.R.D. 421, 426 (D. Kan. 2007).

[7] *Reed v. Bennett*, 193 F.R.D. 689, 692 (D. Kan. 2000).

discovery request should be sufficiently definite and limited in scope that it can be said "to apprise a person of ordinary intelligence what documents are required and [to enable] the court . . . to ascertain whether the requested documents have been produced."[8]

When ruling on relevance objections, the court construes relevance "broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on" any party's claim or defense.[9] If the discovery sought appears relevant on its face, the party resisting discovery has the burden to establish the lack of relevancy by demonstrating that the requested discovery (1) does not come within the scope of relevancy as defined under Fed. R. Civ. P. 26(b)(1), or (2) is of such marginal relevancy that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure.[10] Conversely, when the relevancy of the discovery request is not readily apparent on its face, the party seeking the discovery has the burden to show the relevancy of the request.[11] Relevancy determinations are generally made on a case-by-case basis.[12] The party objecting to discovery bears the burden to support its objections.[13]

---

[8] *Regan–Touhy v. Walgreen Co.*, 526 F.3d 641, 649–50 (10th Cir. 2008) (quoting 8A Wright & Miller, Federal Practice & Procedure § 2211).

[9] *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).

[10] *Gen. Elec. Cap. Corp. v. Lear Corp.*, 215 F.R.D. 637, 640 (D. Kan. 2003).

[11] *McBride v. Medicalodges, Inc.*, 250 F.R.D. 581, 586 (D. Kan. 2008).

[12] *Brecek & Young Advisors, Inc. v. Lloyds of London Syndicate*, No. 09-cv-2516-JAR, 2011 WL 765882, at *3 (D. Kan. Feb. 25, 2011).

[13] *McCoo v. Denny's, Inc.,* 192 F.R.D. 675, 686 (D. Kan. 2000).

**B.    Amtrak's Objections to Exhibit C Topics and Requests (Train crew performance and visibility)**

In its motion for protective order, Amtrak asserts global objections to all Exhibit C Topics and Requests directed at train crew performance and visibility.  More precisely, Amtrak objects to all Exhibit C Topics and Requests to the extent having its designee testify or producing the documents requested would require the premature disclosure of its experts' opinions. Amtrak contends these Topics and Requests are improper because they would require the designated corporate representative to provide expert testimony that involves the expert analysis and interpretation of the event recorder data and locomotive video at issue in this case. But, in its reply, Amtrak states that on October 10, 2017 (subsequent to filing the motion at issue), it produced John Hines, its Senior Director of Compliance, as its corporate representative to testify concerning train crew performance and visibility. Amtrak asserts that Mr. Hines's testimony included a discussion of the findings made in the NTSB Event Recorder and Onboard Image Recorder Group Factual Report, and submits that Mr. Hines fully addressed the subject matter of Exhibit C in his testimony so there is no further need for any additional testimony concerning Exhibit C Topics.

In Intervenor-Plaintiffs' response, which they filed *after* Mr. Hines's deposition, they argue that their Exhibit C Topics to Amtrak concern one of the central issues relative to Amtrak, which is when the train crew could first see the defect and apply the emergency brakes. They also state their motion to compel locomotive headlight inspection may resolve many of Amtrak's objections to these Topics.[14] Intervenor-Plaintiffs do not respond to Amtrak's objection that the Exhibit C Topics seek expert opinion testimony. Nor does Intervenor-Plaintiffs' response or

---

[14] After Intervenor-Plaintiffs filed their response, the Court denied their motion to compel locomotive headlight inspection (ECF No. 248).

surreply refute Amtrak's assertion that Mr. Hines fully addressed the Exhibit C Topics in his deposition testimony and therefore no further testimony is needed on these Topics.

The Court has not been provided sufficient information to make a determination regarding whether Mr. Hines has in fact testified to the extent required with regard to all Exhibit C Topics. Although Amtrak's assertion to that effect is unrefuted, the assertion was made in Amtrak's reply (after which Intervenor-Plaintiffs filed only a brief surreply that did not address the issue), and the Court has only been provided pages from the Hines deposition substantiating that he was Amtrak's corporate designee, that he had an opportunity before his deposition to review the Exhibit C Topics, and that he was prepared to testify on those Topics during his deposition. Without access to the pages of the Hines deposition questioning regarding the substance of the Exhibit C Topics, the Court cannot determine whether objections were asserted and/or Mr. Hines otherwise refused to answer questions regarding these Topics. The Court will therefore grant Amtrak's request for protective order with respect to the Exhibit C Topics only insofar as Mr. Hines has testified fully with regard to those Topics. Thus, to the extent Mr. Hines has so testified, he (or another Amtrak representative) will not be required to attend another deposition to answer additional questions on those Topics.

With regard to Amtrak's global objections and request for protective order on grounds that the Exhibit C Topics seek expert opinion testimony, the Court finds the request premature. Amtrak cites cases for the proposition that a corporate representative deposition cannot be used to obtain legal conclusions, expert opinion testimony, or information that is protected as attorney work product.[15] However, the Court finds that the cases cited by Amtrak do not support its request for protective order under the facts in this case or the law in this District. In the only case

---

[15] *See* Mot. for Protective Order, ECF No. 237, at 14.

cited by Amtrak from this district, *Independent Service Organizations Antitrust Litigation*,[16] the court's ultimate holding granting a protective order was *not* based upon a finding that the Rule 30(b)(6) deposition notice requested expert opinion testimony but rather upon the overly broad, burdensome topic set out in the deposition notice, and the fact that the information requested could be obtained through other less burdensome methods.

The Court notes it has previously addressed in this case a similar expert opinion objection by Railroad Plaintiffs in response to requests for admission.[17] Railroad Plaintiffs objected that the requests for admission improperly sought premature expert opinions. The Court noted a distinction between a request seeking a party's opinions versus its experts' opinions. The Court found it was improper for Railroad Plaintiffs to deny the requests for admission on this basis, and required Railroad Plaintiffs to answer "with the knowledge and information they presently possess, or can obtain after reasonable inquiry (independent of their experts), and cannot delay their responses until after their expert disclosure deadline."[18]

Amtrak's expert opinion objection does not address the specific information or testimony requested in any of the Exhibit C Topics. The Topics specifically ask for "the railroad's" positions on particular compelled admissions made by Amtrak—positions which may or may not be the same as its experts' positions. Amtrak also has not demonstrated and the Court does not find that any of these Topics, on their face, seek expert opinion testimony. The Court finds that Amtrak's request for protective order on this basis is therefore premature and must be denied.

---

[16] *In re Indep. Serv. Organizations Antitrust Litig.*, 168 F.R.D. 651, 654 (D. Kan. 1996).

[17] ECF No. 166. *Nat'l R.R. Passenger Corp. v. Cimarron Crossing Feeders, LLC*, No. 16-CV-1094-JTM-TJJ, 2017 WL 1408226, at *2 (D. Kan. Apr. 20, 2017).

[18] *Id.* at *3.

**C.      Amtrak's Objections to Exhibit C Topic 8 and Request 8 (NTSB Report)**

Amtrak asserts a specific objection to Exhibit C Topic 8, which seeks testimony "concerning the analysis of how the recorders group reached the conclusions that were included in the report."   Corresponding Request 8 asks Amtrak to produce "[a]ny and all documentation that would suggest the conclusions set forth in the NTSB Event and On-Board Image Recorders Group Factual Report are incorrect."   Amtrak objects to this Topic to the extent it calls for a discussion on the deliberative processes of the National Transportation Safety Board ("NTSB"), which Amtrak claims are not discoverable and it is not permitted to disclose. Intervenor-Plaintiffs do not respond to Amtrak's specific objection to Exhibit C Topic 8 and Request 8 based upon the deliberative process privilege.

With regard to Amtrak's specific objection and request for protective order to the extent that Exhibit C Topic 8 calls for discussion regarding the deliberative processes of the NTSB, Amtrak has not cited any cases in which a non-governmental entity asserted the deliberative process privilege as a basis to withhold a governmental agency's information or documents in discovery.   Even assuming Amtrak could assert such a privilege here and meet all the required elements of the deliberate process privilege, the Court finds Amtrak's request for protective order on this basis premature. In this District, courts generally deny requests for protective orders based upon objections that topics identified in the Rule 30(b)(6) deposition notice will elicit privileged or protected information, unless the requested topics on their face seek protected or privileged testimony:

> Generally speaking, this Court will deny motions for protective order based on objections that the information sought in the deposition is protected by work product immunity or attorney-client privilege, unless the requested topics, on their face, call for testimony invading the work product doctrine or attorney-client privilege. Where the topics do not, on their face, seek protected or privileged testimony, the Court will ordinarily require the deponent to appear for the

deposition and raise any such objections to the specific questions posed. Counsel then has an opportunity to explore background facts concerning the immunity or privilege, and the deponent can substantiate any objections.[19]

The Court notes Amtrak originally stated in its motion that it agreed to produce a representative to discuss its review of the information discussed in the NTSB report. The Court presumes this representative was Mr. Hines, whom Amtrak produced for deposition on October 10, 2017.  Consistent with the general rule set out in *Miller*,[20] the Court will deny Amtrak's request for protective order based simply on the possibility some questions posed during the deposition may raise deliberative process privilege concerns.  Instead, during the deposition, Amtrak may assert any such objections to  specific questions posed to its Rule 30(b)(6) designee(s). Counsel will then have an opportunity to explore background facts concerning the immunity or privilege, and the deponent can substantiate any objections. Amtrak's request for a protective order with respect to Exhibit C Topic 8 and Request 8 is therefore denied.

**D.**    **Amtrak and BNSF's Objections to Exhibit D Topics and Requests (Incentive bonuses)**

Amtrak and BNSF both object to Intervenor-Plaintiffs' Exhibit D Topics and Requests concerning incentive bonuses, arguing that the Court has already addressed this issue and ruled these subject areas are irrelevant and not discoverable. They claim the present Exhibit D Topics and Requests are in violation of the Court's December 19, 2016 Memorandum and Order (ECF No. 82) ("December 19, 2016 Order"), are issued in bad faith, and intended simply to subject it to undue burden and expense.

---

[19] *Miller v. Union Pac. R. Co.*, No. 06-2399-JAR-DJW, 2008 WL 4724471, at *6 (D. Kan. Oct. 24, 2008) (internal citations omitted).

[20] *Id.*

Intervenor-Plaintiffs take issue with Railroad Plaintiffs' characterization of the Court's December 19, 2016 Order. They claim it was solely related to production of the Master Agreement, and the Court did not hold information regarding incentive bonuses was wholesale irrelevant or undiscoverable. Instead, Intervenor-Plaintiffs contend that during oral argument the Court found that even though the Master Agreement was not discoverable, Intervenor-Plaintiffs could still inquire of witnesses about the arrangement between the railroads, Amtrak's incentive payments to BNSF, and the contents of any agreements between the entities. They contend this dictum during oral argument is noted in the Order where the Court stated, "The discovery sought by Intervenor-Plaintiffs can be obtained from the inspection of the track, through depositions, or other discovery."

In its December 19, 2016 Order, the Court did deny Intervenor-Plaintiffs' motion to compel BNSF to produce "the contract that provides track rights for Amtrak to travel over the La Junta Subdivision" ("Master Agreement").  The Court recognized Intervenor-Plaintiffs' contention that the Master Agreement contains information relevant to their claims that the derailment in this case was caused by BNSF's failure to properly inspect and maintain the track and that incentives were offered for keeping the track at a certain Class, which determined the speed at which trains could operate. However, the Court concluded that the potential harm from disclosure of the Master Agreement, which contains proprietary and highly confidential commercial information, outweighed Intervenor-Plaintiffs' need for the Master Agreement.  The Court also did note in the Order that the discovery sought by Intervenor-Plaintiffs could be obtained from the track inspection, through depositions, or other discovery.[21]

---

[21] The Court also notes that, during the October 20, 2016 telephone status conference, it signaled its guidance that Intervenor-Plaintiffs would be entitled to ask interrogatories about any contractual or other obligations that Railroad Plaintiffs have or how they would benefit from continuing to run their trains at certain speeds. Oct. 20, 2016 Tel. Conf. Tr. 73:6–11, ECF No. 256.

Thus, while the Court did rule that the Master Agreement itself was not discoverable, the Court did *not* rule generally, as Railroad Plaintiffs' argue in their reply, that "the subject matter of 'incentive payments' was irrelevant and not discoverable." However, the Court also did *not* rule, as Intervenor-Plaintiffs suggest, that they would be entitled to explore the Railroad Plaintiffs' incentive payments carte blanche. Indeed, in its December 19, 2016 Order, the Court agreed with Railroad Plaintiffs "that this case involves track conditions only in the particular area near Cimarron where the Derailment occurred,"[22] and that "information included in the Master Agreement on incentives for keeping the track at a certain Class would not provide any indication whether the Train was operating at an excess speed at the time of the Derailment."[23] Additionally, the Court's December 19, 2016 Order regarding additional discovery should be read and interpreted in the context of its preceding language:

> the Court has already entered an order which allows the parties to inspect and examine the track where the Derailment occurred and within five miles on both sides of the Derailment, so that Intervenor-Plaintiffs [could] directly assess and evaluate whether the track had been properly maintained prior to the Derailment and whether the track was in a diminished condition that required the Train to be operated at a reduced speed. In short, the discovery sought by Intervenor-Plaintiffs can be obtained from the inspection of the track, through depositions, or other discovery.[24]

The Court has reviewed Intervenor-Plaintiffs' specific Exhibit D Topics and Requests. Many of them go beyond what the Court's Order contemplated and what is relevant to the derailment and particular track at issue in this case. For example, the Exhibit D Topics and Requests include 2012 and 2013 Amtrak Audits (the derailment at issue occurred in 2016), "checkpoints" on the entire La Junta Subdivision (the Court has previously limited discovery

---

[22] Dec. 19, 2016 Order, ECF No. 82 at 6.

[23] *Id.* at 7.

[24] *Id.* at 7-8 (emphasis added).

regarding the track to the vicinity of the derailment near Cimarron, Kansas), and other matters with no specified time period or limitation. The Court finds that, with the exception of BNSF Exhibit D Topics 2 and 9,[25] the Exhibit D Topics and Requests are overly broad, unduly burdensome, and not proportional to the issues in this case. Accordingly, the Court grants Railroad Plaintiffs' request for a protective order precluding inquiry into all Exhibit D Topics and Requests, except BNSF Exhibit D Topics 2 and 9. But these two Topics shall be limited to deposition questioning about the actual or potential incentive bonuses and/or payments to which BNSF may have been entitled at the time of the derailment and for the specific section of track where the derailment occurred.

### E.    BNSF's Objections to Exhibit C Topics and Requests (Passenger Operations)

BNSF objects to all of the Exhibit C Topics and Requests concerning its passenger operations group, and specifically to Topic 5 concerning incentive bonuses, as not reasonably limited in time, not described with "reasonable particularity" as required by Rule 30(b)(6), and as requesting information that is not relevant or proportional to the needs of this case. Exhibit C Topic 5 asks BNSF to produce a corporate designee to testify regarding "who operates as the liaison between Amtrak and BNSF in general, on complaints about track conditions, [and] on payment of 'Incentive Bonuses.'" BNSF also specifically objects to Topic 2, which would require that BNSF produce a witness to discuss the "Wessler PowerPoint," a 2008 BNSF presentation about trespasser prevention at locations such as railroad stations where there are

---

[25] Exhibit D Topic 2 to BNSF seeks testimony regarding how BNSF becomes entitled to "Incentive Bonuses" generally and specifically those related to the La Junta Subdivision. Topic 9 seeks testimony on how "Slow Orders" and substandard track conditions affect "Incentive Payments." BNSF Notice, ECF No. 237-2.

pedestrian activities. BNSF contends these Topics are intended for no purpose other than to subject it to undue burden and expense.

Intervenor-Plaintiffs argue that inquiry into BNSF's passenger operations group, its interactions with Amtrak, and its documentation of complaints about track conditions on this section of track for the years 2014 through 2016 are relevant to BNSF's prior knowledge of substandard track conditions for the operation of high-speed passenger trains on this section of track. They claim that Richard Wessler, BNSF's Director of Passenger Operations, has previously provided a declaration stating he is the liaison between BNSF and Amtrak and summarizing six categories of Wessler's job responsibilities. Intervenor-Plaintiffs claim their Exhibit C notice simply seeks a BNSF Rule 30(b)(6) designee to testify regarding Mr. Wessler's duties.

The Court sustains BNSF's objections to Exhibit C Topics and Requests concerning its passenger operations group.  BNSF has shown the referenced Exhibit C Topics and Requests are either not reasonably limited in time, not described with reasonable particularity as required by Rule 30(b)(6), and/or request information that is not relevant or proportional to the needs of this case. The Court finds none of the Exhibit C Topics and Requests to BNSF, except Request 3, appear relevant on their face.  Intervenor-Plaintiffs therefore have the burden to demonstrate the relevance of the Topics and Requests. They have not done so with regard to the requested discovery concerning BNSF's passenger operations group personnel, the group's workings, responsibilities, liaison, the referenced "Noel PowerPoint," or the "Wessler PowerPoint." Intervenor-Plaintiffs' bare assertion the Topics and Requests are relevant to "BNSF's prior knowledge of substandard track conditions" is far too general and not sufficient to establish relevance. Intervenor-Plaintiffs' requested inquiry into the Wessler PowerPoint, which concerns

13

pedestrian trespasser accident prevention and bears no relationship to the claims and defenses in this case, is emblematic of the overly broad and unduly burdensome nature of Intervenor-Plaintiffs' Exhibit C Topics and Requests. The Topics and first two Requests are also overly broad and unduly burdensome because they contain no time limit.

The Court will therefore grant BNSF's motion for a protective order precluding inquiry into Exhibit C Topics 1–6, and Requests 1, 2, 4–6. The Court will however deny the motion for protective order with respect to BNSF Exhibit C Request 3 (seeking documentation between Amtrak and BNSF that discussed complaints about track conditions from 2014 to 2016), but will limit this Request to the derailment location and five miles on either side.

### F.    BNSF's Objections to Exhibit E Topics and Requests (BNSF specific track repairs)

#### 1.    Exhibit E Topics 1(b), 2(b), and Request 1(b) (Broken joint bar)

Exhibit E Topic 1(b) seeks deposition testimony from a BNSF designee regarding the "Broken Joint Bar from Court Ordered Inspection." Topic 2(b) asks for "[i]dentification of all track inspection records that documented the defect, in particular the first documentation of each" of the three identified rail defects listed in Topic 1. Request 1(b) asks BNSF to produce any and all documentation concerning the "Broken Joint Bar from Court Ordered Inspection." BNSF objects that the Court has already ruled on discovery related to this dispute in its April 20, 2017 Memorandum and Order, wherein the Court found the cracked joint rail bar was not relevant because the photograph of it was taken at a remote location, away from where the accident occurred, and nearly a year after the derailment.

Intervenor-Plaintiffs' response does not address BNSF's objection. Instead, Intervenor-Plaintiffs argue that the Court's prior April 20, 2017 ruling related to the photograph of the broken joint bar taken during the parties' December 2016 scene inspection was based upon

Intervenor-Plaintiffs' failure to meet their burden to show the relevancy of the particular request for admission and interrogatory. Intervenor-Plaintiffs contend here they have met their burden of proof to establish relevancy of Topics and Requests regarding the same broken joint bar.

The Court sustains BNSF's relevancy objections to these Topics. As the Court previously found in its April 20, 2017 Order, the broken or cracked joint bar photographed at the December 2016 track inspection was not located at the derailment site and was photographed several months after the derailment. Even permitting a second attempt to establish the relevancy of their Topics and Request, Intervenor-Plaintiffs still have not shown the requested inquiry regarding the referenced broken joint bar is relevant. BNSF's request for a protective order precluding deposition questioning on Exhibit E Topics 1(b) and 2(b), and Request 1(b) is granted.

### 2.    Exhibit E Topic 4 and Request 4 (Post-derailment rail joint testing)

Exhibit E Topic 4 asks BNSF to testify regarding the "[i]dentification of all Rail Joint Testing performance over the derailment site and/or track 5 (five) miles each direction from the derailment site for the years 2015 and 2016. (Rail Joint Testing is the type of testing referred to in the NTSC report on page 10 (Bates#DCA16MR004)." Corresponding Request 4 seeks production of "documentation that identifies all Rail Joint Testing performance over the derailment site and /or track 5 (five) miles each direction from the derailment site for the years 2015 and 2016."

BNSF states it has produced all joint bar testing conducted for the entire year preceding the derailment. The rail joint bar testing conducted during this period included joint bar tests on May 27, 2015, November 19, 2015 and March 3, 2016 (10 days before the derailment). BNSF thus agrees to produce a corporate representative to testify concerning the rail joint testing pre-derailment, but objects to producing a witness to discuss rail joint testing conducted post-

derailment. It contends any inspections and maintenance performed nearly a year after the derailment, under conditions that did not exist at the time of the derailment, are not relevant and Intervenor-Plaintiffs' insistence on obtaining this discovery is intended to harass and unduly burden BNSF.

Intervenor-Plaintiffs argue that inquiry into joint testing on this section of track is needed for their experts to accurately know if the rail has been changed and to reach their opinions in light of the changed conditions from the date of the derailment to the date of the site inspection. They claim this Topic is also relevant for purposes of discovering defects that were present at the time of the derailment, as well as evidence relating to BNSF's failure to issue slow orders for Amtrak trains in order to continue to receive Amtrak incentive payments.

Consistent with its December 1, 2017 Memorandum and Order (ECF No. 277) granting in part and denying in part Intervenor-Plaintiffs' motion to compel BNSF designee on maintenance issues, the Court finds here that Intervenor-Plaintiffs' Topic 4 post-derailment Rail Joint Testing inquiry seeks discovery relevant to whether there were *pre*-derailment track defects.  The Court further finds that the Topic 4 and Request 4 post-derailment inquiry time period is limited (less than 1 year) and therefore proportional to the needs of this case. BNSF's objections are overruled. BNSF's request for a protective order limiting deposition questioning on Exhibit E Topic 4 and Request 4 is denied.

## G.    BNSF's Objections to Exhibit F Topics and Requests (Derailment analysis and education)

### 1.    Exhibit F Topic 7 (Derailments caused by emergency brake applications)

Exhibit F Topic 7 seeks BNSF testimony regarding "[i]dentification of specific derailments caused by emergency brake applications, BNSF training on this issue and BNSF's

position as to whether or not emergency braking can cause derailments, including the basis for that position."

BNSF objects to this Topic to the extent that it asks for identification of specific derailments caused by emergency brake application and BNSF training on this issue. It points out the derailment at issue here did not involve a BNSF freight train or BNSF train crew. It involved an Amtrak passenger train being operated by an Amtrak train crew. BNSF argues that the information requested is therefore irrelevant and requiring it to identify specific freight train derailments on its entire railroad system (not the track at issue) caused by emergency brake applications would be extraordinarily burdensome. BNSF points out that the Rail Equipment Incident Report identified the cause code for the derailment as "track damage caused by non-railroad interference with track structure." BNSF also contends that this Topic is not reasonably limited in time or scope and the burden associated with gathering information to properly prepare a corporate representative to testify on this Topic is not proportional to the needs of the case.

Intervenor-Plaintiffs argue that the purpose of the BNSF Derailment Accident Investigation Procedures Manual is to illustrate and describe the principles of derailment investigation and to guide the investigator through the data collection process, analyzing this data, and drawing the correct conclusions concerning the cause of the derailment, based upon the data. Intervenor-Plaintiffs note that the manual lists "[e]mergency brake application to avoid accident" as a potential cause code for a derailment.  While the derailed train in this case was owned and operated by Amtrak, Intervenor-Plaintiffs contend that Amtrak engineers must be properly trained and aware of BNSF rules regarding proper train handling while operating over BNSF tracks. Intervenor-Plaintiffs maintain that in this case it is undisputed the Amtrak engineer applied the emergency brakes while the train was traversing the defect. Thus, Intervenor-

Plaintiffs contend, inquiry into BNSF's knowledge that emergency brake application may cause a derailment, its position and basis for that position is relevant to the training it provides to Amtrak train crews who operate over BNSF's tracks. Intervenor-Plaintiffs argue Topic 7 is also relevant to discover BNSF's investigation of this derailment and whether it considered emergency brake application as a cause or contributing cause to the derailment.

The Court sustains BNSF's objections to this Topic. The train that derailed in this case was a passenger train owned and operated by Amtrak, not BNSF, and the preliminary cause identified in the Rail Equipment Incident Report is "non-railroad interference with track structure." The Court finds that Intervenor-Plaintiffs have failed to show the relevance of their Topic requiring BNSF to identify derailments caused by emergency brake applications on BNSF's railroad system, under circumstances and at locations that may be dissimilar and far removed from the track at issue in this case. The Court also finds that this Topic is not reasonably limited in time or scope and the burden associated with gathering information to properly prepare a BNSF corporate representative to testify regarding this Topic is not proportional to the needs of the case. BNSF's request for a protective order precluding deposition questioning on Exhibit F Topic 7 is granted.

**2.    Exhibit F Topic 9 (Members of Technical Research Development team)**

Exhibit F Topic 9 asks BNSF to identify "all former members of the Technical Research and Development team who have been part of the team at any time since 2006, and whom are no longer BNSF employees." BNSF states it has agreed to produce a representative to identify the Technical Research and Development team members at the time of the derailment. Intervenor-Plaintiffs insist on BNSF identifying the members of the team from 2011 to 2016, including any

former members. BNSF objects to this Topic, arguing it is not reasonably limited in time and also seeks information that not relevant or proportional to the needs of the case.

Intervenor-Plaintiffs argue that requiring BNSF to identify members of the Technical Research and Development team for a five-year time frame leading up to the derailment is a reasonable limitation. They claim asking a BNSF designee to identify team members can lead to the discovery of relevant, admissible information, such as the development and identification of contributing causes of a derailment and how derailment investigations into potential causes have changed over time.

The Court sustains BNSF's objections to Topic 9.  The Court finds the Topic is not reasonably limited in time and seeks information that is not relevant or proportional to the needs of this case. Intervenor-Plaintiffs' relevance argument for Technical Research Development team membership for the five years leading up to the derailment is vague and unpersuasive. BNSF's request for a protective order limiting deposition questioning on Exhibit F Topic 9 to identification of members of the Technical Research and Development team at the time of the derailment is granted.

### 3.     Exhibit F Topic 10 (Derailment Analysis Seminar)

Exhibit F Topic 10 asks BNSF to produce a corporate representative to discuss "the Derailment Analysis Seminar [as mentioned in Exhibits F-1 & F-2], including identifying the teachers /presenters/instructor of this seminar." The referenced Exhibits F-1 and F-2 are BNSF pamphlets titled "Derailment Prevention and Resource Protection Solutions Programs." One of the programs mentioned in these pamphlets is a Derailment Analysis Seminar, "taught approximately four times a year in Topeka, Kansas, by BNSF's Technical Research and

Development team . . . ."[26] BNSF agrees to produce a representative to discuss the Derailment

Analysis Seminar, but only as of the time of the derailment. Intervenor-Plaintiffs respond they

are willing to temporally limit this Topic to the years 2015 and 2016, which would require

BNSF's designee to testify regarding all of the eight seminars held in 2015 and 2016. While the

parties are continuing to discuss this Topic, BNSF objects to this Topic to the extent that it is not

reasonably limited to the seminar held at the time of the derailment.

The Court sustains BNSF's objections to Topic 10 and limits it to the seminar held

closest in time preceding the derailment. The Court finds Intervenor-Plaintiffs' failure to include

any limitations on the referenced seminars renders the Topic unreasonably broad. The Court

further rejects Intervenor-Plaintiffs' belated proposed limitation of its Topic to the 2015 and

2016 seminars. The Court agrees that the Topic should be limited to the seminar held closest to

the time but preceding the derailment. BNSF's request for a protective order is granted with

respect to Exhibit F Topic 10. BNSF shall only be required to produce a corporate representative

to discuss the Derailment Analysis Seminar as of the time of the derailment.

**4.    Exhibit F Topics 11 and 12 (Derailment Analysis Seminar attendees)**

Exhibit F Topics 11 and 12 ask BNSF to identify La Junta Subdivision railroad managers

(Topic 11) and any other BNSF La Junta Subdivision employees (Topic 12) "who have attended

the Derailment Analysis Seminar at any time since 2006."

BNSF objects to these Topics because they are not reasonably limited in time period or

reasonably limited to railroad managers who were involved in the derailment investigation at

issue in this case. These Topics ask BNSF to identify all railroad managers and railroad

employees with respect to the entire La Junta Subdivision who have attended the Derailment

---

[26] ECF No. 237-2, at 18 & 22.

Analysis Seminar. BNSF points out that the Court has previously limited other similar overly broad discovery requests. For example, in its October 12, 2017 Order, the Court limited the scope of Interrogatory No. 19, seeking identification of track maintenance employees, to such employees during the six-month time period prior to the derailment.

Intervenor-Plaintiffs assert one of their allegations is that substandard track maintenance and conditions—which exacerbated the impact deformity of the Cimarron truck striking the ballast and ties—caused or contributed to cause the derailment. They argue inquiry into the employees and managers who had this section of track in their territory for the ten years prior to the derailment is relevant to discovering BNSF employee and management's prior knowledge of substandard conditions of this section of track and its failure to remedy those deteriorating conditions for the span of ten years prior to the derailment.

The Court sustains BNSF's objections to Topics 11 and 12. Intervenor-Plaintiffs do not offer any justification for imposing a ten-year time period for these Topics, as opposed to a much shorter time period. The Court finds Intervenor-Plaintiffs' ten-year time period for Topics 11 and 12 is arbitrary and overly broad. The Court finds a one-year time limit for the  year preceding the derailment should provide sufficient information on seminar attendees. The Court also agrees with BNSF that the Topics should be limited to railroad managers or other BNSF employees who were involved in the derailment investigation at issue in this case. The Court therefore grants BNSF's request for a protective order limiting Exhibit F Topics 11 and 12 to identifying La Junta Subdivision railroad managers or other BNSF employees who attended a seminar during the one-year period preceding the derailment and who were involved in the derailment investigation at issue in this case.

**5.      Exhibit F Topic 14 (Root cause of derailment)**

Exhibit F Topic 14 asks BNSF to identify all documentation that reflects what BNSF did to determine "the root cause of [this] derailment [as mentioned in Exhibits F-1 & F-2]."   BNSF states it has produced the accident reports, photographs, measurements, and email communications as to its own investigation of the cause of the derailment.  It has also agreed to produce a representative to discuss its investigation of the cause of the derailment. But BNSF conditions its agreement on the limitation that it is not permitted to discuss the deliberative processes of the NTSB, which BNSF was privy to in its status as a party to the investigation. BNSF asks the Court to enter a protective order recognizing this limited scope to this Topic.

Intervenor-Plaintiffs claim that until NTSB releases the final report, Intervenor-Plaintiffs are only seeking discovery into BNSF's participation in the investigation and its determination of the root cause of the derailment. At this time, Intervenor-Plaintiffs state they are not seeking discovery into the deliberative process, just what BNSF did to determine the root causes of the subject derailment.

BNSF states it will produce a corporate representative regarding Topic 14, subject to a limitation to which Intervenor-Plaintiffs have agreed. Intervenor-Plaintiffs have agreed not to seek discovery into the deliberative process at this time (prior to the release of the NTSB final report). Therefore, the Court grants BNSF's request for protective order with regard  to Topic 14 as unopposed. BNSF shall produce a corporate representative to discuss BNSF's investigation of the root causes of the derailment, but such representative shall not be required to give testimony at this time (prior to release of the NTSB report) regarding the deliberative processes of the NTSB. The Court makes no finding at this time regarding the applicability of the deliberative process privilege in this case, either now or after the release of the NTSB report. But, consistent

with the general rule set out in *Miller*,[27] the Court will require BNSF's 30(b)(6) designee(s) to appear for deposition and raise any such objections to the specific questions posed. Counsel will then have an opportunity to explore background facts concerning the privilege, and the deponent can substantiate any objections.

### 6.    Exhibit F Topic 15 (Aggressive rail detection program)

Exhibit F Topic 15 seeks a BNSF representative to identify "anything BNSF did to utilize the 'aggressive rail detection program that uses advanced rail measurements and prediction models to identify and prevent rail defects that can result from metal fatigue due to rolling equipment' on the LaJunta Subdivision [between Dodge City and LaJunta]."  BNSF states it has already produced a corporate representative to discuss the rail detection program and systems that it uses. It has also produced all of the automated rail detection inspection records for the year prior to the derailment. It objects to this Topic to the extent it is not reasonably limited to the one-year time period prior to the derailment and asks the Court to order no further inquiry is necessary concerning this Topic and enter a protective order prohibiting any further testimony.

The Court sustains BNSF's objections to Topic 15. Intervenor-Plaintiffs only comment with respect to this Topic is that they are willing to limit this Topic to 2015 and 2016. Based upon the information regarding the rail detection program that BNSF reports it has already provided, which Intervenor-Plaintiffs do not dispute, the Court finds BNSF need not further respond to Topic 15. BNSF's request for a protective order precluding any further inquiry into Exhibit F Topic 15 is granted.

---

[27] 2008 WL 4724471, at *6.

### 7.    Exhibit F Topic 16 (Outside contractors consulted)

Exhibit F Topic 16 requests that BNSF "[i]dentify outside contractor(s) BNSF has consulted with since 2006 to obtain their expertise about derailment investigation and prevention."  BNSF objects to this Topic as not reasonably limited in time and not described with reasonable particularity. It further objects that by asking it to identify all outside contractors it has "consulted" about derailment investigation and prevention, this Topic seeks information that is protected by the attorney-client privilege and work product doctrine.

Intervenor-Plaintiffs contend this Topic is reasonably limited in time to ten years. In addition, they contend BNSF has not shown how this Topic seeks information protected by the attorney-client privilege or as work product. Intervenor-Plaintiffs state they are not seeking to inquire about specific confidential conversations between those contractors and BNSF, but merely seeking the identification of those individuals or entities and discussions between those contractors in the normal business setting.

The Court sustains BNSF's objections to Topic 16.  The Court finds this Topic is neither reasonably limited in time, nor described with reasonable particularity. Intervenor-Plaintiffs' Topic requesting that BNSF identify all outside contractors it has consulted with over a 10 year period about derailment investigation and prevention generally, without any connection to the derailment or track at issue in this case, is overly broad and not proportional to the needs of this case. BNSF's request for a protective order precluding any inquiry into Exhibit F Topic 16 is granted.

### 8.    Exhibit F Topic 17 (Derailment rates)

Exhibit F Topic 17 requests the 2012, 2013, 2014, 2015, and 2016 BNSF "derailment rates."  BNSF objects to this Topic as not relevant, not reasonably limited in time and geographic

scope, and as not described with reasonably particularity. It argues the Topic is not limited to any subject matter relevant to this litigation, the track at issue, the type of trains involved or even the kind of derailment that occurred in this matter.  The Topic also seeks information concerning BNSF system-wide derailment rates, is not limited to derailments in the specific area of 5 miles of track to the east and west of milepost 373.03, and asks about derailment "rates" for four years prior to the derailment. BNSF argues system-wide derailment rates in particular are not relevant because derailments occur for all different types of reasons. Discovery on such subjects is not relevant or proportional to the needs of the case.

According to Intervenor-Plaintiffs, BNSF refers to its derailment rates, as reported to the Federal Railroad Administration, in its Derailment Prevention and Resource Protection Solution Program pamphlets. Specifically, these pamphlets list derailment rates for 2003 and 2005. Intervenor-Plaintiffs argue that its Topic inquiring into BNSF's derailment rates in the five years preceding the derailment at issue is relevant to Intervenor-Plaintiffs' allegation BNSF willfully disregarded the safety of the traveling public. Finally, Intervenor-Plaintiffs argue the requested derailment rate information is maintained and regularly published by BNSF, and is thus not unduly burdensome for BNSF to produce.

The Court sustains BNSF's relevance objection to Topic 17.  Intervenor-Plaintiffs have not shown the relevance of the requested "derailment rates" to the claims and defenses in this case. Their argument that the requested "derailment rates" are relevant to BNSF's willful disregard for the safety of the traveling public" is unpersuasive. The requested "rate" would include derailments of all types and causes and would be a system-wide derailment rate, not limited to the section of track at issue or even the La Junta Subdivision. BNSF's request for a protective order precluding inquiry into Exhibit F Topic 17 is granted.

### 9.    Exhibit F Topic 18 (AAR Train Derailment Cause Finding manual)

Exhibit F Topic 18 asks BNSF to produce a corporate representative to discuss the Association of American Railroads ("AAR") Train Derailment Cause Finding manual and the application of the principles in that manual to BNSF's investigation of this derailment. BNSF asserts a relevance objection to this Topic, arguing the referenced AAR manual was not authored by BNSF, is not maintained by BNSF, and is not utilized by BNSF for its derailment investigations. It describes the 1982 AAR manual as "outdated" and a 97-page document that covers a wide variety of subject matters and principles. BNSF also objects that because the AAR manual covers a wide variety of principle, Topic 18 is not described with reasonable particularity because it does not set forth the "principles" upon which testimony is sought.

Intervenor-Plaintiffs point out that BNSF produced the AAR manual in this litigation and BNSF and Amtrak are full members of AAR, which is an industry trade group that sets policy and standards for North America's railroads, including Amtrak and BNSF. Therefore, discussion of the application of the industry principles in the AAR manual to BNSF's investigation of this derailment is clearly relevant to determine if BNSF followed the standards set for by its industry in properly investigating this incident and determining all causes of the derailment.

The Court sustains BNSF's objections to Topic 18, regarding a 35-year-old, 97-page document, on relevance and lack of reasonable particularity grounds.  BNSF states that it does not utilize the referenced AAR manual for its derailment investigations, hence there would be no need for Intervenor-Plaintiffs to inquire into BNSF's application of the AAR manual's principles to its investigation of the derailment at issue in this case. BNSF's request for a protective order precluding deposition inquiry into Exhibit F Topic 18 is granted.

    **10.**    **Exhibit F Topics 19–22 (Accident Standard Procedure manual and derailment investigation)**

Exhibit F Topic 19 asks BNSF to produce a corporate representative to discuss "the BNSF Accident Investigation Standard Procedures manual [produced by BNSF as bates #AMT-BNSF 2044-2241], and the application of the principles in that manual to BNSF's investigation of this derailment." Topic 20 seeks testimony about Amtrak's involvement in the investigation of the derailment, while Topic 21 asks for identification of all Amtrak and BNSF personnel involved in the derailment investigation.  Topic 22 asks BNSF to identify communications about the derailment investigation and any documentation created as a result of the investigation.

BNSF states that while it has agreed to produce a representative to discuss its investigation of the derailment, it objects to all these Topics to the extent they call for discussion on the deliberative processes or otherwise seek discovery of information protected by the attorney-client privilege, work product doctrine, and/or NTSB deliberative process privileges.

Intervenor-Plaintiffs argue that to the extent the information calls for discussion of documentation or communications subject to NTSB deliberative process protections, those documents or communications should be identified in a privilege log, which BNSF and Amtrak have failed to provide. They contend that any inquiry not related to the NTSB deliberative process is discoverable, and any inquiry related to Amtrak and BNSF's participation and input in the NTSB investigation is discoverable after the final report is issued. They assert both entities should provide a privilege log for those documents or communications withheld.

The Court denies BNSF's request for a protective order on these Topics as premature. On their face, Topics 19 through 22 do not seek protected or privileged testimony, but rather factual information about BNSF's procedures manual, Amtrak's involvement in the derailment investigation, identification of Amtrak and BNSF personnel involved in the investigation, and

communications about the investigation. Again, consistent with *Miller*,[28] if a specific deposition question elicits protected or privileged testimony, BNSF's 30(b)(6) designee(s) may raise an appropriate objection to the specific question at that time.  Counsel will then have an opportunity to explore background facts concerning the immunity or privilege, and the deponent can substantiate any objection.

### H.    Objection to Live Internet Streaming of the Depositions

Railroad Plaintiffs object to the depositions being conducted "using instant visual display and live internet feed to allow viewing of the deposition questions and answers by other counsel, legal assistants, consultants and/or potential expert witnesses." Railroad Plaintiffs argue this highly unusual deposition condition directly contradicts this Court's prior rulings on this exact issue. The Court previously ruled in this case on this same issue and sustained Railroad Plaintiffs' objections to live internet streaming of the depositions.  Based upon the same reasons and concerns discussed in the Court's prior Order,[29] the Court again sustains Railroad Plaintiffs' objections and will not permit live internet streaming of these depositions, absent the express agreement of the parties to be deposed.

### I.    Objection to Unilateral Noticing of Depositions

Railroad Plaintiffs object to Intervenor-Plaintiffs' unilateral noticing of these depositions without consulting them, their counsel, or the witnesses. Intervenor-Plaintiffs admit they unilaterally noticed the depositions because, at that time the discovery deadline was less than two months away, but state they were and are willing to work with all parties on mutually convenient dates for these depositions.

---

[28] 2008 WL 4724471, at *6.

[29] Sept. 26, 2017 Mem. & Order at 19–21, ECF No. 234.

The Court reminds counsel of the District of Kansas Deposition Guideline 3, which provides that "[a]bsent extraordinary circumstances, counsel shall consult in advance with opposing counsel and proposed deponents in an effort to schedule depositions at mutually convenient times and places."[30] A discovery deadline less than two months away does not constitute an "extraordinary circumstance" that justifies counsel for Intervenor-Plaintiffs' failure to consult with Railroad Plaintiffs' counsel before scheduling the depositions in question. The conduct of Intervenor-Plaintiffs' counsel in this instance was not in accordance with Deposition Guideline 3, much less with the standards of courtesy and professionalism this Court expects of counsel who appear before it.

## III.    REQUEST FOR SANCTIONS

Railroad Plaintiffs request that Intervenor-Plaintiffs be sanctioned pursuant to Fed. R. Civ. P. 26(c) and (g), and by extension Fed. R. Civ. P. 37(a)(5), including Railroad Plaintiffs' costs and expenses in responding to the subject 30(b)(6) Notices and preparing and filing the present Motion for Protective Order. They contend an award of sanctions is appropriate based upon Intervenor-Plaintiffs' issuance of Notices to conduct corporate designee depositions on Topics that this Court has already ruled are irrelevant, overbroad, disproportionate, and otherwise improper and by ignoring their duty to cooperate in discovery, which has caused unnecessary delay, and increased the burden and costs of this litigation.

Intervenor-Plaintiffs contend that sanctions are not appropriate as they have complied with the Rules and the discovery sought is justified in light of the issues in the case. They state the Notices they issued were on Topics this Court explicitly stated in prior rulings Intervenor-Plaintiffs were entitled to pursue or were in light of newly discovered information.

---

[30] D. Kan. Dep. Guideline 3, available at http://www.ksd.uscourts.gov/deposition-guidelines/.

The Court will take Railroad Plaintiffs' request for sanctions under advisement. Railroad Plaintiffs' motion for protective order is being granted in part and denied in part. Under Fed. R. Civ. P. 37(a)(5)(C), "the court may issue any protective order authorized under Rule 26(c) and may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion." The Court sustained many of Railroad Plaintiffs' objections to Intervenor-Plaintiffs' Topics and Requests, some of which the Court had previously ruled upon, which is troubling. However, the Court recognizes that Intervenor-Plaintiffs and Railroad Plaintiffs have filed separate motions requesting discovery sanctions, which the Court has set for an evidentiary hearing on January 19, 2018. The Court will reserve ruling on whether, and if so to what extent, to award sanctions pursuant to this Order, until after the January 19 hearing.

**IT IS THEREFORE ORDERED THAT** Railroad Plaintiffs' Motion for Protective Order Regarding Intervenor-Plaintiffs' Third Notices of Video Deposition Duces Tecum of Corporate Designee(s) (ECF No. 237) is granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** the objection to live internet streaming of the depositions is sustained. Absent the express agreement of the parties to be deposed, Intervenor-Plaintiffs are prohibited from live internet streaming the depositions.

**IT IS FURTHER ORDERED THAT** Railroad Plaintiffs' request for sanctions is taken under advisement.

**IT IS SO ORDERED.**

Dated December 29, 2017, at Kansas City, Kansas.

Teresa J. James
U. S. Magistrate Judge

30