IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


NATIONAL RAILROAD PASSENGER CORP.
and BNSF RAILWAY COMPANY,
            Plaintiff,

      and

EVERETT OWEN, *et al.*,                              No. 16-1094-JTM
            Intervenors

      vs.

CIMARRON CROSSING FEEDERS,
            Defendants.



MICHAEL LEE ROUNDS,
            Plaintiff,

      vs.                                            No. 18-1081-JTM

NATIONAL RAILROAD PASSENGER CORP.,
*doing business as* AMTRAK, *et al.*,
            Defendants.



MEMORANDUM AND ORDER


On March 13, 2016, employees of Cimarron Crossing Feeders left a large feed truck

unattended. The truck rolled down a hill, crossed a highway, and smashed into train

tracks owned by BNSF Railway. The Cimarron employees retrieved the truck — but told

no one of the accident, or the fact that the truck had bent the rails about nine inches out

of alignment. Shortly after midnight the next day, an Amtrak passenger train reached the misalignment and derailed.

Amtrak and BNSF have sued Cimarron for negligence, recklessness, and trespass. Several passengers, intervening in this action and presenting a separate claim (*Rounds v. National R.R. Passenger Corp.*, No. 18-1081-JTM (D. Kan.)), have made claims against Cimarron, but also have advanced various claims against Amtrak and BNSF. Cimarron denies liability, contends that Amtrak and BNSF were acting as a joint venture, and argues that their fault contributed to the accident. The matter is scheduled for trial on liability issues to begin December 6, 2018.

The present Order addresses Motions for Summary Judgment filed by plaintiffs Amtrak and BNSF (Dkt. 398, 400, 402, 463) as to the claims made against them, as well as various related motions. (Dkt. 432, 436, 438, 478, 480, 482). The court denies plaintiffs' appeal (Dkt. 468) from the decision of the Magistrate Judge to permit plaintiffs to add to the Pretrial Order (Dkt. 461) claims by the Intervenor that the Amtrak locomotive used a defective headlight. While recognizing a close question, the court also denies plaintiffs' request for sanctions against Intervenors' counsel for the submission of evidence in bad faith. The court otherwise grants plaintiffs' motions.

There is nothing in the voluminous record to establish any legal fault on the part of Amtrak or BNSF. The only party potentially liable for damages from the derailment is Cimarron.

## Findings of Fact

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*).

One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).[1]

The morning before the accident, two Cimarron employees were working on the company's feed lot, which is located north of Highway 50 and the BNSF rail line. Kevin Ornelas was operating the feed mill and Arturo Carillo was operating a feed truck, a 2004 Kenworth grain hauling truck, which had an empty weight of at least 26,900 lbs. and had gross vehicle weight range of 26,000 to 33,000 pounds.

Carillo had made several feed lot runs that morning before Ornelas asked him for help unplugging a "soak leg" that had become clogged on the feed mill. Ornelas needed Carillo to open and close a gate at ground level that runs corn up into the soak tanks, so that Ornelas, standing up on a catwalk over the soak tanks, could make sure the downspout was clean.

Carillo parked the truck next to the soak tanks and grain elevators facing south in the direction of the railroad track. As Carillo left the truck to help Ornelas, it was parked on an incline facing in a downhill direction away from the mill and toward the highway and railroad tracks.[2]

---

[1] The court excludes from these findings all assertions of fact, or attempted denials, which wee submitted without specific and accurate citations to the record, or touch on matters not relevant to the issues before the court..

[2] Cimarron's standard procedures required employees to set parking brakes of equipment and prohibited employees from parking trucks or other equipment on hills or leaving them in any position where they could roll. Carillo was later disciplined by Cimarron for not setting the brakes of the feed truck when he

Some time between 10:00 and 11:00 a.m., Ornelas, with a clear view of the truck from atop the soak tank catwalk, watched the truck start to roll and yelled down to Carillo that the truck was rolling away.

Carillo went to get his personal truck, losing sight of the run-away feed truck in the process.

Ornelas saw the runaway feed truck roll down the hill, across Highway 50, into the ditch running parallel to the train tracks on the south side of the highway, up the opposite side of the ditch, and then back down into the ditch where it stopped, still facing south. The momentum of the thirteen-ton truck was enough that when it crossed the highway into the ditch it became airborne.

In the ditch, the truck's undercarriage bottomed out before it continued, striking the rail track roadbed. The impact caused a displacement of between seven to ten (but most typically described as a nine) inch displacement of the tracks.

The Kansas Highway Patrol later documented the continuous path of travel of the Cimarron feed truck, the tire mark evidence matching the truck to the railroad track bed damage, and, most importantly, the impact of the truck's bumper with the railroad roadbed causing the railroad tracks to be pushed to the south. The truck hit the track roadbed at a perpendicular angle and stopped when the front bumper struck the railroad roadbed on the north side of the track, shifting the railroad ties and track to the south.

---

left it and letting it roll down the hill, safety violations, negligence and for disregarding previous instructions not to park feed trucks on a hill.

To reach the feed truck, Carillo drove his personal truck across Highway 50, crossed the railroad tracks at a grade crossing on the south side of the highway, and turned right on a dirt road on the south side of, and running parallel to, the tracks. Carillo parked his personal truck on the dirt road directly across the tracks from where the Cimarron feed truck had come to rest, and walked right over the damaged track.

Carillo found the still-running feed lot truck in the ditch, sitting perpendicular to the railroad tracks. He moved the truck away from the tracks and drove it back up to the feed lot where he told Rita Tobyne, Cimarron's head feed truck driver, what happened. He asked her to call feed lot manager Maynard Burl and tell him the feed truck had rolled to the other side of Highway 50. Tobyne said she was not going to call Burl.

Carillo then asked Ornelas to call Burl, which Ornelas did, asking Burl to come out to the feed lot. Ornelas has testified that, while they were waiting for Burl to arrive, he took Carillo back down to the railroad tracks to retrieve his personal vehicle.

At the time the truck hit the BNSF tracks, there was a railroad crossing sign near where the truck impacted the tracks, which also contains a blue sign with a 1-800 phone number to report problems or emergencies to BNSF.

Ornelas saw the sign as he crossed over the tracks and was aware of the sign, but neither he nor any other Cimarron employee called the 1-800 phone number to report the truck runaway incident.

When Burl came to the feed lot, Ornelas showed him the path the truck had taken down the hill, and told him that the truck had gone across the highway and through the

ditch on the south side of the highway, and pointed him to where the truck had come to rest.

Carillo also tried to tell Burl about the path that the truck had taken and where it had come to rest, but Burl said he did not care and that Carillo would probably get fired.

Burl observed the path that the truck left through the field from the mill to the highway. After being told what had happened, Burl did not go down to examine the railroad tracks and did not ask either Ornelas or Carillo whether there had been any damage to the tracks.

Instead, he yelled at Carillo that he did not care that the truck had crossed the highway, criticized Ornelas for asking Carillo to help unclog the soak leg, pointed out to both men that the truck had likely suffered several thousand dollars in damage, and told Carillo that he would probably get fired or written up. Burl straightened the feed truck's bent muffler, and went home.

Later in the afternoon Cimarron assistant manager Jim Fairbank came to the mill. Ornelas told him that the feed truck had rolled down the hill and across the highway, and Fairbank laughed about it and made no effort to see for himself where it had rolled.

No one at Cimarron did any further investigation, or contacted the railroad, law enforcement, or any other party to inform them of the truck roll-away incident.

Earlier the same morning, at about 7:26 a.m. (some three hours before the roll away event) a BNSF train with lead locomotive BNSF 3917 passed over the location where the Cimarron truck hit the track roadbed, and the locomotive video captured the track conditions showing no track anomaly.

After the 7:26 BNSF train, the next train to pass over the area was the Amtrak 4 train, which is the subject of the present action. Led by locomotive AMTK 153, Amtrak 4 reached the impact location about 12:02 a.m. on March 14, 2016.

The rear portion of Amtrak Train 4 derailed immediately after passing over the misalignment caused by the Cimarron truck. Investigators of the Federal Railroad Administration (FRA) and National Transportation Safety Board (NTSB) determined that the misalignment was within twenty-five feet of milepost 373.07.

Before the feed truck incident, there had never been a derailment at that location. In the week before the derailment alone, more than 30 trains passed over the location of the derailment without incident.

Immediately following the derailment, investigators of the Kansas Highway Patrol, the FRA, and the NTSB reported to the scene to investigate. The NTSB examined:

a.  the train event recorder data and the train on-board image recorders;

b.  the track conditions at the derailment scene including the point of impact by the feed truck, the point of derailment, the track conditions at the derailment scene, and BNSF's track maintenance, track inspections and track inspection records;

c.  the mechanical condition of the Amtrak train including Amtrak locomotive 153;

d.  records of the operational testing, training and certifications of the Amtrak train crew, the Amtrak train crew's work history and hours of service, the Amtrak train crew's operation of the train, and sight distance observations on March 17, 2016, to a lighted lantern placed next to the rails (using a different locomotive);

e.  a video study of the locomotive video from the Amtrak;

f.  signal data and an inspection of signals at various signal locations along the train's route approaching the derailment; and

g.  the Amtrak passenger cars involved in the derailment.

The Kansas Highway Patrol documented all of the post-accident track conditions, conducted a detailed mapping, measurement and inspection of the path of travel of the Cimarron feed truck and its impact to the railroad roadbed, and inspected the Cimarron feed truck. The Highway Patrol's test of the feed truck's emergency brake found that the brake had not been properly set, and with the truck parked on a downhill grade this allowed the truck to roll away across Highway 50 and impact the railroad bed resulting in displacement of the railroad ties and tracks.

When Ornelas arrived at work at the Cimarron feed lot on March 14, 2016, just hours after the derailment had occurred, and the investigators were already on scene investigating the derailment. Burl told Ornelas to leave the mill, to stay away and not be seen. Burl instructed Ornelas to leave the scene knowing Ornelas had seen the truck roll down the hill and across the highway to the area where the derailment occurred.

The track at the location of the derailment was classified by BNSF as "Class 3." The maximum authorized speed for a passenger train on the Class 3 track at the location where the derailment occurred was 60 m.p.h. It is uncontroverted that the Amtrak train was traveling 60 m.p.h. as it approached the derailment location.

The FRA has enacted numerous regulations establishing the standards with which railroad tracks, ballast, track roadbed and related facilities must comply, generally referred to as Track Safety Standards, which are contained in 49 C.F.R. Part 213. Part 213 also specifies the subject matters upon which railroads must create internal plans, rules

or standards pursuant to federal regulations in order to comply gwith regulatory requirements.

For example, 49 C.F.R. § 213.118 requires railroads with track constructed of continuous welded rail (CWR) to have in effect a plan containing written procedures for the installation, adjustment, maintenance, and inspection of CWR. Although BNSF has adopted and implemented a CWR Plan pursuant to the regulation, the track where the March 14, 2016 Amtrak derailment occurred was not CWR track and, therefore, none of BNSF's CWR procedures were applicable to the track at the point where the derailment occurred. As to the remaining BNSF internal rules, engineering instructions, and track construction standards which have been cited by the Intervenors, including specifically Standard Plan 1000, none of these internal rules, engineering instructions or track construction standards identified above were adopted or created by BNSF pursuant to any federal regulation, order of the FRA, the Secretary of Transportation, or Secretary of Homeland Security.

The NTSB studied every askpect of the track at the derailment scene, including the point of impact by the feed truck, the point of derailment, the track conditions, and BNSF's track maintenance, track inspections and track inspection record keeping. NTSB investigators and local police agencies documented the continuous set of wheel marks and path of the Cimarron truck to the track. The investigation included a finding that the

Cimarron truck crossed the highway continuing towards the railroad right-of-way and struck the ballast shoulder of the track structure.[3]

The NTSB investigators photographed and measured the "as found" condition of the track structure and lateral shift or misalignment and identified this as the point of impact (POI) upon the track structure.

Investigators documented where they observed the first markings at MP 373.07 on the inside gage face of the north rail approximately twenty-five feet after the POI and determined this was the point of derailment (POD).

The investigators for the Track and Engineering Group for the NTSB investigation included Richard A. Hipskind of the NTSB and Rick Bruce of the FRA. Hipskind, a track and engineering specialist, prepared the Track and Engineering Chairman Group Factual Report. The NTSB investigators took account of measurements and photographs of the area of the single main track preceding the derailment footprint. The inspection included taking measurements of the track conditions of the undisturbed track at the location of the derailment for compliance with FRA Track Safety Standards. The track field notes measurements were within FRA track safety standards for Class 3 track.

---

[3] 49 U.S.C. § 1154(b) provides that "[n]o part of a report of the Board, related to an accident or an investigation of an accident may be admitted or used in a civil action for damages." However, courts have held that this prohibition applies to the ultimate conclusions of causation contained in a final NTSB report. The statute does not preclude the admission of factual portions of a preliminary NTSB investigative report. *See, e.g., Starling v. Union Pac. R. Co.*, 203 F.R.D. 468, 485 (D. Kan. 2001). See also 49 C.F.R. § 835.2 (distinguishing between the Board's ultimate probable cause determination and its "[f]actual accident report" which contain[s] the investigator's investigation of the accident. The Board does not object to, and there is no a statutory bar to, admission in litigation of factual accident reports."). These factual findings from the on-scene investigation are admissible pursuant to Fed.R.Evid. 803(8)(B).

Investigators for the NTSB also requested, received and reviewed BNSF track inspection records for the most recent three months preceding the derailment, and the FRA examination of those records found that the records met the required frequency and no record deficiencies were noted. Three days before the accident, an FRA-qualified BNSF track inspector inspected the track in the area. The inspection record noted no defects in the vicinity of the derailment—an area that includes the track preceding, and up to, where the train derailed.

While 49 C.F.R. 213.233 only requires Class 3 tracks carrying passenger trains to be inspected twice weekly, BNSF inspected the track at least four times a week.

The subject track was visually inspected by FRA-qualified BNSF track inspector Bryce Gilliam five times in the week before the derailment— on March 7, 8, 9, 10, and 11, 2016.

In addition to the visual inspection, prior to the derailment, BNSF also performed several automated track inspections of the tracks and track components at the site of the derailment including geometry car testing, rail defect testing and rail joint testing.

On February 1, 2016, a BNSF Geometry car inspected the track at the location of the derailment, and there were no exceptions noted on the approach to or in the vicinity of the derailment. A geometry car inspection was also performed on January 12, 2016, and there were no exceptions noted in that inspection at the location of the derailment.

Intervenors have not asserted a claim that the track at the location of the derailment violated the specific FRA regulations for gauge (213.53), alignment (213.55) or track surface (213.63 applicable to track runoff, profile and cross-level).

BNSF performed rail defect testing on the La Junta Subdivision January 27 to 29, 2016, which included the area throughout the derailment footprint. The rail defect testing records did not show any uncorrected rail defects at the point of the derailment. The main track at the location of the derailment was conventional jointed rail and not CWR, and, therefore, joint testing was not required. Further, there was no joint or joint bar identified by the NTSB at the point of derailment. Nevertheless, BNSF conducted joint testing in the pertinent on March 3, 2016, which did not note any defect at the location of the derailment.

Regulation 213.33, which governs drainage, provides: "Each drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned."

It is uncontroverted that there was no measurable precipitation at the derailment site for nearly 30 days prior to the derailment. Intervenors' retained expert Alan Blackwell did not look at weather records to determine how much it rained in this area during the year of the derailment. It is uncontroverted there was no standing water at the derailment location on the date of the derailment, and Blackwell testified that he does not know if there was any standing water there during the months before the derailment. Blackwell does not know whether the ballast at the location of derailment was adequately draining water.

The Intervenors and Blackwell contend that a blocked drainage culvert under a grade crossing contributed to the derailment. But the culvert is located over 1,000 feet to

the east of the derailment, the derailment did not happen at the grade crossing, and the derailed train cars never reached the crossing or the culvert.

Moreover, Blackwell did not do any objective studies to measure the flow of water through the alleged culvert that he claimed was blocked nor did he even attempt to determine what the expected flow of water was for this area.

Intervenors also contend that the BNSF track violated 49 C.F.R. 213.103, which sets standards for track ballast. As noted earlier, before the feed truck incident, no train had ever derailed at this location, and, as constructed, the railroad roadbed and track structure was properly performing the function for which it was intended — restraining the track laterally, longitudinally, and vertically under dynamic loads imposed by railroad rolling equipment.

In the week before the derailment alone, over 30 trains passed over the location of the derailment without incident

The Intervenors also contend that the track ballast section, track roadbed and embankment next to the tracks should have been maintained in a manner that would have prevented or allowed it to withstand the lateral impact by the feed truck.[4] However, the Intervenors' expert Blackwell is not aware of anything in any scholarly materials or

---

[4] In their response to the motions for summary judgment, the Intervenors challenge the plaintiffs' description of their failure to prevent claims as "design" claims, which would be subject to preemption. Rather, they contend, they are maintenance claims. But this particular maintenance claim — that BNSF was obliged to somehow fortify or "maintain" its tracks to withstand vehicle impacts merely because "vehicles leaving the roadway at or near crossings" is foreseeable (Dkt. 413-1, ¶ 96) — is not meaningfully distinct from how the railroad designs the crossing. At any rate, however characterized, as a factual matter, the Intervenors fail to provide reliable evidence for the theory.

trade journals that says ballast should be made to withstand vehicle strikes. He does not know of any railroad that puts such requirements in its standards.

Blackwell is familiar with the FRA's Track Safety Standards Compliance Manual, and he admits there is no portion of that Manual requiring a railroad shoulder be made to prevent impacts from vehicles leaving the roadway.

In his deposition, Blackwell admitted that the Cimarron truck hit the BNSF track, that the track was not misaligned before the truck hit it, but was misaligned afterwards. However, in his report, Blackwell never mentions the Cimarron truck or its knocking the BNSF track out of alignment. Blackwell has not calculated the amount of force that the truck exerted on the track, does not know the impact force the truck exerted in the track in any measurable, quantifiable unit, does not know how much force was necessary to move the track out of alignment, conducted no analysis regarding how the truck interacted with the track structure at the site of the derailment, and claims not to know, has not done any analysis, and does not to have any opinion about whether this derailment would have occurred if the Cimarron truck had not struck the BNSF tracks. He admits that his analysis of the alleged causes of the derailment is at variance with the findings of the FRA Investigation.

Intervenors assert that BNSF violated 49 C.F.R. 213.1.[5] As discussed above, Intervenors and their experts claim that the track ballast section, track roadbed and

_____

[5] It is uncontroverted that Amtrak did not own or maintain the tracks over which the train was traveling when it derailed. It is also uncontroverted that Amtrak did not perform or direct nor was it responsible in

embankment next to the tracks should have been maintained in a manner that would have prevented or allow it with withstand the lateral impact by the feed truck.

BNSF currently operates over 32,500 route miles of track in 28 states in the United States. BNSF's railway system is the result of nearly 400 different railroad lines that BNSF merged with or acquired over the span of 160 years.

BNSF's track in Gray County, Kansas, where the subject derailment occurred, was formerly operated by the Atchison, Topeka, and Santa Fe Railway (ATSF), with which BNSF merged in 1994. This includes BNSF's La Junta subdivision, running from Los Animas Junction, Colorado, to Ellinor, Kansas, more than 400 miles of main line track alone, most or all of which, including the portion in Gray County, Kansas, was constructed 100 years ago. In other words, the railroad roadbed and track structure at the location where the derailment occurred has been in place for over 100 years.

BNSF's Standard Plan 1000, referenced by Intervenors and their experts, is used as guidance in the construction of its tracks, but it is not a hard and fast standard that BNSF adheres to in all circumstances. This Standard Plan was not intended, nor is it used, to require the re-engineering or reconstruction of all existing tracks on BNSF's railroad system, including those acquired through mergers or acquisitions. Nothing in BNSF's Engineering Instructions used by its maintenance department demands strict adherence

---

any way for BNSF's inspection, repair and maintenance of the tracks over which the Amtrak train was travelling when it derailed.

to all of the specific dimensions contained in the Standard Plan, and the suggestion that the plan is a one-size-fits-all requirement is neither accurate nor practical.

Requiring BNSF to change the entire track structure, including ballast sections, sub-ballast, subgrade, and excavations or embankments on all of its existing tracks into compliance with the 1997 Standard Plan is neither feasible or warranted.

It is uncontroverted that, if the allegations made by Intervenors in this case as well as the claims by Intervenors' experts were accepted, BNSF would be forced to change the track structure, road bed and surrounding embankment topography at not only the location of the derailment but also arguably on the entire La Junta Subdivision to address Intervenors claim that the roadbed and ballast section should have been constructed in a manner that prevented a lateral strike from a vehicle.

BNSF is an interstate freight railroad and operates the mainline trackage on the La Junta Subdivision 24 hours per day, 365 days per year. Further, Amtrak operates trains on the tracks daily and 365 days per year.

This mainline track is the sole Amtrak route through the State of Kansas. Amtrak operates two passenger trains per day over this area and, BNSF operates, on average, two to five trains per day. Changing the track structure, road bed and surrounding embankment topography to meet the various claims of the Intervenor's proposed experts would include but not be limited to the following:

    a. Extensive studies, permitting and redesign work that would include land surface/subsurface, topography, signals, signal circuits, fiberoptic cables, traffic engineering, crossing/rail switches, movement of public utilities and other access rights operated on easements on the railroad right-of-way and coordination with

the Kansas Department of Transportation for implications and impact on the adjacent highway right-of-way.

b. Environmental impact studies would also have to be performed, which are costly and time consuming.

c. If the above studies confirmed that reconstruction of the track structure, road bed and surrounding embankment topography was feasible, possible and safe, the project would include extensive construction work that would include not only the railroad tracks at the location of the derailment but also arguably the entire La Junta Subdivision.

d. Even if the work was confined to the 5 miles in either direction from the location of the derailment, the work would require a lengthy period of closure of the BNSF mainline track and disruption and transfer of traffic of not only BNSF freight trains but disruption and transfer of traffic for Amtrak trains.

e. The project would require coordination with the Kansas Department of Transportation to involve study of the impact on the adjacent highway and possibly highway closures to accommodate the work. BNSF does not have authority to close highways or alter the adjacent roadway right-of-way without consultation with the Kansas Department of Transportation.

f. Closure of this stretch of track and disruption and transfer of train traffic would significantly impact the operations of BNSF and Amtrak along the entire stretch of the La Junta Subdivision and area beyond. Passenger traffic would have to be re-routed, shipments of BNSF freight would have to be re-routed, and trains would have to be rescheduled.

g. Delays in passenger and freight service would also disrupt the daily lives of many shippers and consumers who depend upon the timely rail service and it would impact the schedules of passengers on Amtrak trains. In addition to delays, safety issues could arise in light of the rescheduling and re-routing.

Smply put, such work would be an enormous, burdensome and expensive undertaking. It would shut down freight and passenger rail transportation on the railroad line at issue for a considerable amount of time, resulting in train delay losses and other logistical issues for both the railroad industry, its customers, and possibly the users of the adjacent highway and roads impacted.

Turning next to the locomotive engineer, the FRA has enacted regulations governing the selection, training and qualification of such engineers; a railroad's documentation of its programs for training, qualifying, and certifying locomotive engineers; and FRA approval of such programs. These regulations require that railroads adopt policies and procedures for the training, testing and evaluation of persons seeking certification or re-certification as locomotive engineers.

Under 49 C.F.R. § 240.103, Amtrak must submit to the FRA Amtrak's written program for the certification and recertification of locomotive engineers, and a description of how the program conforms to the specific requirements of Part 240. Amtrak's program for the certification and recertification of locomotive engineers is considered approved by the FRA, unless the FRA notifies the railroad in writing that the program does not conform to the criteria set forth in 49 C.F.R. Part 240.

Amtrak has developed a program for determining the qualifications of each person that it permits or requires to operate a locomotive. Amtrak's locomotive engineer's certification program, which included a detailed program developed by Amtrak for the training, testing and evaluation of locomotive engineers, was submitted to the Federal Railroad Administration on or about June 17, 2015.

The program requires annual monitoring and testing of the operational performance of Amtrak's locomotive engineers. Each calendar year, each engineer also receives at least one unannounced efficiency test. Amtrak's engineer certification and training program was organized according to, and contained all the information required by, appendix B to 49 CFR part 240.

The FRA did not notify Amtrak that its program did not conform with any of the criteria set forth in 49 C.F.R. Part 240. Accordingly, the program is deemed approved by the FRA pursuant to 49 C.F.R. §240.103(c). Although the FRA does have the authority and discretion to notify a railroad when it determines there are problems with the railroad's training program, the FRA did not take any exception to Amtrak's submission.

Federal regulations enacted by the FRA also set forth requirements for the implementation, enforcement, and instruction/training of Amtrak's operating rules and practices. In accordance with 49 C.F.R. Parts 217 and Part 218, Amtrak maintained operating rules and implemented programs to ensure that its employees were instructed and tested periodically on the operating rules. Amtrak's program included training, instruction, operational testing and inspections to ensure compliance with its code of operating rules.

As required by the FRA, Amtrak keeps records of its instruction and testing of its engineers and conductors on the railroad's operating rules. As of the date of the accident, the Amtrak crew (Engineer Jennifer Montanez, Student Engineer Zachariah Blea, Conductor Wilbert Benoit, and Assistant Conductor Nicholas Stoval) had successfully completed all instruction and training required by Amtrak's training program.

The monitoring, testing, physical examinations, supervision, and recertifications that Montanez received during her employment as a locomotive engineer at Amtrak were in compliance with Amtrak's policy and program, which contained the criteria set forth in 49 C.F.R. Part 240 and was approved by the FRA. As of March 14, 2016, Montanez was recertified as a locomotive engineer, and was fully qualified to be a locomotive engineer.

She had received all of the continuing or recurring training for recertification required by Amtrak's program and policy. This included classroom training and testing, on the job training, performance testing, and regular field efficiency tests by supervisors to monitor her for ongoing rules compliance while she was actually operating a train.

Since becoming certified as a locomotive engineer, Montanez received ongoing locomotive engineer training, evaluation, monitoring, testing, and supervision. During her employment with Amtrak, after initially becoming certified as a locomotive engineer, Ms. Montanez has been continuously recertified without interruption in accordance with the requirements set forth in 49 C.F.R. Part 240. Thus, Montanez was an FRA-certified engineer on March 14, 2016. Throughout her employment with Amtrak as a locomotive engineer, Montanez received the requisite training and instruction regarding Amtrak's operating rules, practices, and policies that is required pursuant to Part 217 and Part 218.

As part of its investigation, the NTSB reviewed the operational testing and training of the Amtrak train crew. The NTSB noted: "Operational testing – Title 49 CFR 217.9 contains specific requirements for the testing and observations of operating employees while they perform their duties. Amtrak maintains an operational testing program to monitor the performance and rules compliance of operating employees."

The NTSB also set out the specific testing and training information concerning all of the Amtrak crew members, including their hire date, medical, hearing and vision exams, certification dates, certification expiration, skills performance rides, efficiency testing and knowledge testing. The NTSB noted no exceptions to the testing and training

of the Amtrak train crew members or to Amtrak's operational testing and training program.

As part of its investigation of the derailment, the FRA also, along with the NTSB, reviewed the operational testing and training of the Amtrak train crew. The FRA indicated that all four employees had completed required safety and operating courses with passing scores and that the Amtrak engineer was current with the requirement of Title 49 CFR Part 240 – Engineer Certification. The FRA also concluded that the crew members had received regular training, rules examinations and various safety training, including emergency preparedness.

With respect to the last suggestion, the Intervenors' expert, Colon Fulk, believes that if the Amtrak engineer had simply "ridden out" the defect and applied no braking at all, the train would have simply continued uneventfully on to Dodge City without derailing. Additionally, Fulk and Intervenor expert James Loumiet have stated that, assuming the train crew saw the misalignment at 800 feet or more away and applied the emergency brakes, they could have avoided the derailment or lessened its effects. However, as discussed more fully in the section of this opinion devoted to Intervenors' experts, Fulk's opinion as to this theory of "riding out" the misalignment is not reliable and is excluded from the action.

On the two occasions that Mr. Fulk experienced a track misalignment while operating a locomotive, he did not see the misalignments until his locomotive was less than 400 feet away from the misalignment on the first occasion, and two seconds, or less

than 200 feet away, on the second occasion, even though both incidents occurred during daylight hours in clear weather.

One incident involved a sun kink he encountered during the daylight hours; the train did not derail; he did not apply emergency braking and he only saw the kink a couple of seconds before he hit it. The other kink incident Fulk was involved in occurred in Efland, North Carolina in the early '80s involving a freight train going 45 miles per hour. This also involved a kink that he encountered in daylight hours and only saw for 3 or 4 seconds before hitting it. This second train did not derail and he never applied emergency braking.

Fulk has never experienced a situation where trains derailed after the application of emergency brakes. Other than this case, Mr. Fulk has never investigated an accident where a train derailed after application of emergency brakes.

Fulk acknowledges that Montanez's application of emergency braking was not addressed by the Amtrak Air Brake and Train Handling Rules, and he cannot cite any rule by an American railroad recommending his theory of "riding out" such misalignments. He has not recommended this theory to any railroad company, and is not aware of any analysis ever done of when a train's emergency brakes should or should not be applied when a track misalignment is encountered. He has not analyzed the frequency with which derailments have occurred due to track misalignments even though that information is available through an FRA website.

Fulk is not aware of any other derailment that was caused by a track misalignment, or a track misalignment and emergency braking. He has not seen any statistics suggesting

a correlation between derailments involving track misalignments where there was or was not an emergency brake application.

Neither the NTSB nor the FRA has published any safety advisory addressing an increased risk of derailment from a track misalignment if emergency braking is applied or governing the use of any braking technique on a misalignment.

Fulk believes that compressive "buff" forces of the train as it crossed the misalignment caused the derailment. However, he has not analyzed the "buff" or "draft" (decompressive slack) forces that the Amtrak train would have experienced during this derailment event, even though the forces can be calculated through computer simulations that he has utilized in the past and agrees other experts in the industry utilize to analyze events. He does not know how much buff and draft force would be necessary to cause a derailment of a train given the dimensions of the misalignment that existed in this case.

Fulk does not know how slow the train would have had to be going when it crossed the misalignment for the derailment to not have occurred. He has no training in physics or human factors, and does not know what distance from the misalignment the Amtrak locomotive engineer could have applied the emergency brake without risk of derailment.

Fulk did not analyze how long it would take the buff forces of the Amtrak train to dissipate once the brakes were applied.

Loumiet's report does not contain any analysis of the contribution of emergency braking to cause the derailment, and he did not perform any analysis of what amount of longitudinal force was needed to cause a derailment in the situation that the Amtrak train

encountered or whether any such forces were actually present. He has acknowledged he was unable to determine whether the derailment would have happened even in the absence of train braking. He has agreed there are three potential mechanisms of derailment—wheel climb, broken rail, and wide gage—but does not identify which mechanism was at play with the subject derailment.

As noted, the Amtrak locomotive engineer at the time of the accident was Jennifer Montanez. She testified that while operating as an engineer, she is watching her speed, watching her throttle, watching crossings and looking out for cars and people. She is looking for the lights and bells on the gates, signals, signal plates, bridges and generally looking out her window for anything and everything.

Montanez testified she put the train in emergency as soon as she saw the misalignment, and she only saw the defect right before she placed the train into emergency.

At the time of the underlying derailment, Zach Blea was a locomotive engineer trainee and was in the cab of the locomotive with engineer Montanez. Blea remembers looking out the window, seeing the defect in the rail, and bracing for impact. He also recalled seeing the defect about two seconds before the Amtrak train went over it.

As part of its investigation of the derailment, the NTSB, using an exemplar locomotive, performed a visibility study at night and concluded that an object placed near the track was visible to the train crew only 381 and 403 feet away, even though the crew was traveling at only 25 m.p.h. and was told in advance to anticipate the object near the track.

Video from the locomotive involved in the derailment shows that misalignment appears out of the darkness for approximately two seconds before the lead locomotive passes over it, consistent with the NTSB's assessment in its Event and On-Board Image Recorders Group Chairman's Factual Report.

Intervenors attempt to discount the results of this investigation by stressing various aspects of the test, such as the fact that it "did not involve seeing the defect itself, but an object placed in the location of the defect." (Dkt. 413-1, ¶ 197). But all of the distinctions between the test and the accident itself (the engineer was warned to look for something unusual, the object used was a lantern, and the train was travelling at 25 m.p.h. rather than 60 m.p.h.) all tend to strongly exaggerate the distance, and hence the warning time to Amtrak's engineer.

Intervenors' expert Loumiet has hypothesized what would have happened if the crew would have applied the brakes after seeing the misalignment at 800 or 1,000 feet away, but acknowledges he has no opinion that the crew actually had the ability to see the misalignment at such distances on the date in question. Fulk has opined that, by the time the crew was able to see the misalignment, braking was no longer the proper response. He also testified that in his opinion, the crew should not have placed the train into emergency if they first saw the misalignment at 400 feet and at 500 feet, stating "it's iffy."

### Findings of Fact – Headlight Claims

The lead locomotive of the Amtrak train involved in the accident (AMTK153) was a GE model P42DC locomotive, equipped with a dual-lamp headlight. In its dual-lamp headlights, Amtrak sources and installs only General Electric PAR-56 200-watt 30V bulbs. On the date of the derailment, the lead locomotive of AMT153 was equipped with two of these bulbs in its headlight assembly.

To give its inspectors guidance on how to inspect headlights to determine compliance with 49 CFR 229.125, the FRA publishes a "Motive Power and Equipment Compliance Manual." The manual provides that if a locomotive has a light arrangement with two sealed beam headlights the inspector must ascertain whether they are 200-watt, 30-volt lamps.

On March 14, 2016, the date of the derailment, the FRA conducted an inspection of AMTK 153 and did not note any exception with the locomotive headlights.

Two days before the accident, on March 12, 2016, maintenance personnel in Los Angeles performed a "15-day Inspection" of AMKT153. This inspection, which included inspection and testing of locomotive headlights and auxiliary lights, noted no issues.

Jennifer Montanez. the train's engineer, went on duty and boarded the train in La Junta, Colorado, on the evening of March 13, 2016. It is uncontroverted that Montanez inspected the lead locomotive before leaving the station, and verified that the locomotive's headlights and auxiliary (or "ditch") lights were working.

As the train approached the point of derailment, the locomotive headlight was on and the switch was set to "bright."

After the derailment and after the train stopped, Montanez remained in the locomotive for an extended period of time as railroad personnel, emergency responders and law enforcement reported to the scene. Because these workers were outside the train, including some standing in front of the locomotive, Montanez changed the locomotive headlight switch from "bright" to "dim."

On March 16, 2016, members of the NTSB mechanical group investigating the derailment performed a pre-departure inspection of the Amtrak train involved in the derailment, including AMTK153, and no exception with the function of the locomotive headlights were noted. The mechanical group reviewed locomotive daily inspection records and took no exceptions to the documentation received or to the maintenance history of the equipment.

An on-board camera recorded video of the train's approach to the derailment location. The relevant portion of the video begins thirty seconds before the derailment and continues through the time the train came to a complete stop after the derailment.

In the video, signs adjacent to the tracks appear, reflecting the light they receive from the locomotive's headlights.[6] Examination of the video confirms that the headlight was illuminating vertical objects more than 800 feet ahead of the locomotive. These objects include a sign about ten feet to the right of the track centerline (at about 1,000 feet ahead), a whistle post next to the track anomaly and about six to seven feet to the right

_____

[6] Intervenor's expert Colin Fulk has testified that, if a locomotive's headlights reflect light off a vertical reflective device located outside but adjacent to tracks from 800 feet away, the headlight is properly aimed.

side of the tracks (at the same distance), and a mile marker next to the to the track on its left side (at about 1,500 feet).

It is uncontroverted that an object traveling at 1 m.p.h. travels 1.4667 feet per second.

Intervenors' expert Colon Fulk stated, "It is my opinion … that the train crew should have been able to see the misalignment or kink for at least 800 feet in advance of the misalignment."

## Findings of Fact – Joint Venture

In the Pretrial Order, Cimarron alleges:

> Amtrak and BNSF operated the subject railroad operation as a joint venture. As such, for comparative fault purposes, Amtrak and BNSF should be considered a single entity, and the sum of any comparative fault for this incident by Amtrak should be combined with that BNSF so that if the total of Amtrak and BNSF's fault exceeds forty-nine percent bars, they are barred from recovery against Defendant Cimarron.

(Dkt. 461, at 23).

Amtrak and BNSF are distinct corporations. Amtrak provides passenger rail service by using track owned by other railroads, including BNSF. BNSF owns railroad tracks in a number of states, including the State of Kansas.

Amtrak, not BNSF, owned and operated the train involved in the derailment. BNSF, not Amtrak, owned and maintained the tracks where the derailment occurred.

While Amtrak compensates privately-owned railroads for the incremental cost of Amtrak operations on their tracks, the private railroads are solely responsible for the

inspection and maintenance of the railroad roadbed and tracks and for coordinating the flow of traffic over their railroad tracks.

While BNSF provides dispatching services for Amtrak trains using its tracks, it does not operate those trains, provide train crews, or supervise Amtrak's crews. BNSF was responsible for inspection, repair and maintenance of the tracks over which the Amtrak train derailed March 14, 2016.

Amtrak did not perform or direct the inspection, repair and maintenance of BNSF's tracks. All the personnel of BNSF performing such track work are subject to the exclusive direction and supervision of BNSF. BNSF did not supervise of the the Amtrak train crew.

Amtrak does not share with BNSF ownership of the tracks over which the train was running, and Amtrak has no role in fixing of any BNSF salaries and BNSF has no role in fixing of any Amtrak salaries. BNSF does not share in or have any voice in determining the division of Amtrak's net earnings, profits or losses.

While the agreement between Amtrak and BNSF provided for Amtrak's use of BNSF's rail line, neither party intended this as an agreement to share profits and losses with the other company, or for the profits and losses of either BNSF or Amtrak, or as an agreement to jointly own any passenger trains or rail lines.

## Motions to Strike

Following the Intervenors' Responses (Dkt. 411, 412) to their summary judgment motions, the railroad plaintiffs moved to strike certain portions of these pleadings which were premised on new opinions offered by expert witnesses retained by the Intervenors. The plaintiffs condemn the opinions as last-minute attempts to salvage the passengers' claims, and argue the opinions should be excluded because (1) they are new or novel opinions not previously revealed in the experts' reports or depositions, and thus barred by Fed.R.Civ.Pr. 26(e) and 37; (2) they are unreliable conclusions outside the expertise of the witness, and thus barred by Fed.R.Evid. 702; (3) or both.

In addition, following the entry of the Pretrial Order (Dkt. 461) which added new claims for the allegedly defective locomotive headlight, Amtrak moved for summary judgment on these claims and, after Cimarron and the Intervenors opposed this motion, filed a reply coupled with separate motions to strike portions of the expert statements cited in the responses.

Under Rule 26(e), a party may submit a supplemental or rebuttal expert report if the expert has been presented with new information, but the rule precludes such reports submitted in the absence of such information. *Spirit Aerosystems, Inc. v. SPS Technologies, LLC*, Case No. 9-CV-114-EFM-KGG, 2013 WL 6196314, *6 (D.Kan. Nov. 27, 2013). Thus, "a supplemental expert report that states additional opinions or rationales or seeks to 'strengthen' or 'deepen' opinions expressed in the original expert report exceeds the bounds of permissible supplementation and is subject to exclusion under Rule 37(c)." *Paliwoda v. Showman*, No. 12-2740-KGS, 2014 WL 3925508 at *3 (quoting *In re Cessna 208*

*Series Aircraft Prods. Liab. Litig.*, Case No. 05–md–1721, 2008 WL 4937651, at *2 (D.Kan. Nov. 17, 2008)) (emphasis added). The undersigned has adopted rules which specifically provide that "absent strict compliance with Rule 26(a)(2), the witness's testimony will be excluded pursuant to Rule 26(e)(1)." Guidelines for Parties and Counsel on Pretrial and Trial Matters, Revised Aug. 2011 (J. Thomas Marten, United States District Judge).

Expert opinions must not only be disclosed through Rule 26(a)(2), they must also be reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993) (expert testimony must have "a reliable basis in the knowledge and experience of [the relevant] discipline"); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). An expert's opinion may be admitted under Rule 702 if is helpful to the jury, which requires the court to determine if there is "a valid scientific connection to the pertinent inquiry." *Daubert*, 509 U.S. at 592. "Although many factors may bear on whether expert testimony is based on sound methods and principles, the *Daubert* Court offered five non-exclusive considerations: whether the theory or technique has (1) been or can be tested, (2) been peer-reviewed, (3) a known or potential error rate, (4) standards controlling the technique's operation, and (5) been generally accepted by the scientific community." *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1217 (10th Cir. 2016) (citing 509 U.S. 593-94). As explained below, the court finds that in most respects the expert opinions cited in the Intervenors' Responses are either novel and undisclosed opinions not in compliance with Rule 26, or opinions which have not been demonstrated to be reliable under Rule 702, and accordingly grants the plaintiffs' motions. (Dkt. 432, 436, 438).

## Fulk

Colon Fulk worked for Amtrak as a locomotive engineer for 11 years. Before that, he worked in the operating department of Norfolk Southern Railway for 22 years, serving as brakeman, conductor, fireman, road foreman, and locomotive engineer. Fulk provided his report in the present action on April 2, 2018.

Fulk currently works for a company called Railex. He is Railex's only employee, and 90-95% of his work involves consulting and providing testimony for parties to actual or potential litigation. All of this work is performed on behalf of persons who are adverse to railroads.

In his recent affidavit, Fulk states the derailment occurred, or was made worse, because (1) the train's headlight was improperly set to dim rather than bright, (2) the crew failed to see the misalignment at 800 feet away or more and then used emergency breking, and (3) the engineer failed to "rid[e] out" the misalignment and avoid emergency braking.

Fulk has not identified any railroad rules or recommendations from the FRA or NTSB suggesting that locomotive engineers not apply emergency brakes when encountering a kink or misalignment of track.

Fulk himself has only encountered kinked or misaligned track twice. Both incidents occurred in daylight and clear weather. In both incidents, Fulk did not see the misalignments until his locomotive was less than 400 feet away, and in one, less than 200 feet away from the misalignment. Once incident occurred in the early 1980s when Fulk was operating a freight train at 45 miles per hour. He saw the misalignment three to four

seconds before hitting it. In the other incident, Fulk saw the misalignment only a couple of seconds before he hit it. In both incidents, Fulk did not apply emergency braking and the train did not derail. In his deposition Fulk acknowledged he does not now know how big either misalignment was.

Fulk has never experienced a situation where trains derailed after the application of emergency brakes. Other than this case, Fulk has never investigated an accident where a train derailed after application of emergency brakes.

Fulk is not aware of any analysis ever done regarding when a train's emergency brakes should or should not be applied when a track misalignment is encountered. He did not analyze the frequency with which derailments have occurred due to track misalignments even though that information is available through an FRA website. He is not aware of any other derailment that was caused by a track misalignment, or a track misalignment and emergency braking. He has not seen any statistics suggesting a correlation between derailments involving track misalignments where there was or was not an emergency brake application.

The FRA website identifies three Amtrak derailments that resulted from track kinks between 1994 and 2005. Fulk is unaware if any of these incidents that involved the application of emergency brakes.

Fulk has not seen anything from the FRA or NTSB suggesting that applying emergency braking on a track kink increases the likelihood of a derailment. He has likewise seen no reports or data from any third-party source suggesting such a correlation.

Fulk has never talked to anyone who applied emergency brakes when encountering a track kink after which the train then derailed. He does not know whether there are some misalignments large enough to derail a train even in the absence of emergency braking.

Fulk does not know at what speed a train passing over a nine-inch misalignment would derail. He is unaware of any data from prior derailments that he could use in analyzing and drawing conclusions from the subject derailment.

According to Fulk, the train derailed because of the buff forces of the train braking as it crossed the misalignment.[7] Fulk has not tried to quantify the buff or draft forces that the Amtrak train would have experienced during this derailment event, even though the forces can be calculated through computer simulations that he has utilized in the past and agrees other experts in the industry utilize to analyze events

Passenger and freight trains typically are subject to different slack forces. A freight train could have 50 or more feet of slack. Passenger trains have very little slack, and use tightlock couplers that are designed to reduce the amount of slack. They also have different draft gear with less slack than freight cars.

Fulk testified that there are many differences between freight trains and passenger trains. Freight trains consist of 100 or more cars, while a passenger train typically has 15

---

[7] The operation of trains results in two types of slack force, which arises from the different speed of adjacent cars. "Buff" force occurs created when the locomotive brakes and the cars behind it begin running in toward it and the slack compresses. "Draft" force occurs when the locomotive accelerates, and the slack between cars runs out and puts couplers in a state of tension.

or fewer. Freight locomotives and cars are also significantly heavier than passenger locomotives and cars.

Fulk does not know how much buff and draft force would be necessary to cause a derailment of a train given the dimensions of the misalignment that existed in this case. He does not know how slowly the Amtrak train would have had to be traveling in order to avoid derailment when it encountered the misalignment.

Fulk has no training in physics or human factors.

Fulk does not know what distance from the misalignment the Amtrak locomotive engineer could have applied the emergency brake without risk of derailment.

As a manager at Norfolk Southern, Fulk had the ability to suggest changes to railroad rules if he identified a subject that needed to be addressed. Fulk states that he was trained about how to handle a train when it encountered a defect, but he has also admitted that Norfolk Southern had no rule governing the operation of trains over track kinks, and he never suggested that Norfolk Southern adopt such a rule.

Fulk is unaware of any railroad in the United States that has adopted a rule requiring the action that he claims Montanez, the Amtrak locomotive engineer, should have taken.

His report cites no rule from any railroad that discusses train handling on a track kink. He has seen no advisory from the FRA or NTSB encouraging railroads to adopt a rule of the sort he now wants to impose on Montanez, identified any training materials from any railroad that tells engineers how to deal with track kinks, has not seen and does not know the contents of the Amtrak's engineer certification and training plan, and does

recall anything about the actual training materials that Ms. Montanez did receive as part of her training by Amtrak.

Fulk believes that Montanez's training was deficient because Amtrak did not train her on things that he thinks should have been the subject of her training.

Fulk admits that he has not seen any training materials from any other railroad that contain the subject matter he claims Amtrak should have provided to Montanez. He has not seen any safety advisory from the FRA or NTSB concerning the technique for braking when encountering a track kink.

According to Fulk's deposition, the train would not have derailed if the crew had seen the kink earlier, at 800 feet away or more, and immediately applied the emergency brakes. However, Fulk was asked in the deposition, "How slow would the train have had to have been going for it not to have derailed?" Fulk responded:

> I don't know. I don't know. That's an opinion that -- for the fact we did get two locomotives and two cars over it before it derailed. And I can't put a -- and I'd be very naive to try to put a specific speed with it to say that, but that's my opinion.

Fulk testified that if the engineer had done nothing at all, as opposed to applying the emergency brakes, the train would not have derailed. He believes that applying the brakes when the train was 400 feet away would have been the wrong course of action.

Fulk was then asked, "So you don't have any data that you could point to that says, there's actually some data out there that supports what I think?" Fulk responded, "No. · Not in relation to a track kink." When asked again if the train would have derailed

if the crew had applied the emergency brakes at 400 feet, Fulk said, "I don't know the answer. I don't know. I suspect they would have."

The hypothetical was then changed to 500 feet, and Fulk's only additional comment was, "I think -- I think that is getting in the range of where it is -- it's iffy."

Asked about 600 feet, Fulk said, "I don't know."

The following exchange then occurred:

[Q.] So we've been kind of going through a whole lot of different scenarios as, okay, at 400 feet what should you do, at 500 feet what should you do, at 600 feet what should you do. These are all things that you would have to take into account a whole lot of variables, and you're not even sure exactly what the right answer is?

[A.] I am not. You are correct. I don't know, and I don't know anybody else that knows.

Fulk is unaware of any data or studies supporting his opinions as to what actions the train crew should have taken or what would have resulted.

The railroad plaintiffs attack the opinions offered by Fulk in his affidavit on two grounds. First, they argue the opinions should be excluded under Rule 37(c) because they are new opinions not presented in his earlier report. They contend that it is fundamentally unfair to present these opinions for the first time after the close of discovery and the filing of dispositive motions. Second, the plaintiffs contend that Fulk's testimony should be excluded under Rule 702 and the standards for the admissibility of expert opinions recognized in *Daubert* and *Kumho Tire*.

The court finds that Fulk's opinion testimony that operating the headlight on dim would have been contrary to appropriate operating procedure is not a new opinion. The

plaintiffs and intervenors do not appear to actually disagree that Fulk would not be testifying as an expert to the fact that train headlight was on dim at the time of the accident. See Resp. at 28 (not post-accident photos showing the light switch on dim, which "is a fact" and that "Fulk's opinion is not about whether the headlight was on dim or bright"). Rather the dispute appears to be whether Fulk's affidavit opinion that running the train with the headlight on dim would have been careless. This opinion is implicit in Fulk's earlier report. Although his report "assume[s]" that headlight was actually on bright at the time of the accident, but was still inadequate because it was defective or misaligned, he also adds that "[i]f [the headlight was] not [on bright], it would have been operational error to have been running with the headlight on dim."

Accordingly, the opinion as to the effect of running the headlight on dim is not new or novel. Ultimately, the court need not resolve any secondary issue with respect to the reliability of such opinion. The issue of whether the headlight was on dim or bright was explicitly removed during the pretrial conference conducted August 18, 2018.

Similarly, the court finds that the affidavit's statement that "the train crew should have been able to see the misalignment or kink for at least 800 feet in advance of the misalignment" is not excludable under Rule 37(c). The plaintiffs contend that his argument is a novelty, because in his report Fulk had stated that the failure to see the misalignment at 800 feet because the headlight was defective or misaligned, but in the affidavit this conclusion is "unqualified and unequivocal." (Dkt. 458, at 8). The court finds no substantial surprise or prejudice which would justify striking the opinion under Rule 37. In his report, Fulk indicated his belief the crew could have seen the misalignment at

800 feet, and the plaintiffs could and did inquire as to the grounds for his opinion at his deposition. The affidavit opinion is not so radically different that exclusion is justified pursuant to Rule 37.

The court does find that the opinion that the train should have been abiding by a 25 mile per hour "slow track" order, is a new, previously undisclosed opinion which should be excluded under Rule 37(c). That opinion cannot be fairly traced in Fulk's earlier report.

In his affidavit, Fulk states that there would have been no derailment "[i]f the Amtrak train was abiding by the 25 mph disturbed track slow order." The earlier report, however, only references a separate slow track order well away from the scene of the derailment, and Fulk acknowledged in his deposition that for the actual location of the accident "there was no slow track order in effect" and that consequently the maximum authorized speed in the area was 60 miles per hour, not 25. To the extent that Fulk now opines that a slow track order was in effect for the area of the accident, it his contrary to his earlier statements and is excluded.

The court also finds that Fulk's new assertions regarding the content of Amtrak's training programs should be excluded from the case. Fulk now opines that properly-trained engineers should be able to detect track misalignments, and makes suggestions regarding proper field-training for engineers. (Resp. ¶¶ 204-207, 209-12, 225, 249). But Fulk in his deposition expressly testified that he has not seen Amtrak's training program, that he does not know what the training includes, and does not know if the training Montanez received complies with FRA guidelines. Fulk did not previously criticize the

content of Amtrak's training program, and may not do so for the first time in opposition to the railroad's summary judgment motion. The evidence supplied by the plaintiffs supports the conclusion that Montanez's training meets the standards for the FRA and those set forth by 49 C.F.R. Part 240.

The court next finds that much of Fulk's testimony has not been shown to be reliable, and accordingly should be excluded. Responding to plaintiffs' *Daubert* arguments, Intervenors simply (and quite repeatedly) stress the length of Fulk's experience. (Dkt. 446, at 22-23). They also emphasize that Fulk has indicated he has relied on Loumiet (*id*. at 24), and is buttressed by the testimony of other experts (*id*. at 26). But as to important elements of Fulk's proffered opinions, the intervenors have completely failed to justify Fulk's *own* expert testimony. Simply repeating Loumiet's conclusions provides no assistance to the jury. And intervenors do not show *how* Fulk's years of general locomotive experience renders reliable particular opinions advanced here.

Fulk has opined that the crew erred when it tried to brake while over the misalignment. But, as noted earlier, Fulk has very little actual experience with misalignments. In all the many years of those experience, he has encountered them twice. Both occasions were in daylight, and on both occasions, he perceived the misalignments much closer (400 feet or less) than the distance (800 feet) he now says that the train crew should have seen the present misalignment in the middle of the night. On both occasions, Fulk did not apply brakes, and no derailment occurred. But he does not remember how big those misalignments were, and more importantly, he has no experience with the

converse:  any instance in which braking while over a misalignment *caused a derailment which otherwise would not have occurred*.

Here, the Intervenors have completely failed to show anything in Fulk's experience or training which would support the opinion that braking over the misalignment caused the derailment. Fulk has not identified any railroad rules or recommendations from the FRA or NTSB that require such an action. Other than this accident, Fulk has never investigated an accident where a train derailed after application of the emergency brakes. Fulk is not aware of any analysis about when a train's emergency brakes should or should not be applied when a track misalignment is encountered, has not analyzed the frequency with which derailments have occurred due to misalignment, and does not know of any other derailment that was caused by a track misalignment and emergency braking.

The Intervenors are correct to note that experience alone can provide sufficient foundation for expert testimony. *See In re Motor Fuel Temperature Sales Practices Litig.*, No. MDL No. 1840, 2012 U.S. Dist. LEXIS 13881, at *50 (D. Kan. Feb. 6, 2012). But a proffer of such testimony must show how the experience supports the opinions included. Here, the record shows that Fulk's actual experience with misalignments in general is almost nonexistent. As to a misalignment encountered at night, it is nonexistent.

Fulk's contention in his report that the train "would not have derailed had emergency braking not been applied," and in his affidavit that the braking "contributed to the derailment" are conclusions which are not supported by anything in Fulk's

background. Similarly, the Intervenors' attempt to save Fulk's conclusions by citing Loumiet's testimony or the conclusions of other experts, is insufficient.

First, Fulk himself does not do so. In his report, deposition, and affidavit, Fulk does not ground his "ride it out" causation theory on Loumiet. Indeed, Fulk only states in his report that he read Loumiet's report but does not otherwise discuss his findings, and does not mention Loumiet at all in the course of his report. Second, Loumiet himself does not testify that braking caused the derailment, stating only that using the brakes "while on the track misalignment applied longitudinal forces to the rails and wheels that would not have otherwise been present." The court will address Loumiet's opinion below, but for present purposes it is sufficient to note that this is far short of establishing that the braking caused the accident, and, in any event, provides no basis for Fulk testifying as to the issue.

Fulk has also provided opinions as to the distances at which the crew should have seen the misalignment, and, once seen, the course of action they should have taken. The Intervenors respond to plaintiffs' motion by citing Fulk's training and by noting the results of Fulk's experiment in railway nighttime visibility. But the argument which generically cites Fulk's "training" carries little weight, as Fulk himself never specifically references that training as a basis for his opinions, which instead appear to be his own unsupported estimates of visibility. As noted earlier, in his deposition Fulk was questioned about the basis for his opinions that the crew should have acted in certain ways based upon when the say the misalignment — whether at 400, 500, or 600 feet —

and agreed that he was not sure what the right answer was. "I don't know, and I don't know anybody else that knows."

The Intervenors have failed to show a reliable basis for Fulk's statement that the crew could have seen this particular misalignment at 800 feet. As noted earlier, despite his years of experience, Fulk has never seen a track misalignment at night, and thus has no experience from which to opine how far such misalignments might be perceived, and none at all for saying that a misalignment of this particular magnitude should show have bene seen at 800 feet.

Additionally, Fulk's experiment referenced in his declaration—which involved placing reflectors at various distances along a railway and determining how far they were visible—provides no substantial reason for crediting that his opinions as to the adequacy of the Amtrak headlight. The experiment involved a different locomotive type, using an unknown type of bulb. Further, as discussed elsewhere in the present Order, reflectors are designed for visibility, capturing and returning light towards the person viewing the reflector. Thus, Fulk's reflector experiment does nothing to show the distance at which the ground-level track misalignment was actually visible to the crew on the night of the accident. The court finds that the plaintiff's joint Motion to Strike (Dkt. 423) should be granted.

Amtrak separately targets (Dkt. 482) Fulk's opinions cited in support of Cimarron and the Intervenor's defense of their headlight claims. Fulk states that the headlight failed to meet the standards set forth by 42 C.F.R. § 229.125 because it was improperly aimed and because it failed to illuminate the track in front of the train. The court finds that Fulk's

conclusions, which are largely premised on his review of the locomotive video, are not reliable under the standards for expert opinions set forth separately in this Order.

Fulk acknowledges the video is "poor quality." He ultimately concludes in his report, however, that "[t]he locomotive headlight was not aimed in the proper direction as required by federal regulations, *i.e.*, CFR 229.125n" (Dkt. 474-1, 10). Fulk offers this conclusion with no explanation or discussion.

Notwithstanding his long experience as a locomotive engineer, the proponents of his testimony have failed to show that Fulk has any experience at all in attempting to forensically reconstruct the facts of a nighttime event based on electronic image captures. Fulk's review of the video and his proffered subjective belief it shows the light was inadequate or aligned to one side is not admissible because there is no indication that Fulk has experience in video analysis. Such subjective impressions do not establish a violation of § 229.125. As noted below, the FRA has explicitly eschewed as vague the requirement that the headlight must allow the train crew to "see" a person at 800 yards, replacing it with objective criteria for brightness and aiming.

Fulk has otherwise admitted he does not know, on the night of the accident, how much actual light the Amtrak locomotive placed 800 feet ahead. Fulk acknowledged that he has not seen any source (from the FRA, NTSB, or recognized journal) indicating that his method of estimating visibility is consistent with federal regulations.

This lack of reliability is further undercut by Fulk's own statements. As noted earlier, when attempting to blame the train crew for reacting too slowly or for having the headlight on dim, Fulk opined that the crew "should have been able to see the

misalignment or kink for at least 800 feet." And he agreed that the reflection from signs well beyond 800 feet indicated that "the light is bouncing off those reflectors and coming back means that the light's properly aimed."

The same result is true for Fulk's claim that the "AIM" of the headlight was impaired because of prior damage to the locomotive. Fulk bases this conclusion on photographs showing some damage to the front area of the locomotive. But the photographs do not reveal any damage to areas of the locomotive near the headlights. Fulk was asked if he "kn[e]w, in fact if any of the damage actually altered the aiming or orientation of the lights?" and he responded: "I don't know that for a fact, no."

### Loumiet

Loumiet, Intervenors' accident reconstruction expert, has a Bachelor of Science degree in Mechanical Engineering. He has some 30 years of professional experience, and has specialized in the reconstruction of train and motor vehicle accidents, including expertise in the calculation of train stopping distances. Loumiet has made numerous technical presentations and authored numerous technical publications in the areas of accident reconstruction and highway safety, including the areas of train operations and dynamics. He is the principal author of the book, *Train Accident Reconstruction and FELA and Railroad Litigation.*

Plaintiffs challenge three opinions offered by Loumiet in the affidavit attached to the intervenors' summary response: (1) an opinion that the misalignment was visible to the train crew at a distance of 400 feet, (2) that braking while over the misalignment created lateral braking forces which caused the misalignment, and (3) that better ballast or maintenance of the area would have prevented the runaway Cimarron truck from ever striking the track. Plaintiffs argue that these opinions are new opinions, presented improperly for the first time in opposition to summary judgment, and that the opinions are unreliable and inadmissible under Rule 702.

Intervenors identified their liability experts, including Loumiet, on April 2, 2018, after obtaining agreement from the plaintiffs to a brief extension of the March 30, 2018 deadline. The deadline for the completion of all discovery testimony was May 7, 2018. The intervenors have never sought to designate any rebuttal expert. Plaintiffs were first presented with Loumiet's declaration, which is the subject of the present motion to strike, when it was signed on June 28 and filed the same day with the intervenors' summary judgment response.

The plaintiffs argue that the declaration's direct opinion that the train crew could have seen the misalignment when the train came out of the curve ahead of the scene is a novel opinion not previously presented in the case. They contend that the previous report focused on the calculations of various stopping distances after assuming the train crew detected the misalignment.

The Intervenors contend that this misstates the record, as Loumiet did say in his November 13, 2017 report that the crew could see the misalignment at 400 feet. Actually,

a review of the report indicates that its focus was on braking distances, with Loumiet simply stating that at one point in the report: "Given that the train crew had 400 feet of visibility to the track misalignment, at 25 mph they would have had ample time and distance to see the misalignment and stop the train before reaching it."

Again, the entire context of Loumiet's report is a discussion of stopping distances. Loumiet simply indicated that "[g]iven … 400 feet of visibility" the train could have stopped reflects an assumption visibility, based apparently on NTSB estimates. That Loumiet was not *himself* offering an opinion as to how far the crew could have seen the misalignment was confirmed in his deposition:

> Q   You're not suggesting that they actually saw or could have seen this defect at that distance [800 feet]; are you?
>
> A.  I'm not opining on that; that's correct.
>
> ***
>
> Q.  This video from the locomotive is not an accurate depiction of what the train crew could see?
>
> A.  Of that aspect, I would agree. But, again, I'll look to others to speak to that.
>
> ***
>
> Q.  Have you made any determination as to how far away the crew would have been capable of seeing the track defect?
>
> A.  No.
>
> Q.  No calculations either?
>
> A.  Correct.
>
> Q.  That's something you'll defer to others on?

A. Yes.

In addition, Loumiet does not ground the new opinion on any testimony or other data.

The Intervenors contend that "longitudinal braking forces" applied by the train crew adversely "affected the track" and contributed to the derailment, citing Loumiet's report. Plaintiffs correctly point out that Loumiet said nothing about such forces in his report. In their response to the motion to strike, the Intervenors argue that Loumiet's discussion of lateral forces is not new, as in his report he observed that braking creates "longitudinal forces to the rails and wheels that would not have otherwise been present."

But such generalized testimony as the effect of braking is different from the new suggestion in response to the summary judgment motions that the application of emergency breaking *caused* or *contributed* to the derailment. In his deposition, Loumiet acknowledge that he had not done any calculations to show that not braking would have prevented the derailment.

The declaration's discussion of longitudinal effects of braking as a contributing factor to the derailment is novel opinion testimony, and properly excluded. Further, the intervenors have failed to show any underlying calculations or data which would render such an opinion about the causal effects of longitudinal forces reliable under Rule 702.

Plaintiffs also challenge opinions included in Loumiet's declaration to the extent it: (1) describes the extent of the misalignment as being 7 to10 inches, (2) states an opinion

as to the speed at which the Cimarron truck struck the track, (3) relies on an article[8] by Dr. Allan Zarembski, as to the effects of additional ballast in the area, and (4) that with "better quality … and more ballast" in the area the truck would not have struck the track with sufficient force to cause a misalignment. The intervenors contend that (1) the estimate of the amount of misalignment was simply taken from the plaintiffs' own Statement of Facts in their motion for summary judgment, (2) that Loumiet's statement of opinion as to the speed of the truck is merely a response to the testimony of plaintiff's expert Dr. Wolf as to the truck's speed, (3) that Loumiet's reliance on the Zarembski treatise is similarly a reflection of Wolf's use of the treatise, and (4) that the issue of ballast was discussed in Loumiet's report and deposition, and in any event any ambiguity is the fault of BNSF, which prevented actual measurements of the ballast present at the scene by reworking the area after the accident.

The court finds that the motion to strike should be granted. First, while plaintiffs have separately asserted that the track misaligned some 7 to 10 inches, this does not mean that *Loumiet* may provide opinion evidence on the issue. In his deposition, Loumiet states the amount of deformation not as something that he is simply assuming, based on other evidence, but suggests that this is his opinion as well — stating that such a determination "can be reliably made from the available evidence in this case." In his previous report

---

[8] Dr. Allan Zarembski, "Survey of Techniques for Increasing the Lateral Resistance of Wood Tie Track," University of Delaware Department of Civil and Environmental Engineering, available online as sponsored research at the Railway Tie Association website (www.rta.org).

and deposition, Loumiet made no attempt to offer an opinion as to the amount of misalignment.

Similarly, Loumiet acknowledged in his deposition that he had not analyzed the force the train put on the tracks as it went over the misalignment. Again, the focus of the report is on stopping distances. Loumiet did not attempt to explain how any lateral forces created by braking caused the derailment. As plaintiffs note, the intervenors' response addresses Loumiet's opinions as to longitudinal forces by attempting to argue that they should not be excluded under Rule 26 because they are not new. But plaintiffs also challenged Loumiet's declaration addressing the longitudinal effects of braking under Rule 702, arguing his conclusions are not only new but also unsupported by any documentation, data, or testing, and that intervenors wholly fail to address the issue. The court finds that such opinion is properly excluded under both Rule 26 and 702.

The court finds that Loumiet's calculations of the truck's speed and his reliance on the Zarembski treatise should also be excluded. The new opinion testimony is not a fair and necessary response to new information. Once Wolf delivered his report, which included calculations as to the truck's speed, the intervenors could have sought leave to file a supplemental report. They did not do so, nor did they file any such supplemental report until after the time authorized by Rule 26(a)(2)(D)(ii) for such supplementation. Instead, they first referenced the matter some two months after plaintiffs moved for summary judgment, by submitting a new declaration by Loumiet in conjunction with their response.

Nor can the speed of the truck be considered a novel issue which Intervenors could not have anticipated until Wolf's testimony. The impact of the truck on the rails, as the most open and obvious event leading to the derailment, was present in the case from the very beginning. The force with which the truck struck the track – including its speed at the time — were issues which should have been addressed in any initial report by experts in the case. *See Spirit Aerosystems, Inc. v. SPS Technologies, LLC*, Case No. 9-CV-1144, 2013 WL 6196314 at *6 (D.Kan. Nov. 27, 2013) (while an expert report may be supplemented based on new information not previously available, "a lack of diligence in pursuing information that could have been available at the time of the original report does not mean the same as information that was not available").

The same is true with respect to Loumiet's new reliance on the Zarembski treatise. Again, the facts surrounding the truck's impact were matters for the initial report of any expert. Loumiet was required to present his opinions on the issue and any underlying supporting documentation in his report. Instead, he made no calculations and cited no support. Intervenors are correct that the Zarembski treatise was an exhibit to Wolf's deposition — because *counsel for intervenors* included it the record. Wolf did not cite the treatise in his report, and it does not appear the treatise itself was discussed during the deposition. The Zarembski treatise is publicly available, and could have been used by Loumiet in his original report. The unilateral action by counsel in marking the treatise as a deposition exhibit is not a valid basis for offering a subsequent, new opinion by their own expert, when that opinion should have been presented months earlier.

The testimony by Loumiet as to the effect of more or better ballast is also subject to exclusion. First, the opinion testimony is new and properly excluded. While Loumiet did discuss the purpose of ballast generally in his report and deposition, he did not give an opinion as to the causal effect of the ballast on the accident. He gave no opinion as to the lateral force applied to the track by the truck, and did not discuss the "quality" of the ballast. Loumiet expressly disclaimed having any opinion at his deposition, stating, "I'm not opining about the ballast conditions, and, in fact, it's my understanding others will deal with that issue."

The opinions as to the causal effects of the ballast at the scene of the accident are new opinions. In his deposition, Loumiet disclaimed such opinions:

Q. Is it fairly well recognized that the truck caused the misalignment?

A. Well, the truck, combined with the ballast conditions. Although I'm not opining about the ballast conditions, and, in fact, it's my understanding others will deal with that issue.

***

Q. Okay. You've not looked at anything or quantified the stability of the ballast section to withstand lateral forces; have you?

A. No. That would be the side of BNSF, or AREMA, a spec in that regard.

Q. Okay.

A. But otherwise I'm not giving those calculations.

Q. But as far as how the forces actually imparted by the truck, when it hit the roadbed, under the circumstances existing on March 14th, you're not going to be suggesting to what extent the ballast contributed to that misalignment; are you?

A. No.

***

Q.  So you're not suggesting that a different ballast shoulder would have prevented a lateral displacement when the truck hit the ballast as it did?

A.  No.

The focus of Loumiet's original report was his claim that the shoulder area should have been constructed differently, so that the truck would never have hit the rails, but come to a stop sooner. The opinion offered for the first time in response to a summary judgment motion—that different ballasting would have prevented derailment by softening the impact from the truck—is a new opinion properly excluded under Rule 26.

Additionally, the evidence is properly excluded under Rule 702. Loumiet offers simply conjecture (stating that with different ballast it is "*possible* the track would not have misaligned" (emphasis added)) based upon no underlying documentation or testing. Intervenors argue that such documentation is simply the plaintiffs' own fault, as "[i]t is impossible to calculate the exact amount of restraint the ballast shoulder provided at the misalignment location." (Dkt. 447, at 20).

The railroad plaintiffs point out that the reballasting undertaken by BNSF immediately after the accident only occurred west of the accident, in the area where the train cars derailed. The area east of the misalignment were not substantially affected by the reballasting. According to information supplied by the plaintiffs, they specifically invited intervenors to inspect this area within a month of the accident, but Intervenors refused.

### Blackwell

Alan Blackwell is a railway engineering consultant hired by the Intervenors to discuss the condition of the track near the accident. Blackwell submitted his report on April 2, 2018. As noted earlier, the deadline for expert discovery was May 7, 2018. In their present motion, the railway plaintiffs argue that the new Declaration signed by Blackwell on June 28, 2018 (and submitted by Intervenors the same day in conjunction with their Response to plaintiffs' motions for summary judgment Blackwell) contains substantial modifications or additions to Blackwell's earlier report, and should be stricken as either improper supplementation under Rule 26, or as unreliable under Rule 702. In their Response, Intervenors only cite to the new Declaration, not the original Report by Mr. Blackwell.

The full extent of the methodology that Blackwell used to determine if, how, and to what degree various factors caused the derailment is set forth in his Report's sections on "Methodology" and "Summary and Grounds for each Opinion," which explain that his opinion is grounded on his "technical training, and specialized knowledge and experience."

Blackwell agreed in his deposition that he had not performed a "detailed analysis of what caused this derailment." Asked if he had conducted any analysis of "the forces involved" in the accident, Blackwell testified, "I wouldn't call it that." He also testified that he has not calculated the amount of force the Cimarron truck exerted when it struck the BNSF track structure, and does not have the ability to do so. He does not know and has not analyzed how much force was necessary to move the track structure out of

alignment. Blackwell acknowledged in his deposition that he does not know what the term "the scientific method" means.

Blackwell has testified that, based on his knowledge and experience, that with an eight-inch ballast shoulder the Cimarron truck would not have knocked the track off alignment. Blackwell acknowledged that fouled ballast can be objectively tested for or confirmed with a sieve test, and that there are ways to objectively test whether a roadbed is soft. However, Blackwell did not do any testing of the ballast near the scene to test his claims.

The Declaration includes a photograph of the area (Exhibit D) which it describes as being taken "only a few days after the derailment cleanup was completed and the track was put back into service." In fact, the photograph was taken by Intervenor Glory Pennington (for purposes of supporting a claim of inadequate drainage) months after the derailment, on June 8, 2016.

Blackwell did not look at any weather records.

Blackwell testified in his deposition that there was no evidence of track defect in BNSF notes taken before the accident. He agreed there was no evidence of alignment defects, gauge defects, cross-level defects, or track surface defects before the truck impact. Blackwell has stated that inspection notes after the accident indicate cross-level defects and otherwise improper ballast.

The plaintiffs note that Chad Holsteen, chief of the BNSF road gang operating in the area in the months before the derailment, worked on "spot surfacing, getting rid of

mud holes," and did a little bit of tamping here and there. Hosteen testified his crew did

not need additional ballast to do the spot surfacing and getting rid of mud holes.

Blackwell concluded:

It is my opinion that the following cause codes contributed to the derailment that occurred near milepost 373 on or about March 14, 2016.

- T001     roadbed settled or soft

- T104     Disturbed ballast section

- T105     Insufficient ballast section

- T108     Track alignment irregular (other than buckled/sun kink)

- H499     Other way and structure defect (Provide detailed description in narrative) Fouled Ballast, Drainage embankment excavation improper width and depth/Drainage culvert completely obstructed not providing adequate drainage and accommodating expected water flow for the area concerned.

- H699     Speed, other (Provide detailed description in narrative) Failure to issue appropriate temporary speed restriction when there was a deviation in the track beyond the limiting tolerances and the track had been disturbed and the ballast section not restored.

- M506     Track damage caused by non-railroad interference with track structure

The court denies plaintiffs' request to strike various portions of Blackwell's

Declaration, at least to the extent that it is grounded on the contention that the opinions

are novel or supplemental opinions and thus barred under Rules 26 and 37. Although

formatted differently from the original Report, a detailed examination of the Declaration

reveals that its ultimate conclusion—that poor maintenance contributed to the derailment

— replicates the conclusion of the Report. According to Blackwell, the misalignment was

caused or aggravated by defects in the track and its supporting ballast. He contends that

ballast problems were aggravated by poor drainage in the area, and the failure to impose

speed restrictions in light of these problems. Further, the court finds that Declaration premises these conclusions on the same evidence cited in the original Report: photographs of the scene before and after the accident, BNSF track maintenance records, and FRA and BNSF track maintenance guides and recommendations.

The plaintiffs argue that Blackwell's conclusions are unreliable. They note, for example: (1) that the blocked culvert cited by Blackwell was approximately a quarter mile away from the actual site of the derailment; (2) that a photograph showing water pooling taken by a passenger was not, as Blackwell assumed, taken within days of the accident but months later; (3) that the road gang leader denies engaging in any extensive resurfacing in the area  that would have required "restoration" of any ballast; (4) that the resurfacing in any event occurred four weeks before the accident so that any loosened or disturbed ballast would have safely compacted in the interim; (5) that Blackwell does not understand the term "scientific method," and (6) that the district court granted a motion to restrict Blackwell's testimony as to track conditions in a separate case

These and other issues raised by plaintiffs raise a substantial question as to the reliability of Blackwell's opinions under Rules 702 or *Daubert*. Blackwell does have extensive training and experience in track maintenance, has explained his opinions, and has cited the evidence and reasoning behind them. To the extent that he has relied on BNSF and FRA materials, and on photographic documentation, such materials appear to be matters of general acceptance and usage within the field.

However, the court concludes that the Intervenors have failed to show that Blackwell's conclusions are sufficiently reliable to be admissible. Although Blackwell has

attempted to provide those conclusions with a veneer of objectivity by using a laundry list of BNSF "cause codes," an examination of the actual method Blackwell employed in reaching those "cause code" conclusions indicates that the opinion is unreliable and not helpful to any finder of fact.

Here, the Intervenors have failed to show how Blackwell's conclusions are supported by sound methodology. Blackwell does not know what the scientific method is. He has not demonstrated how any underlying "facts and data" actually support the "cause codes" conclusions, or shown how the various maintenance issues he has otherwise identified would have measurably reduced the longitudinal resistance of track ballast. He agrees that he conducted no actual studies of the physics of the truck impact, or the degree longitudinal resistance necessary to make track immune to damage from a thirteen-ton truck. The maintenance issues identified by Blackwell occur at some distance from actual site of the derailment, which occurred at a specific deformation in the rails caused by the impact of the Cimarron truck. The rails were not deformed at the obstructed culvert cited by Blackwell, or anywhere else other than the place where Cimarron's truck struck the railway.

The Intervenors' Response argues that Blackwell's approach is reliable, because he adopted BNSF's system of "cause codes" produced by a flow chart analysis of track maintenance issues. But this reflects a repeated tendency of Intervenors to shore up the conclusions of their experts by argument of counsel, rather than pointing to how *the expert* reached that conclusion. The court separately addresses the railroad plaintiffs' request for bad faith sanctions premised on the changing opinions offered by Intervenors' experts

after the summary judgment motions were filed. But the court notes here that those requests are understandable, given the lack of clarity in, for example, the response's reliance on Blackwell. Thus, the Intervenors cite to reports of prior track resurfacing maintenance in the general area of the accident, an aerial photo of the area, or evidence of obstructed drainage. But closer examination indicates that the underlying facts cited as support in the response either (1) were not cited by Blackwell in his report, or (2) reflect conditions chronologically or geographically distant from the scene of the accident. For the conditions actually cited by Blackwell, there is no evidence of track buckling or misalignment. The misalignment occurred only at the Cimarron truck's point of impact.

The court further finds that Blackwell's conclusions excludable for another reason. These conclusions are unreliable and unhelpful because they amount, in the end, to nothing more than an invitation for the jury to speculate about how the various factors presented in his report contributed to the accident. When expressing an opinion as to the cause of an event, an expert must not only rely on sound methodology, he must also account for obvious alternative explanations. *Lanzon v. Senco Prods.*, 270 F.3d 681, 693 (8th Cir. 2001) (citations omitted). *See e.g., Smith*, 232 Fed.Appx. 783 (10th Cir. 2007) (holding expert's causation opinion was unreliable where expert could not rule out any of the numerous alternative causes for accident).

The Tenth Circuit explained the principle in *Taber v. Allied Waste Systems*, 642 F3d.Appx. 801, 810-11 (10th Cir. 2016):

> In evaluating an expert's testimony, district courts may consider whether the expert has "adequately accounted for obvious alternative explanations." Fed.R.Evid. 702 committee note to 2000 amendment. But an

expert need not exclude every possible cause of an injury to testify as to causation. *Bitler* [*v. A.O. Smith Corp.*], 400 F.3d [1227,] 1238 n. 6. [(10th Cir. 2004)]. Instead, the expert need only exclude those alternative explanations that are "obvious"—*i.e.*, where there is "an established connection between certain possible causes and [the injury]." *Id.* If there is no evidence showing a possible alternative is valid, the expert's failure to rule it out does not render his diagnosis unreliable. *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 999 (10th Cir.2003). So long as the most obvious causes have been considered and ruled out, the existence of possible "uneliminated" causes goes to "the accuracy of the conclusion, not the soundness of the methodology," and therefore goes to the weight rather than admissibility of the evidence. *Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C.Cir.1996).

In *Bitler*, we referred to this process of eliminating causes to arrive at the most likely as "reasoning to the best inference," and we analogized the process to the medical practice of "differential diagnosis." 400 F.3d at 1237. In taking this approach, the expert must first identify "some independent evidence that the cause identified is of the type that could have been the cause." *Id.* The expert must then "eliminate other possible sources as highly improbable, and must demonstrate that the cause identified is highly probable." *Id.* at 1238….

….

[M]ere acknowledgment of other possible causes cannot establish the reliability of [an expert]'s causation theory. Rather, "reasoning to the best inference" means that the expert "must eliminate other possible sources as highly improbable, and must demonstrate that the cause identified [by the expert] is highly probable." *Bitler*, 400 F.3d at 1238.

Such reasoning to the best inference is missing from Blackwell's assessment. In the present case there is quite manifestly an "obvious" alternative explanation for the derailment — the runaway Cimarron feed truck which forcefully struck the rails at almost precisely the spot where the train derailed only a few hours earlier. Before this, trains routinely and successfully passed the area, notwithstanding the supposed poor maintenance now claimed by Blackwell.

In the end Blackwell's report is simply a list of various hypothetical factors which might have contributed to the accident. Blackwell does not show that it is "highly improbable" that the truck impact *alone* would not have caused the derailment. Similarly, there is nothing in the Report or Declaration to show that the additional railroad maintenance errors (summarized in the accident codes in Paragraph 29 of the Declaration) are the "highly probable" causes of the derailment.

As noted earlier, Blackwell acknowledged in his deposition that he had not attempted to reconstruct the accident, or conducted any "detailed analysis of what caused this derailment." He did not assess the force with which the Cimarron truck struck the BNSF track structure or how this affected the track, and thus cannot establish that it is highly improbable that the runaway truck, by itself, caused the accident.

### Nightenhelser

Cimarron's response to Amtrak's summary judgment motion depends in part on its expert Stuart Nightenhelser's statements that the train headlight was misaimed, and asymmetrical, that a proper headlight would have illuminated the misalignment at 800 feet, and that the crew was inattentive. The court finds these conclusions highly unreliable and inadmissible.

Nightenhelser has bachelor of science degree in physics and mathematics with a minor in chemistry. He has ridden on some locomotives in the past, but has never inspected the type of locomotive which was involved in the derailment.

In his deposition, he was asked, "Are you making any judgments or rendering any opinions as to what the actual output of the lamps on this particular locomotive were?" He responded: "Not by way of this analysis, but by inspection of the video, something is wrong with the lights on this locomotive. But I haven't worked that into any analysis."

He was also asked about the distance at which the crew could see the misalignment:

Q:    Okay. Do you have any opinion as to whether the train crew could have seen this misalignment when they were 800 feet away on the night of the accident?

A:    With the lights as they were?

Q:    Yes.

A:    No. I can't tell you.

Asked about the supposed problem with the headlights, Nightenhelser said, "It's just something I can't explain to you." And asked if these problems diminished the candela output of the lights, Nightenhelser responded, "I don't know. It's certainly a possibility."

Nightenhelser agreed that he cannot make any reliable assessments of illuminance from the headlights by looking at the locomotive video. He testified that that he could not say within a reasonable degree of scientific certainty that the lights did or did not meet the candela output required by the FRA regulations.

Nightenhelser does not know how much light from the headlight was reaching 800 feet down the rails at the time of the derailment. He agreed that there is no aiming or adjustment of either the headlights or the ditch lights.

According to Nightenhelser, the lights might have been misaimed because of some "error or damage" but has seen no evidence of such damage on the locomotive in question. Nightenhelser also suggested a potential error in the installation of the lamps but does not even know if it is possible to install them incorrectly because he has never installed one.

Nightenhelser was directly asked if he knew whether a person would have been illuminated 800 feet in front of the locomotive on the night in question. He responded he did not know.

Nightenhelser stated in his report:

Both Ms. Montanez and Mr. Blea had the opportunity to perceive the misaligned track at least 800 feet, and up to 1300 feet, before reaching it.

***

Regardless of the poor and mis-aimed lighting on the locomotive, both crew members must have been extremely inattentive to have not perceived the misaligned track long before it became visible in the video. Had they been keeping a proper lookout to the track ahead of them, *they could have perceived the misaligned track from more than 800 feet away* and been in a position to respond to it much earlier.

(Emphasis added).

The court finds Nightenhelser's conclusions inadmissible because they attempt to add to Amtrak's duties with respect to the headlight. As discussed below, Amtrak's duty to illuminate its trains is defined by 49 C.F.R. § 229.125. Nightenshelser's attempt to craft a duty far beyond § 229.125 is inadmissible, because any such duty of care is preempted.

As further discussed below, § 229.125 requires a headlight of at least 200,000 candela, and further provides that a railroad satisfies this requirement by providing a

single lamp of the type used on the Amtrak train. Nightenhelser, however, opines that the regulation actually requires a headlight of over a *million* candela, some five times the actual required amount of light. He accomplishes this by taking the highest recorded actual output for such a lamp (275,000), multiplies it by two for the two lamps in the headlight (even though the regulation explicitly requires only a single blub of this type be lit), and then doubles it again, by adding the two auxiliary lamps on either side of the headlight (which are actually pointed at an angle and are intended[9] to help make the train visible to motorists, rather than increase the vision of the train's crew).

The court finds that Nightenshelser's view of headlight brightness is so violently at odds with a plain reading of the § 229.125 that it that presents no reliable or admissible evidence. Whether couched as an interpretation of federal law or (as expressed in Cimarron's response) a claim of negligence *per se*, the court finds Nightenhelser's opinion reflects an attempt to magnify the standards for a locomotive headlight well beyond what is required by the text of § 229.125, and any claim of fault on the part of Amtrak premised on such a magnified duty is preempted by federal law.

Equally unacceptable are his unsupported assertions that the train's headlight was defective or misaligned. An expert should be able to offer more than mere conjecture. Nightenshelser simply speculates about the "possibility" that the actual Amtrak

---

[9] See Railroad Locomotive Safety Standards: Clarifying Amendments; Headlights and Auxiliary Lights, 68 Fed. Reg. 49713-01, 2003 WL 21959742 (August 19, 2013) ("[t]he primary purpose of locomotive auxiliary lights is to enhance the visibility of the front-end locomotive of a train from the perspective of a driver of a motor vehicle approaching a grade crossing") (citing 61 Fed. Reg. 8881; Locomotive Visibility; Minimum Standards for Auxiliary Lights, 61 Fed. Reg. 881-02, 1996 WL 93211 (March 6, 1996)).

headlight suffered from diminished brightness. The hallmark of a reliable expert is the ability to articulate how his opinion is justified by his experience or by observed data. *See Gen. Elec. Co. v. Joiner*, 522, U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"); *United States v. Nacchio*, 555 F.3d 1234, 1258 (10th Cir. 2009). Here, asked about his opinion that Amtrak's headlight was defective, Nightenhelser responds with a *je ne sais quoi* — "It's just something I can't explain to you."

Moreover, with respect to alleged misalignment of the headlight, Nightenhelser's opinion is at odds with itself. To support the defective headlight claim, Nightenhelser now opines that the video shows that the lamps are aimed more to the left than the right.[10] But Nightenhelser has also asserted that the train crew kept an inadequate lookout because the misaimed headlight still revealed the misaligned track:

> *Regardless of the poor and mis-aimed lighting on the locomotive*, both crew members must have been extremely inattentive to have not perceived the misaligned track long before it became visible in the video. Had they been keeping a proper lookout to the track ahead of them, *they could have perceived the misaligned track from more than 800 feet away* and been in a position to respond to it much earlier.

---

[10] Further, to the extent Nightenhelser is simply stating his subjective impression of what he sees in the video, the factfinder could do the same. Such opinion, unsupported by scientific data or testing, is not helpful to the jury. *See Mayfield v. Brewer*, 2014 WL 718049, *2 (S.D. Miss. Dec. 16. 2014) (excluding testimony of expert who "largely describes what he sees in the video" since "the jury can view the subject video and come to their own conclusions … based on their common knowledge and experience").

Further, the proffered opinion that the headlights were misaimed rests on the locomotive video, which Nightenhelser otherwise acknowledges lacks clarity. In his report, Nightenhelser described the video as "exhibit[ing] serious degradation in resolution, brightness dynamic range and brightness and color sensitivity compared with human vision," and wrote that the "poor resolution of the video imagery also plays a substantial role in whether and how scene elements are perceived." The opinion is not premised on any reliable methodology. Coupled with his acknowledgement that he simply does not know how much light the actual headlight was projecting 800 feet ahead, the court finds the opinion should be excluded.

Finally, the court grants Amtrak's motion with respect to Nightenhelser's opinion that the train crew failed to keep a proper lookout. Nightenhelser is an engineer, and expressly acknowledged in his deposition that "I don't hold myself out to be a broad human factors expert." He further testified that he has no experience in train handling or operating a locomotive. The introductory section of his report cites no human factors training or experience, only his expertise in physical sciences, specifically: "physics, mathematics, accident reconstruction, vehicle dynamics, optics photogrammetry, lighting, human vision, and visibility." (Dkt. 481-1, at 5). And the analysis section of his report (*Id.* at 5-12) is entirely given over to Nightenhelser's physical assessment of the video.

As noted earlier, the factfinder can watch the video and reach its own conclusions as to what it contains. Nightenhelser's additional assertion that the crew must have been "extremely inattentive" is a conclusion wholly unsupported by his training or expertise.

Because the assertion is unsupported by any reliable methodology or data, the court grants Amtrak's request to exclude it.

## Mathison

Brad Mathison provided his report on April 2, 2018, and was deposed April 24, 2018. Mathison did not submit a timely supplement to that report. Instead, consistent with the pattern established during the first set of summary judgment motions, Intervenors responded to Amtrak's motion for summary judgment on the headlight claims (Dkt. 474) together with a new Declaration by Mathison. (Dkt. 474-2). The Declaration cites the materials cited by the railroad plaintiffs in conjunction with their May 31, 2018 summary judgment motions, unspecified "discovery documents," and a recently-produced, post-derailment locomotive video.

The Declaration is the subject of a corresponding Motion to Strike by Amtrak. (Dkt. 478), which the court finds should be granted. As noted elsewhere in this opinion, under the circumstances of the case, the court finds no abuse of discretion in the decision of the Magistrate Judge to allow the headlight claims to be added to the case. But nothing in that decision may be taken as justification for the attempt by Intervenors to "strengthen

and deepen" Mathison's original report,[11] or as *carte blanche* to circumvent the existing requirements for timely expert disclosures.[12]

The court finds the attempted supplementation is improper. In the Declaration, Mathison applies photogrammetry principles to still images captured from video after the train came to a stop, comparing the light reflecting off of sign posts, and then opines about the aiming of the headlights. However, the screen capture image Mathison uses in his September of 2018 Declaration is essentially identical to another image, contained in the NTSB's "Event and On-Board Image Recorders Group Chairman's Factual Report," which was issued on April 5, 2016, and published on November 23, 2016.

The Intervenors argue that the new Declaration is simply an elaboration of the principles which Mathison used in his April report, and that Amtrak has no grounds for complaint, because the additional analysis was required after it produced additional footage of the locomotive video after the Magistrate Judge's Order of June 29, 2018. In

---

[11] "A supplemental expert report that states additional opinions or rationales or seeks to strengthen or deepen opinions expressed in the original expert report exceeds the bounds of permissible supplementation and is subject to exclusion under Rule 37(c).'" *In re Cessna 208 Series Aircraft Prod. Liab. Litig'n*, No. 05-1721-KHV, 2008 WL 4937651, *2 (D. Kan. Nov. 17, 2008) (internal quotation and citations omitted). Nor may Fed.R.Civ.P. 26(e) "be used to provide an extension of the expert report deadline or sandbag one's opponent with issues that should have included in the original report." *Spirit Aerosystems, Inc. v. SPS Tech.*, No. 09-1144-EFM, 2013 WL 6196314, *7 (D. Kan. Nov. 27, 2013).

[12] The Third Scheduling Order (Dkt. 348) required Intervenors' expert reports by March 30, 2018 (later modified to April 2, 2018), and all expert discovery was to be completed by May 7, 2018. The subsequent Fourth Scheduling Order (Dkt. 396), which provisionally allowed Intervenors to include headlight claims in the Pretrial Order, gave no permission for Intervenors to supplement their expert's reports. To the contrary, the Order referenced the Intervenors' prior April 2, 2018 expert report, and expressly gave the right "to serve rebuttal or supplemental expert reports" until Jul 9, 2018, and then *only to the railroad plaintiffs*. *Id*. at 4. There is nothing in the record to suggest that Intervenors ever sought leave to supplement Mathison's April 2 report. *See* Dkt. 448, 461.

response to the Amtrak's argument that while the still image used in the Declaration might be similar to previously available still images, Mathison was only able to complete his analysis once Amtrak had produced the video footage with a non-oscillating pattern of light. (Dkt. 500, at 8).

These representations are not correct. The new Declaration addresses a wholly new subject, expressing opinions as to the sufficiency or aiming of the headlights, which was not contained in the original report. That earlier report contained no discussion of the requirements of § 229.125; Mathison now contends the Amtrak headlight fails to comply with that regulation. The video produced in July provides no justification for Intervenor's actions. First, as noted, Intervenors made no attempt to obtain leave to supplement Mathison's report. Rather, they once again ignored the letter and purpose of discovery and disclosure deadlines, unilaterally offering a new expert report long after the deadline and after their opponent filed its summary judgment motion. Second, as Amtrak documents in its Reply (Dkt. 516, at 6-8), the representation is simply false. On October 26, 2017, Amtrak supplied to Intervenors video which included footage showing the scene after the oscillating light had stopped. The Intervenors have failed to identify information which was not available at the time of the April 2 report, and the court excludes Mathison's Declaration pursuant to Rules 26 and 37(c).

The court finds that the opinions expressed in Mathison's September Declaration also should be excluded under Rules of Evidence 702 and 703. Mathison has education and training in engineering design and computer graphics, and experience in land use

surveys and computer imagery. But he has no demonstrated education, training, or experience to support the opinions offered here.

The problem is not, as Intervenors suggest in their cursory discussion of the issue of reliability (Dkt. 500, at 25-27) that Mathison did not "use[] his specialized knowledge to create a 3D model" that was "meticulously created," or that in doing so he failed to utilized "photogrammetry principles and a computer program called Lightwave 3D" to generate that model. Photogrammetry is simply "the science of measurement from photographs," *O.M.I Corp. of America v. Kelsh Instrument*, 173 F.Supp. 445, 447 (D. Md. 1959), and certainly may be applied in a given case to produce an accurate 3D model of an accident scene, based on reliable angular and linear measurements.

Rather, the issue is the Intervenors have done *nothing* to show that Mathison's model produces reliable measures of illumination in the present case.[13] Mathison has no education, training, or experience in locomotive headlights or their use. He has no particular training or expertise in the methodology he employs here — estimating the amount of light generated by the headlight based on his own subjective impression of the brightness of light poles to the north of the track. Based on that estimate of the reflected light from those poles, he then estimates how much light was generated ahead of the locomotive.

---

[13] Intervenors stress that plaintiff BNSF previously employed Mathison to provide expert testimony in a separate action, *Belisle v. BNSF*, No. 08-2087-EFM (D. Kan.). But that action did not address the question of whether a locomotive headlight complied with federal regulations for viewing track conditions, so the scope of § 229.125 was never in issue. Rather, that case addressed whether the train was visible to a pedestrian. Relying on an illumination study by a different expert, Mathison reconstructed the scene of the accident.

Mathison has identified no prior use of this method by any person, there has been no demonstration that it would likely render reliable results. As it is entirely based on his own novel approach (used only in this case in his role as a retained expert witness) and his subjective impression of the brightness of the poles, based on the grainy black-and-white video, Mathison's method cannot be tested for its accuracy. The record indicates that Mathison has not attempted to document that his method generates accurate estimates of luminosity along the track's centerline. The Intervenors have not shown this approach is supported by general acceptance in the relevant community, and have not identified any publications or peer-reviewed authority for this approach.

To the contrary, the other evidence in the case indicates that such estimates are not reliable. Cimarron's expert Nightenhelser explicitly testified that the video is seriously degraded, and is "[n]ot anywhere near" to "what the crew would have seen with their eyes." The Intervenors themselves made the same point when asking for leave to physically inspect Amtrak's locomotive; such inspection was necessary, they wrote, because the video "does not … accurately depict what the engineer and student engineer would actually be viewing as they approached the defect [because] the locomotive video is such a poor quality."

As discussed below, the court finds that Mathison's methodology is inconsistent with the standard established by § 229.125, which contains specific requirements for brightness and aiming locomotive headlights. And as discussed below, the FRA has adopted these requirements after rejecting as subjective and imprecise the requirement that headlights allow the crew to "see" a person at 800 feet. Yet this is precisely the

approach that Mathison incorporates into his understanding of the rules, stating in his deposition that "you're supposed to be able to see a person 800 feet away."

The court also finds that Mathison's opinions have not been demonstrated to be reliable to the extent they are premised on his relative assessment of different locomotive videos taken at different times. In his analysis, Mathison compares video taken from a BNSF locomotive that passed through the derailment site with video captured by the Amtrak locomotive. However, in his deposition, Mathison testified he does not know what type of headlamps the BNSF locomotive was using. While he has seen studies addressing about the spread pattern of locomotive headlamps, he has not looked at such documents in this case. He also understands that a candela reading would be dependent upon the angle at which the light reading is taken, and testified that at just 7.5 degrees off centerline, the light, measured in candela, could fall off substantially from 200,000 to 3,000. At 20 degrees, the light would fall off from 200,000 to 400. The farther outside of the centerline, the more the light fall-off.

He further testified that the headlamps needed to satisfy the requirements for auxiliary ditch lights are the same as those that pertain to the locomotive headlights. Auxiliary lights may be aimed horizontally up to 15 degrees off the longitudinal centerline of the locomotive. He agrees that if the auxiliary lights were aimed off center, the intensity of those ditch lights also would be directed off center.

Aligning the lights off center would provide greater illumination off to the left and off to the right of the tracks, meaning that light from the auxiliary ditch lights would be cast considerably farther to the side than the headlights would be.

Mathison does not know what kind of ditch light equipment or lamps the BNSF locomotive had, or how the auxiliary lights on the BNSF locomotive were aimed or if they can be aimed. He does not know what lamps were in use on the Amtrak locomotive at the time of the derailment, or how they were aimed.

Mathison also has not tried to find out which lights in the video are attributable to which of the lamps, *i.e.*, the headlamps versus the auxiliary ditch lights. He agrees some of the light shown on the video could be from the auxiliary ditch lights, and that, if the BNSF train used ditch lights with a 200,000 candela lamp aimed 15 degrees off center, that would tend to illuminate things off to the left and right more than if they were aligned down the center of the track.

Aiming the ditch lights off-center would also increase the visibility of objects off the track itself. If the auxiliary lights were aimed to the right and to the left, that would increase the visibility of things off the track itself such as the poles that Mathison used for his lighting analysis.

Mathison testified that if there are two headlamps on the Amtrak locomotive headlights, with one correctly aimed down the track and one aimed slightly to the left, it would appear that there was a left bias. He agrees that is one explanation for the light spread that he saw.

Mathison testified that the black-and-white Amtrak video was shot just after midnight, when there was no ambient light; the only light that illuminated objects was that coming from the locomotive or possibly a passing automobile. The BNSF locomotive

video was taken somewhere in civil twilight, when there would be ambient light available that would allow one to see objects even without the headlight.

Mathison testified that BNSF video recorder has a higher definition than the Amtrak recorder. Because of the better camera, there is more detail in the BNSF locomotive video than the Amtrak locomotive video. According to Mathison, videos shot during lower lighting conditions will create more grain and noise. He also testified that there could be variations between the camera equipment on board the respective BNSF and Amtrak locomotives, that aspects of the camera, including the lens, the sensor, and the dynamic range, would affect the quality of the image captured.

Given these circumstances, the court will exclude Mathison's comparative video assessment. The comparison addresses different videos from different locomotives, taken at different times under different light conditions, using different cameras with different quality recordings. Mathison agrees that the angular setting of ditch lights may greatly vary the amount of light sent forward, but has no knowledge of the type of headlights or ditch lights on either train, or the angle at which the ditch lights may have been set.

Finally, the court will exclude Mathison's additional conclusion the Amtrak headlight was misaligned, because the locomotive video shows greater brightness just to the left of the centerline. Again, this is not an opinion grounded on any expertise of the expert, but a matter which each juror could judge for him or herself. Moreover, nothing in § 229.125 requires absolute symmetry of illumination for dual lamp headlights. As discussed below, the regulation provides that in the case of dual lamp headlights using the type of lamp used here by Amtrak, the crew need only keep a single lamp lit. Here,

the slightly greater brightness on to the left could simply be caused by the use of both forward lamps, in which the second was aimed slightly left of center. Such a headlight would still be compliant with § 229.125 as to brightness and aiming of the first lamp. In his deposition, Mathison admitted this alternative explanation could explain the observed brightness on the left.[14]

---

[14] The court notes the "supplemental" memoranda filed by plaintiffs (Dkt. 492, 495) and Intervenors (Dkt. 506, 507) relating to Loumiet and Blackwell. Rather than true supplemental memoranda, the briefs appear to be *Daubert* motions, though not denominated as such on the court's docket, seeking to exclude opinions of these experts *at trial*. One memorandum clearly "address[es] the remaining opinions [of Loumiet] that Intervenors may offer should the case proceed to trial." (Dkt. 492, at 1-2). The second expressly incorporates the arguments from the motion to strike Blackwell, but is directed to the "testimony Intervenors are expected to proffer" from Blackwell. (Dkt. 492, at 6).

To the extent that supplemental memoranda are *Daubert* motions addressing potential trial testimony, they appear moot in light of the court's conclusions in this Order. To the extent that they are taken as "supplemental" support for the original motions to strike, the court notes such briefing is disfavored. The motions to strike these experts were already fully briefed. Unlike the true supplemental briefs relating to Colon Fulk, which address his opinions as they relate to the headlight claims advanced in the Pretrial Order *after* the first round of motions to strike, the parties have shown no substantial rationale for repetitive briefing as to Loumiet and Blackwell's summary judgment opinions.

For a motion before the court, D.Kan. 7.1(c) authorizes the filing of an accompanying memoranda, a response by the nonmovant, and a reply. Otherwise the rule limits supplemental materials to brief notations of supplemental authorities. Rule 7.1(f). An additional supplemental brief filed by a nonmovant is of course a surreply, which is heavily disfavored, and may be submitted only with leave of court. Such leave is granted only in "exceptional circumstances compelling the filing of such a pleading." *IMC Chemicals v. Niro*, 95 F.Supp.2d 1198, 1214 (D.Kan.2000).

Nevertheless, for purposes of clarity the court notes that it has reviewed the supplemental memoranda as to Loumiet and Blackwell, and finds the same result applies for their opinions, whether those cited in opposition to summary judgment or those which might be introduced at trial — the opinions are subject to exclusion because they seek to impose burdens contrary to law and because they have not been shown to be reliable under Rule 702.

## Conclusions of Law

### Summary of FRSA

Under the FRSA, Congress mandated that "[l]aws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106. To achieve this aim, the FRSA preempts state laws relating to railroad safety to the extent a federal regulation or order covers the same subject. Thus, the Act provided:

> A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation, or order—
>
> (1)  is necessary to eliminate or reduce an essentially local safety hazard;
>
> (2)  is not incompatible with a law, regulation, or order of the United States Government; and
>
> (3)  does not unreasonably burden interstate commerce.

The Supreme Court addressed "the pre-emptive effect of FRSA on negligence suits against railroads" in *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). Noting the dangers of "unintended encroachment on the authority of the States," the Court observed that "pre-emption will not lie unless it is 'the clear and manifest purpose of Congress.'" *Id.* at 664 (*quoting Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). The FRSA, as noted earlier, permits state action where there is no federal regulation "covering" the

77

same subject, or the state seeks to protect against an "essentially local safety standard." Because "the term 'covering' is … employed within a provision that displays considerable solicitude for state law," the *Easterwood* Court held that for purposes of preemption, federal regulations "cover" a subject only when they "substantially subsume the subject matter of the relevant state law," and not when they merely "'relate to'" or "'touch upon'" the subject area. 507 U.S. at 664.

Applying this standard to the plaintiff's claim that the defendant railroad operated at an excessive speed, the Court determined that the claim was preempted because, read in context, federal regulations covered the issue of maximum speed:

> On their face, the provisions of [49 C.F.R.] § 213.9(a) address only the maximum speeds at which trains are permitted to travel given the nature of the track on which they operate. Nevertheless, related safety regulations adopted by the Secretary reveal that the limits were adopted only after the hazards posed by track conditions were taken into account. Understood in the context of the overall structure of the regulations, the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation of the sort that respondent seeks to impose on petitioner.

*Id*. at 674. Nor could the plaintiff escape preemption by arguing that train's speed was negligently operated at excessive speed given "essentially local" conditions, because "[t]he common law of negligence … provides a general rule to address all hazards caused by lack of due care, not just those owing to unique local conditions." *Id*. at 675.

In 2007, Congress amended the FRSA to give "Clarification regarding State law causes of action" by adopting a new subjection (b) to § 20106. The new provision states:

> Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party —

(A)   has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;

(B)   has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or

(C)   has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2).

"The 2007 amendment is narrow in scope; it was designed to preserve state law causes of action where railroads were not in compliance with federal law." *Veit, ex rel. Nelson v. BNSF*, 249 P.3d 607, 620 (Wash. 2011) (*en banc*). Similarly, the clarification "does not save *all* state law claims based on internal rules and standards … only those claims based on a 'plan, rule, or standard *that it created pursuant to a regulation or order issued by either of the Secretaries.*'" *Id*. (adding emphasis, quoting 49 U.S.C. § 20106(b)(1)(B)). *See also Murrell v. Union Pac. R. Co.*, 544 F. Supp. 2d 1138, 1148 (D. Or. 2008).

This court has recognized that whether a claim is preempted under the FRSA is controlled by two questions:

First, the court asks whether the defendant allegedly violated either a federal standard of care or an internal rule that was created pursuant to a federal regulation. If so, the plaintiff's claim avoids preemption. If not, the court proceeds to the second step and asks whether any federal regulation covers the plaintiff's claim. A regulation covers — and thus preempts – the plaintiff's claims if it substantially subsumes the subject matter of that claim, relying on precedent including cases that predate the 2007 amendment.

*Stonebarger v. Union Pac. R.R.*, 76 F.Supp.3d 1228, 1241 (D. Kan. 2015) (citations and internal quotations omitted).

## Amtrak's Motions for Summary Judgment

At the time Amtrak filed its original motion for summary judgment, the Intervenors had advanced some sixteen claims of fault against the carrier. When the final Pretrial Order (Dkt. 461) was entered, half of these claims were discarded. The Pretrial Order does not include any claim that Amtrak was at fault for failing to stop for an "essentially local safety hazard," for failing to issue a slow order for the area of the accident, for failing to reduce speed because the headlight was defective, or for operating the train without ditch or auxiliary headlight. The Pretrial Order also drops any claims by the Intervenors of inadequate training or claims grounded on the contention that the train's headlight was mistakenly set on dim.

Instead, the Intervenors raised eight claims of fault against Amtrak, and eleven claims of fault against BNSF. The Intervenors allege that Amtrak is at fault for (1) failing to keep a proper lookout, (2) failing to slow the train to avoid a specific, individual hazard, (3) failing to report a defective headlight, (4) operating the train with a defective headlight, (5) not immediately applying brakes, (6) braking while over the misalignment, (7) failing to exercise the highest degree of care required of common carriers, and (8) negligently causing damages as a common carrier.

The last two of these claims allege violations of Kansas statutory duties imposed on common carriers (K.S.A. 66-176 and 66-234, respectively). The two defective headlight claims, both premised on an alleged violation of 49 C.F.R. § 229.125, were added to the

Pretrial Order over the plaintiffs' objection. The plaintiffs have submitted a separate motion for summary judgment on the new headlight claims, as well as a motion challenging the decision of the Magistrate Judge to present such claims in the Pretrial Order.

To some extent, many of the remaining claims overlap, essentially contending that a train crew operating with due care would have seen the misalignment and avoided the accident by prompt braking. Alternatively, the Intervenors allege the crew was negligent because they should not have braked at all once they crossed the misalignment. The court finds that the claims of fault by Cimarron and the Intervenors against Amtrak are (1) unsupported by the facts, (2) attempt to impose duties in excess of that required by federal law and are thus preempted, or (3) both.

The court will first address the claims of excessive speed and inadequate training. Claims of "excessive speed" are no longer explicitly advanced against Amtrak in the Pretrial Order by the Intervenors (Dkt. 461, at 15-16), and they are not mentioned by Cimarron in its enumeration of its defenses (*id*. at 20-22). It simply complains that Amtrak was "negligent," identifying in particular only the allegations that the headlight was defective, and that the train crew was not keeping a proper lookout. However, in its factual contentions narrative, Cimarron does assert that Amtrak "failed to train or otherwise instruct its employees with respect to the track over which they were operating … and failed to advise as to the condition of the subject track." (*Id*. at 10). It also asserts as a fact that "Amtrak was negligent in failing to train its employees with respect to the proper operations and braking of trains." (*Id*.) Moreover, Cimarron claims that Amtrak

81

knew of the track conditions yet "failed to take steps to operate the train at a safe speed," and that "the derailment would not have occurred [if Amtrak']s employees operated the train at a safe speed." (Dkt. 461, at 10).

Thus, in the following section the court will address the claims of excessive speed and inadequate training before turning to those of failure to maintain a proper lookout, failure to brake ahead of the misalignment, and braking while over the alignment.[15]

The court finds that any claims of excessive speed against Amtrak are preempted by the FRA. At the time of the derailment, the Amtrak train was travelling at 60 miles per hour on Class 3 track, a speed permitted by 49 C.F.R. 213.9. Any suggestions that Amtrak was negligent in operating the train at an excessive speed (or expressed conversely as failing to slow the train) are preempted by federal law. *See Seyler v. Burlington N. Santa Fe Corp.*, 102 F. Supp. 2d 1226 (D. Kan. 2000).

Under the facts of the present case, the claim that Amtrak should have slowed the train to avoid a "specific, individual hazard" does not offer any basis, by itself, for

---

[15] Intervenor's claims under K.S.A. 66-176 and 66-234 provide no separate basis for assessing fault against Amtrak. The first statute simply authorizes an award of actual damages and attorney fees against common carriers violating "provisions of law for the regulation of public utilities or common carriers." *See Dietz v. Atchison, Topeka & Sante Fe Ry. Co.*, 16 Kan.App.2d 342, 823 P.2d 810, 815 (Kan.Ct.App.1991); Order of March 29, 2017 (Dkt. 150) (recognizing general right of action against railroads). The second statute authorizes a right of action for negligence against railroads. *See Saliba v. Union Pacific R. Co.*, 264 Kan. 128, 132, 955 P.2d 1189 (1998) (railroads are not insurers under K.S.A. 66-234, which requires that railroads "exercise due care"). Both statutes simply impose a general duty of due care. *See Connolly v. Samuelson*, 671 F.Supp. 1312 (D. Kan. 1987) ("Common carriers are required to use the highest degree of skill, care and foresight"); *Shirley v. Glass*, 297 Kan. 888, 901, 308 P.3d 1, 9 (2013) (Kansas "highest degree of care" cases reflect "nothing more than particularized applications of general tort principles," under which "the law requires one to be as cautious as reasonably possible when dealing with an object that has obviously lethal capabilities," and that ultimately "the standard is always one of 'reasonable care'"). Neither statute sets forth any independent, specific duty for train crew training, headlights, speed, or operation which would survive federal preemption. The specific claims of fault advanced against Amtrak, discussed in the body of the court's opinion, all involve matters subject to specific federal regulations.

escaping preemption. In *Easterwood*, the Supreme Court recognized that federal preemption may not apply if a railroad fails to properly operate in light of an "essentially local condition" (which is not alleged in the Pretrial Order) or fails "to slow or stop a train to avoid a specific, individual hazard." 507 U.S. 658, 675 n. 15 (1993).

A specific, individual hazard is "a unique occurrence which could lead to a specific and imminent collision," rather than a generally dangerous condition. *Hightower v. Kan. City S. Ry. Co.*, 70 P.3d 835, 847 (Okla. 2003). The exception almost always relates to the "avoidance of a specific collision." *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 640 (5th Cir. 2005) ("A condition that can be or is present at many, or most sites cannot be a specific, individual hazard."). "Imminence and specificity are crucial components of the specific, individual hazard exception to preemption." *Partenfelder v. Rohde*, 356 Wis.2d 492, 850 N.W.2d 896 ,900 (2014).

That the Amtrak train was travelling in middle of the night along otherwise dark countryside does not create a specific, individual hazard, since such conditions are "capable of being taken into account by the Secretary and are covered by the federal speed regulations." *Myers v. Missouri Pac R*.R., 2002 Ok. 60, 52 P.3d 1014, 1028 (2002). Thus, "ordinary visibility restrictions … do not constitute 'specific individual hazards' that may create an exception to preemption." *Seronde v. BNSF Ry.*, 2015 WL 1516534, *2 (Ariz. Ct. App. April 2, 2015) (citing cases). A specific hazard presents an imminent risk of collision once the train crew can perceive it. *See Partenfelde*r, 850 N.W.2d at 522 (hazard "did not arise until Monica's van was visible to the train crew").

Here, the nonmovants' claim of failure to slow for a specific, imminent hazard is entirely contingent upon their separate factual assertion that the misalignment was visible to the crew at a distance which would have allowed them to stop the train. As the court discusses elsewhere in this opinion, there is no *reliable* evidence that the misalignment was visible at that necessary distance. To the contrary, at the end of the day all of the reliable evidence is consistent with the locomotive video evidence—the misalignment appears out of darkness approximately 300 feet ahead of the train, giving the crew about two seconds to react.

Next, the court finds that the inadequate training allegation advanced by Cimarron is subject to summary judgment. Such claims are subject to FRA preemption in light of 49 C.F.R. Parts 217, 240, and 242, which provide comprehensive and specific regulations as to train crew qualifications and training. Cimarron has failed to show that Amtrak has violated any specific federal regulation governing the training of locomotive engineers, and all training claims are preempted. *See., e.g., BNSF Ry. Co. v. Doyle*, 186 F.3d 790, 796 (7th Cir. 1999). In fact, it is uncontroverted that the Amtrak crew was properly trained and certified.

The suggestion that the crew should have received some different training is an allegation of negligence which is preempted by federal law. *See Carter v. National Railroad Passenger Corp.*, 63 F.Supp.3d 1118, 1155-57 (N.D. Cal. 2014). Moreover, to the extent that the suggestion rests on the opinion of Intervenor expert Colon Fulk, the untimely and recent expansion of Fulk's opinion in response to Amtrak's motion for summary judgment violates Rule 26(a)(2) and is excluded. Fulk's original report was a purely

conclusory observation that the crew had not been trained on "locomotive safety, track impacts or emergency braking" and that such training is "extremely important."

Fulk made no mention of the actual requirements of federal regulations as to training, or explain what Amtrak's training failed to comply with regulatory standards.

Fulk's deposition clarified his inability to address the issue. He acknowledged that Amtrak trains its engineers according to a specific written plan that it submits to the FRA under Part 240. He has never seen Amtrak's submission under Part 240 and does not know what its contents are, and does not know if Amtrak complied with the FRA submissions for its engineer in this case. Fulk has no grounds for disputing the fact that Montanez was properly certified as a locomotive engineer.

While Fulk has suggested that Amtrak's training material should have contained additional materials, he acknowledges he has not seen training materials from any railroad that includes the kind of training that he advocates. He has not identified railroad rules or recommendations from the FRA or NTSB suggesting that locomotive engineers not apply emergency brakes when encountering a kink or misalignment of track.

Given this background, the court excludes the Fulk's untimely declaration under Rule 26(e)(1). And, to the extent Cimarron might invoke the generic "take the safe course" recommendations in the General Code of Operating Rules cited by Intervenors, summary judgment remains appropriate. Such internal operating policies are insufficient to avoid the preemption of inadequately training claims. *See Ryder*, 2017 WL 4364419, at *9.

The claims of inadequate lookout by the nonmovants, to the extent these are independent of their new, defective headlight claims, require some evidence that the

crew could have seen the misalignment in time to stop the train, given the actual headlight used on the locomotive and the resulting actual level of visibility available to the crew. Because Cimarron and the Intervenors have failed to provide evidence of actual visibility, summary judgment is appropriate as to the claims of inadequate lookout or failure to stop the train prior to crossing the misalignment. *See Nye v. CSX Transp.* 437 F.3d 556, 567 (6th Cir. 2006). A full review of the voluminous material submitted to the court fails to demonstrate that misalignment was actually visible to the crew at a distance of 800 feet. Contrary expert evidence cited by Cimarron and the Intervenors is, for the reasons otherwise discussed in this Order, unreliable and also properly excluded under Rules 26 and 37.

Indeed, those same experts support the conclusion that the track misalignment was not visible at the distance required to stop the train. Fulk stated in his original report that the crew could not see the misalignment in time to stop. Loumiet declined to express an opinion about the issue. And Nightenhelser expressly testified that, the given "the lights as they were" he "can't tell you" whether the crew could have seen the misalignment at 800 feet.

This absence of reliable proof of visibility at 800 feet is entirely consistent with evidence from (1) the Intervenors' own expert Mathison, who stated that the headlight showed the misalignment at 310 feet, (2) the testimony of each member of the locomotive crew, who indicated that the misalignment appeared immediately before or within two seconds of the moment train crossed the misalignment, and (3) the NTSB's factual finding that an object on the tracks would have been visible at a distance of 381 to 403 feet.

Finally, the court grants Amtrak summary judgment as to the claim that the crew was negligent in applying brakes after the train had crossed the damaged tracks, rather than trying to "ride out" the misalignment. This conclusion is appropriate for two reasons.

First, there is no reliable evidence to support the theory. The claim is entirely grounded on Fulk's opinion, which the court discusses elsewhere in this Order, that this is the safest course. Fulk is proffered as an expert solely on the basis of his experience, but he has no experience in observing track misalignment at night; he has come across two misalignments during the day, and only detected them at relatively short distances. Moreover, Fulk is not qualified to reliably opine on the course of action that he now claims Amtrak's engineer Montanez should have made on the night of the accident: that is, deliberately deciding *not* to apply the trains brakes. He has cited no studies, data, or reports which recommend such an approach. Montanez's attempt to stop the train was consistent with Amtrak's rules, and was not negligent.[16]

Even assuming Montanez was negligent in attempting to stop the train, there is no competent evidence that this braking caused the derailment. Fulk is a locomotive, not a

---

[16] The failure of Intervenors to provide any support *for* Fulk's suggested policy of not braking (beyond his own *ipse dixit*) is fatal in itself, but the court further notes that there are obvious reasons *against* such a policy which a railroad might reasonably consider. That is, even assuming there was some added marginal chance of derailment by braking, that must be balanced against the greatly increased damage which would because if the derailment occurs anyway and the train has not been slowed. Cimarron and the Intervenors have supplied no reliable evidence for the fact finder to fairly judge the decision to apply emergency braking. It is uncontroverted the FRA, which closely regulates train operation and speed, has issued no advisory for how a crew should brake when faced with a misalignment. The claims of improper emergency braking are thus both preempted and lacking in evidentiary support.

physical, engineer testifying on the basis of his experience. Fulk has no experience with braking causing a derailment, has performed no analysis of how the various physical forces on the train would have affected it chances of avoiding derailment, and is not qualified to address the issue of causation.

Intervenors' expert James Loumiet has proffered testimony as to the braking distance required to stop a train. But his report lacks any analysis showing the effect of braking on derailments, and candidly admitted, when asked if Ms. Montanez would have avoided derailment by not braking, "That, I can't tell you."

Based on all of the evidence in the action, the court concludes that any claims of fault against Amtrak for failure to maintain a lookout, failure to stop the train, or for applying emergency brakes are properly dismissed.

### Conclusions of Law: Headlight Claims

Amtrak's duty of care with respect to the train headlights is defined by 49 C.F.R. § 229.125. *See Gleason v. Soo Line R. Co.*, 1999 WL 33656833, *6 (N.D. Iowa, Jan. 12, 1999) (finding claims of inadequate train lighting "fall squarely within this preempted field"); *Gould v. Norfolk Southern Corp.*, 1998 WL 35881612, *4 (S.D. Ind. Sept. 30, 1988) ("This Court's review of the case law confirms the railroad's position that claims that the railroad should have installed different lighting, horns and bumpers are preempted" by regulations including § 229.125); *Smith v. Norfolk and Western Ry. Co.*, 776 F.Supp. 1335, 1342 (N.D. Ind. 1991) ("federal law preempts the claim that the train's headlight was inadequate"). *See also Springston v. Consol. Rail Corp.*, 130 F.3d 241, 245 (6th Cir. 1997);

*Marshall v. Burlington N., Inc.*, 720 F.2d 1149, 1154 (9th Cir. 1983); *Estate of Strandberg v. Chicago, Cent. & Pac. R. Co.*, 284 F. Supp. 2d 1136, 1144 (N.D. Iowa 2003). To the extent Cimarron or the Intervenors attempt to increase Amtrak's duties as to the headlight beyond that defined by § 229.125, such claims are preempted by the FRSA, 49 U.S.C. § 20101 *et seq.* and the Locomotive Inspection Act, 49 U.S.C. § 20701 *et seq.*

The regulation is "precise," providing "specific and adequate specifications for headlights" by giving "a specific power amount for the headlights" and "a minimum illumination distance." *Oglesby v. Delaware and Hudson Ry. Co.*, 964 F.Supp. 57, 62 (N.D.N.Y. 1997), *rev'd on other gds.*, 180 F.3d 458 (2nd Cir. 1999).

As to the first of these requirements, brightness, Section 229.125(a) provides:

> Each lead locomotive used in road service shall illuminate its headlight while the locomotive is in use. When illuminated, the headlight shall produce a peak intensity of at least 200,000 candela and produce at least 3,000 candela at an angle of 7.5 degrees and at least 400 candela at an angle of 20 degrees from the center line of the locomotive when the light is aimed parallel to the tracks.

As noted earlier, the FRA Compliance Manual recognizes that certain types of lamps satisfy the standards of the regulation. Further, 49 C.F.R. § 229.125(a)(2):

> The following operative lamps meet the standard set forth in this paragraph (a)(2):   A *single* incandescent PAR–56, 200–watt, 30–volt lamp; a single halogen PAR–56, 200–watt, 30–volt lamp; a single halogen PAR–56, 350–watt, 75–volt lamp; two incandescent PAR–56, 350–watt, 75–volt lamps; or lamp(s) meeting the intensity requirements given above.

(Emphasis added). Here, Amtrak's train had two PAR-56, 200-watt, 30-volt bulbs, meeting the regulatory standard. By its explicit terms, the regulation mandates only a single lamp of that type.

With respect to aiming, § 229.125(a) provides that "Each headlight shall be aimed to illuminate a person at least 800 feet ahead and in front of the headlight."

Both the brightness and aiming standards provide objective standards for headlight performance. The brightness standard reflects a modification of the prior requirement, 49 C.F.R. § 230.231, under which the highlight must

> enable a person in the cab of such locomotive who possesses the usual visual capacity required of locomotive enginemen, to see in a clear atmosphere, a dark object as large as a man of average size standing erect at a distance of at least 800 feet ahead and in front of such headlight.

The FRA eliminated this "vague performance standard" in 1980, moving to the "more precise and scientific" current requirement of headlights producing 200,000 candela. See "Railroad Locomotive Safety Standards: Clarifying Amendments; Headlights and Auxiliary Lights," 69 FR 12532-01, 2004 WL 501925, *12534 (March 16, 2004). The modification also eliminated that requirement that a person in the locomotive see the "dark object as large as a man of average size." The current regulation simply requires that the headlight be aimed "to illuminate a person" at 800 feet.

While ostensibly acknowledging the controlling standard of § 229.125, (Dkt. 474 at 24; Dkt. 476, at 20), Cimarron and the Intervenors repeatedly seek to evade it by adding to Amtrak's duties with respect to the headlight, suggesting, for example, a duty by the train crew to report a defective headlight. Even setting aside the fact that the headlight was not defective, the suggestion is an attempt to evade federal preemption by importing common law negligence duties absent from the regulation. Claims of fault against Amtrak require proof it violated a federal duty of care. 49 U.S.C. § 20106(b).

Similarly, Cimarron and the Intervenors focus on evidence suggesting that the headlight might not have illuminated the misaligned tracks at 800 feet. As noted earlier, the runaway Cimarron truck caused an approximate 9-inch shift in the track alignment. Such a horizontal condition on the ground is much more difficult to see than a vertical object the size of a person standing beside the tracks. The argument thus again attempts to modify the amount of visibility required by the federal regulation. *See Gaul v. Consol. Rail Corp.*, 383 Pa. Super. 250, 264–65, 556 A.2d 892, 899 (1989) (rejecting claim headlight was defective for failing to illuminate person lying on the tracks because "nothing in the regulation states that the lights must be angled to illuminate the track bed").[17]

Similarly, the Intervenors suggest that the headlight was defective because its intensity might have dimmed over time, but this is an indirect way of seeking to impose a burden on Amtrak beyond that required by federal regulation The plain language of § 229.125 requires illumination of a specified intensity of 200,000 candela, but also expressly provides two ways a railroad can satisfy the regulation—*either* by installing an enumerated type of lamp or lamps, "*or* [using] lamp(s) meeting the intensity

---

[17] The court further observed:

> Common sense indicates that the regulation was meant to prevent accidents involving the most common activity practiced by human beings along or on railroad tracks, that of walking or crossing. Richard was doing neither, he was recumbent between the tracks. *Under any reasonable construction of the regulation, the headlights of the train were not required to illuminate him.*

383 Pa.Super. at 556 A.2d at 899 (emphasis added).

requirements." § 229.125(a)(2) (emphasis added). The regulation is explicitly disjunctive, and a railroad using an enumerated lamp thus "meet[s] the standard." Included in the enumerated types of lamp is "a single PAR-56, 200-watt, 30-volt lamp." Amtrak's locomotive had two.

Cimarron's expert Nightenhelser believes the Amtrak headlight was defective because it was patterned asymmetrically or because one or more bulbs were "dim or not working properly." First, the suggestion is speculation which is not founded on any admissible evidence. The locomotive video shows the headlamp was in operation before the accident, and the investigation by the Kansas Highway Patrol after the accident found the headlamps operational.

The nonmovants have failed to provide evidence which would show the train headlight was misaligned in a way which would violate the regulation.[18] As noted earlier, the regulation requires illumination of "a person" 800 feet in front of the train, and the regulation should be interpreted consistent with its underlying purpose—determining the illumination of vertical objects the approximate size of a human being, not track or ground conditions at that distance.

---

[18] In light of Amtrak's motions to strike, the court in this Order separately addresses the issues raised by the nonmovant's reliance on the experts Fulk, Nightenhelser, and Mathison. The court here notes that the Intervenors' response also relies on their expert James Loumiet. (Dkt. 484, ¶ 45). But Loumiet is an accident reconstruction expert who provided opinions about the braking distance required to stop the train. He has no demonstrated expertise in lighting or visibility, and cannot reliably speak to the issue of compliance with § 229.125.

To "illuminate" means simply "to supply *or* brighten with light." *United States v. Flores-Fernandez*, 418 F.Supp.2d 908, 913 (S.D. Tex. 2006) (quoting and adding emphasis to MERRIAM-WEBSTER DICTIONARY 257 (1998)). This portion of the regulation explicitly focuses on how the headlight "shall be aimed" rather than its brightness; it does not require that any particular amount or quantum of light reach the person-sized object at 800 feet.          .

Here, the evidence shows that the Amtrak train was illuminating signs at a distance beyond 800 feet. Of course, the nonmovants correctly point out that that "the signs, whistle posts and mile makers visible in the video are retroreflective" while a person is not. (Dkt. 476, at 26). But this misses the point. The signs are not self-illuminating but reflective; to reflect the light back to the locomotive's camera, the signs first must have been *illuminated* by the train headlight.[19]

The text of the regulation is clear. In direct contrast to the explicit *brightness* requirement (200,000 candela generated at the headlight), the aiming requirement does not specify any amount of light which must reach a person 800 feet way. The regulation only requires that the light "be aimed to illuminate a person at least 800 feet ahead of an in front of the headlight." Here, the video unarguably shows that light from the headlight was reaching out, and reflecting from, objects more than 800 feet in front of the train.

---

[19] Intervenor's expert Fulk expresses the same view based on images of the reflective signs. Asked if this shows that "the light is bouncing off those reflectors and coming back" so that "the light's properly aimed," he responded, "Yes. Yes."

The remaining circumstances cited by the nonmovants do not alter this result. They cite the NTSB statement of student engineer Zach Blea as showing that the headlight failed to "illuminate the track at least 800 feet in front of the locomotive." (Dkt. 474, at 21).

Again, however, the regulation measures aiming by illumination of person standing vertically, not by the visibility of track conditions. At this point in his statement, Blea was asked, "How far do you think, do you estimate you could see?" and responded, "I would say probably about three, maybe four car lengths, if that." But Blea was clearly not addressing the issue of aiming or alignment of the locomotive headlights. As noted earlier, the locomotive video demonstrates that the headlights were aimed so that they illuminated vertical objects a thousand feet ahead of the train.

Further, the context of Blea's statement confirms that he was not talking about any illumination of a vertical, person-sized object. In the cited testimony, Blea was asked to explain his prior answer, where the question had been "[w]hen you came up to *the defect on the track*, did you see it for yourself," and answered:

> Yes I did see it. Recalling the event and the few seconds leading up to it, it was dark out. It was clear but it was still---the only *visibility of the track* was within the beam of the headlight.

(Emphasis added). Blea's testimony simply confirms that the train's headlight was properly pointed forward — "the only visibility of the track was within the beam of the headlight." Even if the headlight failed to make the track defect obvious, nothing in Blea's testimony, or any other evidence cited by the nonmovants, demonstrates that a person standing on the tracks would not have been illuminated. Cimarron's expert Nightenhelser expressly admitted that, given the quality of the locomotive video, he

"cannot state whether a person would have been illuminated 800 feet in front of the locomotive."

In summary, Amtrak has established that its train used a headlight which complied with federal regulations as to brightness and aiming. Cimarron and the Intervenors have provided no admissible evidence that the Amtrak headlight did not comply with § 229.125. The court finds that summary judgment is warranted.

Further, even assuming that Cimarron and the Intervenors had some evidence that the train headlight somehow failed to meet the standard of § 229.125, the court would still grant summary judgment as to the new claims because there is simply no admissible evidence that a compliant headlight would have prevented the accident.

The nonmovants have supplied no evidence that a non-compliant headlight caused the accident. The one lighting expert identified by the nonmovants, Nightenhelser, has explicitly disavowed any opinion as to the actual brightness delivered by the Amtrak headlight. There is no evidence as to how the actual headlight so deviated from a § 229.125-compliant headlight that it caused the derailment. There is no factual basis upon which a rational factfinder could reasonably conclude that a different headlight would have allowed the crew to see the nine-inch misalignment and stop the train in time.

The Intervenors suggest that they were frustrated from advancing more reliable evidence of causation because Amtrak prevented them from inspecting the actual locomotive, and "thus have no measurements reflecting the actual aim of the headlights nor the relative intentsity of the light in front of the train." (Dkt. 474, at 32). The court

finds no basis for excusing Cimarron and the Intervenors from demonstrating causation, and instead allowing the factfinder to speculate as to the issue. A careful review of the procedural history of the action fails to show that the nonmovants made any timely request to inspect the actual locomotive. (Dkt. 223, 233, 240). To the contrary, consistent with their explicit (though later forgotten) representation that they were *not* making a claim that the actual headlight was defective (Dkt. 240, at 3), the Intervenors originally asked to inspect only an exemplar locomotive.[20]

As noted elsewhere in this decision, the court finds no error by the Magistrate Judge in permitting the defective headlight claims to be included in the Pretrial Order. But while Intervenors may make such claims, they must support them with reliable evidence, presented in a timely fashion consistent with the Rules of Civil Procedure and with a fair opportunity for the plaintiffs to respond.

For the reasons stated earlier, the court finds the evidence cited by Cimarron and Interventors[21] on the headlight issues to be unreliable and untimely, and grants summary judgment.

---

[20] The Magistrate Judge denied the Intervenors's motion to compel an inspection the scene. (Dkt. 248). Intervenors did not object to this conclusion.

[21] This court grants summary judgment as to both § 229.125 headlight claims advanced by Intervenor—that the crew negligently operated the locomotive with a defective headlight, and that it negligent failed to report the defect. Section 229.125 occupies the field with respect to railroad locomotive lighting, and as set forth above provides for objective standards for such lighting. Amtrak's headlight was compliant with § 229.125.

## BNSF's Motion for Summary Judgment

The primary claims by the Intervenors against BNSF in the Pretrial Order center on the allegation that it violated federal regulatory standards (or internal rules adopted pursuant to federal regulations) when it failed to properly maintain the track, track ballast, and drainage in the general area of the derailment. (Dkt. 461, at 16-19 ¶¶ 1-3, 8) (citing 49 C.F.R. §§ 213.33, 213.103, 213.118-19). Based on these allegations, they further allege that BNSF failed to inspect for these problems, and failed to remediate them. (*Id.*, ¶¶ 4-5, 7) (citing, in addition to the foregoing, 49 C.F.R. §§ 213.1, 213.5, 213.9(b)). The Intervenors also allege (*id.*, at ¶6), without any reference to any violation of federal regulations, that BNSF failed to keep its property in a safe condition, and that its conduct was willful and malicious. (*Id.* at ¶¶ 9-11). In its defenses in the Pretrial Order, Cimarron generically alleges that "Amtrak and BNSF were negligent," but all of its specific allegations of fault (focusing on the headlight and the actions of the train crew) relate to Amtrak alone. (*Id.* at 21).[22]

The court finds that, to the extent Cimarron and the Intervenors have alleged BNSF violated common duties of due care by ignoring an "essentially local safety hazard," these claims are subject to summary judgment. The Pretrial Order makes no such allegation, the specific claims of fault by BNSF all fall within the scope of 49 C.F.R. Part

---

[22] The nonmovants have generally abandoned the previous claim the accident occurred because the crew mistakenly had the locomotive headlight set to "dim." However, in one section of the Pretrial Order, Cimarron asserts that the "one or more of the headlights [was] off or in a very dim state." (Dkt. 461, at 21). To the extent this reflects a continued suggestion that the headlight was set on dim at the time of the accident, the court dismisses it. The uncontroverted facts establish that the locomotive headlights were set on "bright" prior to the derailment, and set to "dim" afterwards to avoid blinding first responders.

213, and the nonmovants have failed to show an applicable Kansas law, regulation or order (as opposed to common law principles of care), *see Easterwood*, 507 U.S. at 673-75, or the existence of a condition which would provide a narrow exception to preemption. *See Duluth, Winnipeg & Pac. Ry. Co. v. City of Orr*, 529 F.3d 794, 798 (8th Cir. 2008) (quoting *National Ass'n of Regulatory Util. Comm'rs v. Coleman*, 542 F.2d 11, 14-15 (3d Cir. 1976)) (hazard must be one "not capable of being adequately encompassed within national uniform standards").

Next, the court finds that summary judgment is appropriate as to Intervenors' general claims that BNSF violated its own internal rules or regulations. The Intervenors have failed to show reliable evidence that such regulations were adopted "pursuant to" federal regulations. As noted earlier, in this context the violation of an internal policy is actionable only if the policy was required by federal regulation. *See Johns v. CSX Transp.*, 210 F.Supp. 1357, 1374 (M.D. Ga. 2016) ("Plaintiff does not point to any federal regulation or order that required Defendant to create the [policy] on which it relies"); *National R.R. Passenger Corp. v. Young's Comm'l Transfer*, 2016 WL 3538226, *10 (E.D. Cal. 2016) ("plaintiff has failed to point to any federal regulations mandating the adoption of those operating policies"); *Murrell v. Union Pacific Railroad Co.*, 544 F.Supp.2d 1138, 1144–51 (D. Or. 2008).

The Intervenors' claims against BNSF accordingly depend upon their contention that the railroad violated various track standards set forth in 49 C.F.R. Part 213. Based on the uncontroverted evidence, the court concludes BNSF did not violate any standard in Part 213. Even if it had, the alleged violation was not the actual cause of the derailment.

Finally, even if a violation occurred which was somehow the cause-in-fact of the derailment, the court concludes the violation was not the proximate cause of the accident.

Part 213 provides a comprehensive and specific scheme for regulating railroad track. The uncontroverted facts do not show any violation of the controlling provisions of Part 213.[23] Section 213.9 provides maximum allowable speeds for various types of track. Section 213.33 requires adequate drainage to support the track roadbed. Section 213.103 provides general obligations with respect to ballast.[24] Sections 213.118 and .119 include provisions for continuous welded rail (CWR) track. And Section 213.233 provides for track inspections.

The evidence shows no violation of the inspection requirements of Part 213. The prior track geometry measurements demonstrate that the Class 3 track at the scene of the derailment was in compliance with 49 C.F.R. §§ 213.51, 213.53, 213.55, and 213.63. BNSF's

---

[23] Several of the provisions cited by Intervenors do not create any specific obligation for railroads. Section 213.1 simply announces the general scope of Part 213, and provides that "the regulations prescribed in this part" should be considered individually and collectively, does not set forth any independent standard of care. Section 213.5 provides a general requirement for corrective actions for track which is out of compliance with other provisions of Part 213. Neither § 213.1 or 213.5 are identified as track safety standards which subject a track owner to civil penalties under 49 C.F.R. Part 213, App. B. These provisions in 213.1 and 213.5 are contingent upon some other violation of Part 213.

[24] Section 213.103 provides:

> Unless it is otherwise structurally supported, all track shall be supported by material which will —
>
> (a) Transmit and distribute the load of the track and railroad rolling equipment to the subgrade;
>
> (b) Restrain the track laterally, longitudinally, and vertically under dynamic loads imposed by railroad rolling equipment and thermal stress exerted by the rails;
>
> (c) Provide adequate drainage for the track; and
>
> (d) Maintain proper track crosslevel, surface, and alinement.

prior inspections complied with 49 C.F.R. § 213.233. The evidence shows that, before Cimarron's truck hit the BNSF tracks, trains routinely passed the scene without incident. A few hours after the truck impact, the very next train to pass derailed. Cimarron's employees made no attempt to alert the railroad, and the court finds no evidence that BNSF knew or should have known of the incident. The court grants summary judgment as to any claim that BNSF violated the inspection duties under Part 213, or that it negligently failed to alert Amtrak to the danger.

The drainage regulation, § 213.9, requires adequate waterflow "under or immediately adjacent to the roadbed." Here the supposedly debris-filled culvert is not anywhere near the point of the derailment. Nor is there any reliable evidence that the water conditions had any effect upon the structure of the roadbed at the point of the derailment.[25]

The claims of inadequate ballast in violation of § 213.103 are equally unfounded. There is no evidence that the track was out of compliance with the regulation prior to the time it was damaged by Cimarron's truck. The regulation requires ballast sufficient to support "the load of the track and the rolling equipment" and to restrain track movement "under dynamic loads imposed by railroad rolling equipment" — that is, the ballast must be adequate to safely allow trains to run on the tracks. The evidence shows, prior to the

---

[25] The Intervenors' attempt to supply evidence of such an effect again illustrates a recurrent lack of care and candor. The Intervenors present the report of Blackwell, who found evidence from a passenger's photograph that there was "pooling water" at the scene "[o]nly a few days after the derailment." In fact, the photograph was taken several months later, as th passenger freely acknowledged in her 2017 deposition that she took the photo months after the accident, a fact confirmed in the digital photo's metadata.

impact by Cimarron's truck, this section of the BNSF track was routinely and safely crossed by trains. Measurements taken after the accident by BNSF show no problem with the ballast, and NTSB investigator Hipskind examined the scene and noted no exception to those measurements. The railroad roadbed and track structure was properly performing the function for which it was intended.[26]

The court finds summary judgment is appropriate as to the contention that BNSF violated an internal policy for CWR track, adopted pursuant to §§ 213.118-19. The Intervenors claim such violation occurred, but present no evidence of what BNSF's internal policy actually provides, or explain how it was violated. Instead, Intervenors simply present a conclusory opinion from Blackwell, who simply asserts his opinion on what the BNSF policy on CWR ought to have been.

The track where the derailment occurred was not CWR. In this area, only two curved sections of track employ CWR. All the admissible evidence before the court establishes that, some months prior to the accident, some spot resurfacing work had been done on the ballast in the general region. There is no evidence that the resurfacing occurred at or even near the CWR curves. Because Intervenors have failed to show BNSF violated any CWR regulations, rules or plans, summary judgment is appropriate. Section 213.9 permitted a 60 mile-per-hour maximum speed for this section of the track, and any

---

[26] In attempt to oppose this conclusion, Intervenors cite a 2014 grant request from the City of Augusta, Kansas, asking for money for track rehabilitation. (Resp. ¶ 92). The cited evidence does not controvert the evidence that the ballast at the scene of the accident was adequate. The request asks for funding for the installation of CWR somewhere along the BNSF subdivision, but there is no indication that the request included the area of the accident. Moreover, the request asks for CWR to replace some sections of joined track replacement, but makes no suggestion that track ballast in the area was inadequate.

attempt to impose duty of care to impose a different speed limited is preempted. *See Murrell*, 544 F.Supp.2d at 1150-51.

Even if BNSF somehow violated any provision in Part 213, the court finds that such violation was not the actual cause of the derailment within the meaning of Kansas law. *See Rhoten v. Dickson*, 290 Kan. 92, 223 P.3d 786, 801 (2010) ("the plaintiff must produce evidence that 'affords a reasonable basis for the conclusion that it is *more likely than not* that the conduct of the defendant was a cause in fact of the result'") (quoting and adding emphasis to *Yount v. Deibert*, 282 Kan. 619, 628, 147 P.3d 1065 (quoting Prosser & Keeton on Torts § 41, pp. 269–70 (5th ed. 1984))). Here, there is simply no proof that standard joined track, supported by compliant ballast, on a roadway with compliant drainage, would not have misaligned when struck by a runaway thirteen-ton truck. Even if there were some deficiency in the ballast or drainage (and there is not), it played no causal role in the accident – the train would have derailed anyway.

Similarly, even assuming that that there had been some resurfacing work on the two CWR curves, speed restrictions would arise only if BNSF failed to properly restore the ballast. But if BSNF had complied with its CWR policy and restored the ballast, no additional speed restriction would apply.  The Amtrak train would still have been travelling at 60 miles per hour, and would still have derailed.

Finally, the court finds summary judgment is proper because Cimarron and the Intervenors have failed to show that any supposed violations of Part 213 by BNSF were the proximate cause of the accident. Under Kansas law, "[t]o prove legal causation, the plaintiff must show it was foreseeable that the defendant's conduct might create a risk of

harm to the victim and that the result of that conduct and contributing causes was foreseeable." *Drouhard-Nordhus v. Rosenquist*, 301 Kan. 618, 623, 345 P.3d 281 (2015). Put another way, proximate cause is

> the cause that in a natural and continuous sequence, unbroken by any superseding cause, both produced the injury and was necessary for the injury. The injury must be the natural and probable consequence of the wrongful act. Individuals are not responsible for all possible consequences of their negligence, but only those consequences that are *probable* according to ordinary and usual experience.

*Hale v. Brown*, 287 Kan. 320, 322, 197 P.3d 438 (2008) (citations omitted, emphasis in *Hale*).

*See also Castleberry v. Debrot*, 424 P.3d 495, 505 (Kan. 2018); *Wilcheck v. Doonan Truck & Equipment, Inc.*, 220 Kan. 230, 552 P.2d 938, 942–43 (1976)).

> The issue of proximate cause typically presents a question of fact for the jury. *Hale v. Brown*, 287 Kan. 320, 324, 197 P.3d 438 (2008); *Zimmerman v. Brown*, 49 Kan. App. 2d 143, 157-58, 306 P.3d 306 (2013). But a district court may decide causation against a plaintiff on summary judgment if the evidence permits no reasonable inference that could support proximate cause. *Siruta v. Siruta*, 301 Kan. 757, 767, 348 P.3d 549 (2015).

*Montgomery v. Saleh*, 55 Kan. App. 2d 429, 453, 419 P.3d 8, 25 (2018).

That is, while Kansas law prefers that the jury resolve "questions of negligence," this preference "is simply the *general* rule," and does not preclude summary judgment where the facts are uncontested. *See England v. Cox*, No. 11-2362-JTM, 2012 WL 3234438, at *3 (D. Kan. Aug. 6, 2012) (granting summary judgment as to issues of negligence *per se* or proximate cause) (emphasis in original). *See also Saviour v. Revco Discount Drug Ctrs.*, 126 F.R.D. 569, 571 (D. Kan. 1989) ("plaintiff's inability to produce evidence regarding

proximate cause warrants summary judgment for defendant"); *Schenck v. Thompson*, 201

Kan. 608, 443 P.2d 298, 306 (1968).[27]

Related to the concept of proximate cause is that of superseding or interving

causation:

> When negligence appears merely to have brought about a condition of
> affairs or a situation in which another and entirely independent and
> efficient agency intervenes to cause the injury, the latter is to be deemed the
> direct and proximate cause and the former only the indirect or remote
> cause.

*George v. Breising*, 206 Kan. 221, 227, 477 P.2d 983 (1970).

Here, the derailment of the Amtrak train was not proximately caused by any

(hypothetical) BSNF violation of Part 213 track standards because the misalignment was

actually caused by an intervening force which Part 213 was not intended to regulate. As

indicated earlier, the track railway ballast standard is explicitly designed to ensure the

track will support the load of railway rolling stock. Similarly, both ballast and drainage

requirements serve to promote safe rail travel. *See Nickels v. Grand Trunk Western, R.R.*,

560 F.3d 426, 428 (6th Cir. 2009).

---

[27] To the extent Cimarron or Inteervenors couch their claims against plaintiffs as violations of negligenece *per se*, that doctrine also incorporates requirements that the evil complained of by the party advocating application of the doctrine be the type of harm the statute or rule was intended to protect against. "To establish a claim of negligence per se, plaintiff must show that (1) defendant violated a statute, ordinance or regulation; (2) the statute was adopted to protect the class of persons in which plaintiff is included and to protect against the type of harm which occurred as a result of its violation; and (3) the alleged violation was the proximate cause of plaintiff's injury." *Holler v. Cinemark USA, Inc.*, 185 F. Supp. 2d 1242, 1243 (D. Kan. 2002). Here, the accident was caused by the Cimarron truck strike, which is not the type of injury which the federal regulations were intended to prevent.

The CWR track provisions serve to ensure safe travel by trains over CWR track when the roadway has been resurfaced. CWR track is given special treatment because of its unique characteristics. See "Track Safety Standards," 63 Fed.Reg. 33994-01, 1998 WL 323079, at *33994 (Oct. 11, 2006) ("CWR is naturally subjected to high compressive and tensile forces which, if not adequately restrained, can result in track buckling or pull-aparts"). As a result, the rules require that railroads develop "procedures which control train speed *on CWR track*." § 213.119(e) (emphasis added).

Here, the accident did not arise because of a defect with any CWR track. The accident arose because a grain truck struck and deformed jointed rail track which, by coincidence, was located in the same area as CWR track.

The provisions of Part 213 cited by Intervenors, including ballast, drainage, and CWR regulations, were not designed to prevent damage to tracks caused by the intervening acts of negligent third parties such as that presented in the present action.

Because Intervenors have failed to present reliable evidence that BNSF violated any unpreempted duty of care established by or pursuant to Part 213, the court also grants summary judgment as to the claims BNSF acted recklessly.

Finally, BNSF argues that Intervenors' claims, to the extent that they rest on Loumiet's opinion that the track road bed should have been constructed differently—as to grade, roadbed, or ballast—are preempted under the Interstate Commerce Commission Termination Act of 1995 (ICCTA), 49 § U.S.C. 10101 *et seq.*

The ICCTA, created the Surface Transportation Board (STB) to regulate rail transportation in the United States. 49 U.S.C. § 10501(a)(1) (2016). The STB has "exclusive

jurisdiction to regulate 'transportation by rail carriers' and 'the construction, acquisition, operation, abandonment, or discontinuance' of rail facilities ... with the instruction that the agency 'ensure the development and continuation of a sound rail transportation system.'" *City of South Bend v. Surface Transp. Bd.*, 566 F.3d 1166, 1168 (D.C. Cir. 2009). The ICCTA provides remedies that "are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b).

The premeemption under the ICCTA is broad; the Act "preempts all state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation." *Adrian & Blissfield R. Co. v. Village of Blissfield*, 550 F.3d 533, 539 (6th Cir. 2008). *See State v. BNSF Ry. Co.*, 2018 WL 5726512, *5-6 (Kan. Ct. App. Nov. 2, 2018) (holdiing the ICCTA preempts Kansas law, K.S.A. 66-273, regulating amount of time standing train might block crossing).

The Act "preempts 'state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation.'" *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 252 (3d Cir. 2007) (quoting *Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324, 1331 (11th Cir. 2001)). A state regulation does not manage or govern rail transportion, and thus is not preempted by the ICCTA, so long as "(1) the law must not discriminate against rail carriage; and (2) the law must not unreasonably burden rail carriage." *Diehl v. CSX Transp.*, 2018 WL 4705781. *5-6 (W.D. Pa. Oct. 1, 2018).

Generally-applicable state tort laws, such as negligence or nuisance, do not target railroads, and thus survive "the first prong of the ICCTA," but are preempted under the second if the remedy would bar the railroad from "undergo[ing] specific construction projects related to its rail operations." *Id*. at *5 (finding negligence and nuisance claims arising from derailment preempted). In contrast, "[a] typical negligence claim seeking damages for a typical crossing accident ... does not directly attempt to manage or govern a railroad's decisions in the economic realm." *Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796, 803–04 (5th Cir. 2011).

The claims relating to the design and construction of BNSF's track roadway are not narrowly-tailored allegations relating to one location; they are broadly-applicable design claims which would require reworking track roadways throughout Kansas in order to render them able to deflect impacts such as that caused by the runaway Cimarron truck. The uncontroverted evidence establishes that such redesign and reworking would cause a substantial economic effect on BNSF. Accordingly, these claims are preempted under the ICCTA. *See Union Pac. Ry. Co. v. Taylor Truck Line*, 2018 WL 1750516, *7-8 (W.D. La. April 10, 2018) (ICCTA preempted claims relating to "the design of the railroad tracks and crossing" which would require "considerable redesign and reconstruction work," to correct).

In light of the uncontroverted evidence, only one party is potentially liable for the damages arising from the derailment — Cimarron.

## Supplemental Matters

The court first addresses the plaintiffs' motion for summary judgment on the issue of a joint venture. Cimarron's claim that Amtrak and BSNF were involved in a joint venture requires proof of "(1) an agreement; (2) a common purpose; (3) a community of interest; and (4) an equal right to a voice accompanied by an equal right of control over the instrumentality causing the injury." *Cullip ex rel. Pitts v. Domann ex rel. Domann*, 266 Kan. 550, 556–57, 972 P.2d 776, 782 (1999) (citing *Gragg v. Wichita State Univ.*, 261 Kan. 1037, 1050, 934 P.2d 121, 131 (1997)). A second party has a right of control an instrumentality if "there is an understanding between the parties that [that party] has the right and is possessed of equal authority to prescribe conditions of use and operation." *Scott v. McGaugh*, 211 Kan. 323, Syl. ¶ 4, 506 P.2d 1155 (1973). Factors supporting a determination of joint enterprise include:

> (1) the joint ownership and control of property; (2) the sharing of expenses, profits and losses, and having and exercising some voice in determining the division of the net earnings; (3) a community of control over and active participation in the management and direction of the business enterprise; (4) the intention of the parties, express or implied; and (5) the fixing of salaries by joint agreement.

*Modern Air Conditioning v. Cinderella Homes*, 226 Kan. 70, 596 P.2d 816, 823 (1979).

The court finds that the uncontroverted facts fail to establish any grounds for concluding that Amtrak and BNSF were involved in a joint venture at the time of the derailment. In its response to the plaitniffs' motion for summary judgment, Cimarron points to no circumstances which would support such a finding. Rather, it complains that the decision of the Magistrate Judge (Dkt. 359) denying its motion to compel production

of the Operating Agreement between Amtrak and BSNF prevented it from obtaining such information. This decision, it alleges, "has frustrated all efforts to establish the joint venture defense." (Dkt. 408, at 10).

This argument lacks merit. The Magistrate Judge denied the motion to compel on March 1, 2018, over two months before plaintiffs moved for summary judgment on the joint venture defense. The Magistrate Judge found that Cimarron's December 29, 2017 motion to compel (Dkt. 304) was untimely. (Dkt. 359, at 4). The court noted that Cimarron had not previously moved to compel after plaintiffs objected to its request for production under D.K.an.R. 37.1(b). In addition, the Magistrate Judge noted other reasons for declining the motion to compel:

> Cimarron's request for production of the Operating Agreement between BNSF and Amtrak is not proportional to the needs of this case. Cimarron claims the Operating Agreement is needed to establish its defense that BNSF and Amtrak were operating as a joint venture for purposes of comparing their fault against Cimarron. However, given the proprietary and confidential nature of the information contained in the Operating Agreement, along with the amount of information in the Operating Agreement that would not be relevant to Cimarron's alleged defense, the Court finds there are less burdensome and more efficient ways for Cimarron to discover information applicable to its joint venture affirmative defense.

*Id.*

Consistent with this history, Cimarron responded to the ruling by inaction. It filed no objection or appeal the Order of the Magistrate Judge. There is no indication that Cimarron undertook alternative means of discovery to support its claim of joint venture. Instead, it waited until after the plaintiffs moved for summary judgment on the joint venture issue to assert error on the part of the Magistrate Judge as to timeliness, stating

that it "fails to see what less burdensome methods of discovery were available." (Dkt. 408, at 15).

A party may object to the decisions of a Magistrate Judge, but "may not assign as error a defect in the order not timely objected to." Fed.R.Civ.Pr. 72(a). Even if Cimarron's current timeliness arguments were not themselves untimely, the court finds no grounds for concluding that the Magistrate Judge's decision was an abuse of discretion. The decision rests on an assessment of the history of the case, and the court finds the Magistrate Judge's decision as to timeliness was fair and appropriate. Further, Cimarron's alternative discovery argument lacks merit, as it focuses solely on the burden of such discovery *to Cimarron*. Cimarron ignores the Magistrate Judge's conclusion that the Operating Agreement incorporates proprietary and confidentialy information belonging to Amtrak and BNSF to which Cimarron was not entitled.

The court finds that plaintiffs are entitled to summary judgment on the joint venture defense.

Next, the court denies plaitniffs' motion seeking to strike the addition of the defective headlight claims (Dkt. 468). The court is not unsympathetic to Amtrak's complaint regarding the last-minute addition of the two headlight related claims to the Pretrial Order, particularly given the Intervenors' previous representation that they were not making any claims the locomotive headlight was defective. However, the Magistrate Judge has discretion to resolve discovery and pre-trial issues, did so in a thorough and appropriate fashion, and her conclusion was not contrary to law. *See Punt v. Kelly Servs.*, 862 F.3d 1040, 1047 (10th Cir. 2017). Having reviewed the entire history of the action, the

court finds the Magistrate Judge properly excercised her discretion, and reached a conclusion consistent with the law. *See Jensen v. Solvay Chemicals, Inc.*, 520 F. Supp. 2d 1349, 1351 (D. Wyo. 2007).

Finally, while the court grants plaintiffs' motions to strike certain expert opinions presented in opposition to the motions for summary judgment, it declines the request that the court sanction the Intervenors pursuant to Fed.R.Civ.P.56(h). The pattern of Intervenors' actions in presenting undisclosed expert opinions is certainly disturbing and presents a very close question. As this court has noted, however, courts rarely authorize affirmative sanctions under Rule 56(h). *See Christenson Media Grp., Inc. v. Lang Indus., Inc.*, No. 10-2505-JTM, 2012 WL 3024707, at *5 (D. Kan. July 24, 2012) (citing *Burdett v. Harrah's Kan. Casino Corp.*, No. 02–2166, 2003 WL 124665, at *2 (D.Kan. Jan. 12, 2002)). In the present case, the court does not find that the cited opinions were submitted in a bad faith, and finds no sanction warranted beyond their exclusion.

The matter accordingly proceeds to trial on liability as to plaintiffs' claims against Cimarron of negligence and gross negligence, trespass, and recklessness under K.S.A. § 21-5809 (Dkt. 461, at 15, ¶ 1-3), and Intervenors' claims of negligence against Cimarron. (*Id*. 461, at 20 ¶1, 2). The present ruling renders moot some of the remaining pretrial motions; the court will address these by separate order. The existing deadline for motions in limine and proposed jury instructions (Dkt. 519) is extended to November 20, and the response deadline to November 26; the parties shall submit revised witness and exhibit lists which take account of this ruling no later than November 23, 2018.

IT IS ACCORDINGLY ORDERED this 14th day of November, 2018, that the court hereby grants plaintiffs' Motions for Summary Judgment (Dkt. 398, 400, 402, 463) and Motions to Strike (Dkt. 432, 436, 438, 478, 480), except that the court denies the request to impose sanctions and for hearing; the court grants the motions of plaintiff BNSF (Dkt. 464) and Intervenors (Dkt. 472) to file video exhibits conventionally, and denies plaintiff's Motion for Review (Dkt. 468). The joint motion for extension of time (Dkt. 504) is granted.

s/ J. Thomas Marten
J. Thomas Marten, Judge